## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARCELOUS PITTMAN, | ) | |
| | ) | Case No. 23-cv-14786 |
| Plaintiff, | ) | |
| | ) | Judge Nancy L. Maldonado |
| v. | ) | |
| | ) | Magistrate Judge Sheila M. Finnegan |
| JOHN HALLORAN, *et. al.,* | ) | |
| | ) | **Jury Trial Demanded** |
| Defendants. | ) | |

## DEFENDANT KARIN WEHRLE'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

Defendant, Karin Wehrle (n/k/a Dooley), answers Plaintiff's Amended Complaint (dkt. #69) as follows:

## INTRODUCTION

1.     Plaintiff, Marcelous Pittman, was wrongfully convicted of a 2001 shooting that he did not commit. Despite his innocence, Plaintiff spent some 19 years incarcerated for this crime until his sentence was commuted and he was released in 2020. Even then, Plaintiff spent more than two years contesting this wrongful conviction before the conviction was vacated and the charges were dismissed.

**ANSWER: Defendant denies the allegations in paragraph 1 of Plaintiff's Amended Complaint.**

2.     Plaintiff's wrongful conviction was no accident. Instead, this conviction resulted from a City of Chicago practice of coercing vulnerable children and young men into adopting coerced, false inculpatory statements that were invented by the police.

**ANSWER: Defendant denies the allegations in paragraph 2 of Plaintiff's Amended Complaint.**

3.      In Plaintiff's case, this practice was perpetuated by some of the City's most notorious and abusive detectives: John Halloran and James O'Brien. These men are responsible for many wrongful convictions. But a number of other, less well-known CPD officers also acted pursuant to the City's unconstitutional practices and committed egregious misconduct to generate false evidence against Plaintiff.

**ANSWER: Defendant denies the allegations in paragraph 3 of Plaintiff's Amended Complaint.**

4.      By 2001, the year Plaintiff was charged with the crimes he did not commit, the City's practice of coercing false inculpatory statements was known and condoned within the "Felony Review Unit" of the Cook County State's Attorney's Office. The former Assistant State's Attorney named in this case—Karen Wehrle—participated in fabricating and submitting the false confession extracted by Defendants Halloran and O'Brien, as well as other false evidence.

**ANSWER: Defendant denies the allegations in paragraph 4 of Plaintiff's Amended Complaint.**

5.      With this Complaint, Plaintiff seeks justice for the constitutional harm caused by Defendants as well as for the other harms and hardships Plaintiff endured as a result of Defendants' actions. Plaintiff also seeks to shed light on the unconstitutional policies and practices of the City of Chicago that caused and perpetuated his wrongful conviction. Some measure of accountability for the wrongs done to Plaintiff is sought with this suit.

**ANSWER: Defendant denies the allegations in paragraph 5 of Plaintiff's Amended Complaint.**

## Jurisdiction and Venue

6.      This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious actions under the color of law and the deprivation of Plaintiff's constitutional rights.

**ANSWER: Defendant admits that Plaintiff filed this action, but denies the remaining allegations in paragraph 6 of Plaintiff's Amended Complaint.**

7.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of the state-law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:  Defendant admits the allegations in paragraph 7 based on the allegations as pled in Plaintiff's Amended Complaint.**

8.      Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's wrongful conviction. In addition, many, if not all, Defendants reside in this judicial district.

**ANSWER:  Defendant admits that venue is proper. Defendant further admits the criminal investigation of Plaintiff, Plaintiff's criminal prosecution, and Plaintiff's criminal trial related to his crimes against Officer Doyle and Vashon Prince occurred in this judicial district. Defendant lacks knowledge or information sufficient to form a belief about the truth of whether Plaintiff, or many (or all) the Defendants reside in this judicial district. Defendant denies the remaining allegations in paragraph 8 of Plaintiff's Amended Complaint.**

## Parties

9.      Plaintiff, Marcellous Pittman, is a 40-year-old employee of a major airline, a community volunteer, and a loving son, brother, and uncle. Plaintiff resides in Chicago and enjoys spending time with family and friends as he picks up the pieces of his life after more than two decades contesting the false charges against him.

**ANSWER:  Defendant denies that Plaintiff was falsely charged with the crimes against Officer Doyle and Vashon Prince. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 9 of Plaintiff's Amended Complaint.**

10.      At all times relevant to the events described in this Complaint, Defendants John Halloran, James O'Brien, Ronnie Lewis, John L. Foster, Eileen O'Donnell, John Henry, P. McCormack (#60045), and James Breen were detectives employed by the Chicago Police Department who were acting under color of law and within the scope of their employment. Unknown Officer Defendants were also employed by the Chicago Police Department and acting under color of law and within the scope of their employment. The Defendant Officers are sued in their individual capacities.

**ANSWER:  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 10 of Plaintiff's Amended Complaint.**

11.      At all times relevant, Defendant Karen Wherle was an Assistant State's Attorney in the Felony Review unit of the Cook County State's Attorney's Office (CCSAO) and was employed by the Cook County State's Attorney's Office. Wherle is sued in her individual capacity.

4

**ANSWER: Defendant admits that at the relevant times, she was an Assistant State's Attorney in the Felony Review unit of the Cook County State's Attorney's Office and that Plaintiff wrongfully named her as individual defendant in his lawsuit. Defendant denies the remaining allegations in paragraph 11 of Plaintiff's Amended Complaint.**

12. Defendant City of Chicago is an Illinois municipal corporation and is or was the employer of each of the Defendant Officers listed above. The City has respondeat superior liability for the acts of the Defendant Officers and a duty to indemnify them. The City is also liable for the policies and practices of the Chicago Police Department ("CPD").

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 12 of Plaintiff's Amended Complaint.**

13. Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of the Cook County State's Attorney's Office, and was at all relevant times the employer of Defendant Wehrle. Defendant Cook County is a necessary party to his lawsuit.

**ANSWER: Defendant denies that any defendant engaged in misconduct involving Plaintiff that qualifies them as a necessary party to this lawsuit. Defendant admits the remaining allegations in paragraph 13 of Plaintiff's Amended Complaint.**

14. Defendant Cook County is obligated to indemnify Defendant Wehrle.

**ANSWER: Defendant admits the allegations in paragraph 14 of Plaintiff's Amended Complaint.**

## Facts

### A Halloween Egg Fight in Washington Park

15.     On October 31, 2001, a group of young people, some of whom were affiliated or loosely associated with the Calumet Boys/Gangster Disciples and the Mickey Cobras street gangs, engaged in an egg fight in and around Washington Park on Chicago's South Side.

**ANSWER:  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of Plaintiff's Amended Complaint.**

16.     Other teenagers, not associated with any sort of gang, also participated in the Halloween egg fight.

**ANSWER:  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 15 of Plaintiff's Amended Complaint.**

17.     At no time was Plaintiff armed.

**ANSWER: Defendant denies the allegations in paragraph 17 of Plaintiff's Amended Complaint.**

18.     After the eggs were thrown, isolated fist fights broke out among some of the youths.

**ANSWER:  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 18 of Plaintiff's Amended Complaint.**

19.     Sherry Shannon, the mother of some of the boys who were involved in disputes that evening, witnessed some of these events.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 19 of Plaintiff's Amended Complaint.**

### The Shooting of Officer Patrick Doyle

20.     Officer Patrick Doyle and his partner Officer Nicholas Cortesi were called to the Washington Park neighborhood because of the egg fights and secondary fist fights that had unfolded. As they arrived on the scene in their squad car shortly before 6:00 p.m., a group of young people scattered.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 20 of Plaintiff's Amended Complaint.**

21.     Officer Doyle parked his vehicle on 51st Street, across from Washington Park. He and Officer Cortesi exited and tried to interview some of the teens.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 21 of Plaintiff's Amended Complaint.**

22.     As the officers stood near a boy named Vashon Prince, someone fired gunshots out of Washington Park. One of the bullets struck Officer Doyle in the chest. Fortunately, his bullet-proof vest sustained the impact, and while he was left with a bruise, the bullet did not penetrate his chest. Doyle was not admitted to the hospital.

**ANSWER: Defendant admits Plaintiff fired gunshots that struck Officer Doyle. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 22 of Plaintiff's Amended Complaint.**

23.     Officers Doyle and Cortesi were facing the park at the time of the shooting, but both stated that they could not identify the shooter because the shooter stood in the dark and out of view.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 of Plaintiff's Amended Complaint.**

24.     Plaintiff was not in the vicinity of the shooting and did not see who did it. Plaintiff was not involved in the shooting in any way.

**ANSWER: Defendant denies the allegations in paragraph 24 of Plaintiff's Amended Complaint.**

25.     Chicago Police Department Officers Taylor and Levigne quickly arrived at the scene from the nearby police station at 51st Street and Wentworth Avenue. In the park, these officers found a .38 caliber revolver in a garbage can.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25 of Plaintiff's Amended Complaint.**

### Rounding Up Some Teenagers

26.     Right after the shots were fired, Officer Cortesi and other police officers began apprehending teenagers in and around Washington Park. Many of these teens were brought to the police station at 51st Street and Wentworth Avenue for questioning.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 26 of Plaintiff's Amended Complaint.**

27. The police station at 51st and Wentworth is a large building that housed patrol officers on one floor and the Area One Detective Division, which investigated serious crimes, on the second floor.

**ANSWER: Defendant admits the Area One Detective Division was located on the second floor at 51st and Wentworth. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 27 of Plaintiff's Amended Complaint.**

28. Plaintiff was not one of the teenagers arrested and transported to 51st and Wentworth that night.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28 of Plaintiff's Amended Complaint.**

29. Defendants Halloran and O'Brien soon became the detectives assigned to lead the investigation into the shooting of Officer Doyle.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 29 of Plaintiff's Amended Complaint.**

30. Halloran and O'Brien interviewed some teenagers at the scene and back at Area One.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 30 of Plaintiff's Amended Complaint.**

31. Defendants, including Halloran and O'Brien, also interviewed Sherry Shannon, an adult eyewitness to the shooting. She was also the mother of four teenagers who were interviewed. She told police she did not recognize the shooter, but she was able to provide a physical description of him, including that he was

wearing a Dyett High School Uniform and that he ran and caught a city bus heading away from Washington Park after firing the shots.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of Plaintiff's Amended Complaint.**

32.     The person described by Shannon was not, and could not have been, Plaintiff.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 32 of Plaintiff's Amended Complaint.**

33.     Upon information and belief, Defendants documented Shannon's statements—including the fact that perpetrator was wearing a Dyett jacket—in their contemporaneous reports.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 33 of Plaintiff's Amended Complaint.**

34.     Defendants never disclosed this statement to the criminal justice system.

**ANSWER: Defendant denies the allegations in paragraph 34 of Plaintiff's Amended Complaint.**

35.     Instead, Defendants O'Brien and Halloran created a report falsely suggesting that Ms. Shannon could provide no information about the shooter.

**ANSWER: Defendant denies the allegations in paragraph 35 of Plaintiff's Amended Complaint.**

36.     At Area One, the Defendant Officers interrogated multiple teenagers at the same time, sometimes in the same room. They accused these teens of participating in the shooting and threatened to charge them with the shooting if they did not implicate someone else.

**ANSWER: Defendant denies the allegations in paragraph 36 of Plaintiff's Amended Complaint.**

37.     Officers struck multiple teenage boys who were not considered cooperative enough.

**ANSWER: Defendant denies the allegations in paragraph 37 of Plaintiff's Amended Complaint.**

38.     At some point that night, the Defendant Officers decided that, regardless of the evidence, 18-year-old Plaintiff Marcellous Pittman would be the person who would go down for the shooting of Officer Doyle.

**ANSWER: Defendant denies the allegations in paragraph 38 of Plaintiff's Amended Complaint.**

39.     Defendants then began the process of pressuring, coercing, or otherwise finding ways to claim that teenagers at the station had implicated Plaintiff.

**ANSWER: Defendant denies the allegations in paragraph 39 of Plaintiff's Amended Complaint.**

40.     For example, Defendants Halloran, O'Brien, Foster, O'Donnell, and Wehrle were among those who interviewed 15-year-old Eric Plunkett and other teens.

**ANSWER:  Defendant admits she memorialized Plunkett's statement, which was consistent with what he told the police earlier. Defendant lacks**

knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 40 of Plaintiff's Amended Complaint.

41.     They interrogated Plunkett without a parent or guardian present and accused him of being the shooter. They tested his hands, and those of another teen, for gunshot residue. They threatened to charge him with the shooting.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of whether Plunkett's, or another teen, hands were tested for gunshot residue. Defendant denies the remaining allegations in paragraph 41 of Plaintiff's Amended Complaint.**

42.     Plunkett, fearing prosecution, agreed to sign a false statement fabricated by Defendants against Plaintiff,. In furtherance of this scheme, and to make false evidence valid and voluntary, Defendants Foster, McDonnell, and Wehrle then purported to memorialize the false statement they would attribute to Plunkett even though the officers had made it up.

**ANSWER: Defendant denies the allegations in paragraph 42 of Plaintiff's Amended Complaint.**

43.     The Defendant Officers, including Defendants O'Brien, Halloran, and others, also fabricated statements against Plaintiff from other teenagers. Defendants used threats as well as violence to achieve their goal. Multiple teenage boys and their families were victimized and traumatized by these illegal interrogation tactics.

**ANSWER: Defendant denies the allegations in paragraph 43 of Plaintiff's Amended Complaint.**

12

**Plaintiff Learns He Is a Suspect and Seeks To Clear His Name**

44.     The next day, the morning of November 1, 2001, Plaintiff was helping to get his get his younger siblings ready for school.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 44 of Plaintiff's Amended Complaint.**

45.     The morning news was on the television, and Plaintiff was stunned to hear that he was wanted for questioning in the shooting of Officer Doyle.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 45 of Plaintiff's Amended Complaint.**

46.     Knowing that he was innocent and unsure how to proceed, Plaintiff went to his grandmother, Gertrude Fulton, to ask for advice. Together, trusting to the system, Plaintiff and Ms. Fulton decided to go to the police station to clear Plaintiff's name.

**ANSWER: Defendant denies that Plaintiff was innocent. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 46 of Plaintiff's Amended Complaint.**

**The Coercive Interrogation of Plaintiff**

47.     Plaintiff and his grandmother arrived at 51st and Wentworth in the late morning or early afternoon and asked to speak with an officer with whom they were somewhat acquainted, Brian Blackman. Plaintiff honestly explained to Blackman that he was innocent of the shooting and did not see who shot Officer Doyle.

**ANSWER: Defendant denies that Plaintiff was innocent of the shooting and did not witness who shot Officer Doyle, because he in fact shot Officer Doyle. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 47 of Plaintiff's Amended Complaint.**

48.     Blackman told Plaintiff that he would be fine if he explained the same to the detectives, and Plaintiff was then turned over to Defendants Halloran and O'Brien.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 48 of Plaintiff's Amended Complaint.**

49.     Blackman's reassurance was mistaken. Defendants Halloran and O'Brien proceeded to interrogate Plaintiff, including by using violence, until they compelled him to provide a false confession.

**ANSWER: Defendant denies the allegations in paragraph 49 of Plaintiff's Amended Complaint.**

50.     Defendants Halloran and O'Brien were dead set on coercing Plaintiff because it was their practice to do so and because they were fueled with additional angst because a fellow CPD officer had been shot.

**ANSWER: Defendant denies the allegations in paragraph 50 of Plaintiff's Amended Complaint.**

51.     The Defendant Officers' coercion of Plaintiff began almost immediately. Defendants Halloran and O'Brien demanded Plaintiff strip down to his boxer shorts, and they took away his clothing. They then handcuffed Plaintiff behind his back and left him in the interrogation room. He would remain in this condition throughout his interrogation, which spanned the day.

**ANSWER: Defendant denies the allegations in paragraph 51 of Plaintiff's Amended Complaint.**

52. When Defendants Halloran and O'Brien returned and began questioning Plaintiff, Plaintiff told them, as he had told Blackman, that he had no involvement with the shooting.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 52 of Plaintiff's Amended Complaint.**

53. Because Halloran and O'Brien were not engaged in a search for the truth but were instead involved in a guilt-presumptive and accusatory process, they refused to accept these denials.

**ANSWER: Defendant denies the allegations in paragraph 53 of Plaintiff's Amended Complaint.**

54. Defendants Halloran and O'Brien yelled at Plaintiff, called him a liar, and insisted Plaintiff say he shot Officer Doyle. Plaintiff continued to truthfully deny any involvement.

**ANSWER: Defendant denies the allegations in paragraph 54 of Plaintiff's Amended Complaint.**

55. Plaintiff had a large, conspicuous scar on his chest from an open-heart surgery, which Defendants Halloran and O'Brien saw.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 55 of Plaintiff's Amended Complaint.**

56. Nonetheless, Defendants Halloran and O'Brien struck Plaintiff in his chest. He could not protect his chest because he was handcuffed behind his back.

**ANSWER: Defendant denies the allegations in paragraph 56 of Plaintiff's Amended Complaint.**

57. Plaintiff told Defendants Halloran and O'Brien about his concern for his heart condition, evidenced by the scar, but they ignored his pleas and refused to exercise concern for this nearly naked teenager.

**ANSWER: Defendant denies the allegations in paragraph 57 of Plaintiff's Amended Complaint.**

58. Instead, Defendants Halloran and O'Brien threatened Plaintiff, demanding he say he shot Officer Doyal, and they continued to beat him. At one point, Defendant O'Brien choked Plaintiff from behind and lifted him from the ground, causing Plaintiff to fear he would lose consciousness and die.

**ANSWER: Defendant denies the allegations in paragraph 58 of Plaintiff's Amended Complaint.**

59. Defendants Halloran and O'Brien made threats against Plaintiff's life but also against his family members, including his grandmother.

**ANSWER: Defendant denies the allegations in paragraph 59 of Plaintiff's Amended Complaint.**

60. Plaintiff ultimately succumbed and told Defendants Halloran and O'Brien that he would provide a statement falsely implicating himself in the shooting.

**ANSWER: Defendant denies the allegations in paragraph 60 of Plaintiff's Amended Complaint.**

61. Defendants Halloran and O'Brien told Pittman what he should say, knowing that it was false, and repeatedly practiced it with him.

**ANSWER: Defendant denies the allegations in paragraph 61 of Plaintiff's Amended Complaint.**

62.     In the midst of the interrogation, Defendants Halloran and O'Brien worked with Defendant ASA Wehrle and informed her of the progress of the unlawful interrogation and Plaintiff's denials.

**ANSWER: Defendant denies the allegations in paragraph 62 of Plaintiff's Amended Complaint.**

63.     ASA Wehrle knew the tactics used in the interrogation of Plaintiff—to move him from truthful denial to a false inculpatory statement—were unlawful. But, as a Cook County Felony Review Unit member who knew she had to "play ball" with these experienced detectives, Defendant Wehrle agreed to participate in creating false evidence anyway.

**ANSWER: Defendant denies the allegations in paragraph 63 of Plaintiff's Amended Complaint.**

64.     Once Plaintiff's will had been overcome, ASA Wehrle, along with Defendant O'Brien, videorecorded Plaintiff giving the false statement he had been fed and forced to regurgitate.

**ANSWER: Defendant denies the allegations in paragraph 64 of Plaintiff's Amended Complaint.**

### Additional Evidence Points Away from Plaintiff

65.     The Defendant Officers and ASA Wehrle knew Plaintiff the evidence against Plaintiff was false because they had participated in fabricating it and suppressing exculpatory evidence.

**ANSWER: Defendant denies the allegations in paragraph 65 of Plaintiff's Amended Complaint.**

66.     These defendants also became aware that additional objective evidence confirmed Plaintiff's innocence, including fingerprints found on the gun involved in the shooting and an absence of any gunshot residue on Plaintiff or his clothing.

**ANSWER: Defendant denies the allegations in paragraph 66 of Plaintiff's Amended Complaint.**

**Plaintiff's Wrongful Prosecution and Conviction**

67.     Plaintiff was charged with the shooting of Officer Doyle based upon the false evidence generated during the interrogations of Plaintiff other teenagers.

**ANSWER: Defendant denies the allegations in paragraph 67 of Plaintiff's Amended Complaint.**

68.     Before the creation of this evidence, there was no probable cause to suspect Plaintiff of shooting Doyle.

**ANSWER: Defendant denies the allegations in paragraph 68 of Plaintiff's Amended Complaint.**

69.     After the creation of this evidence, there was no probable cause to suspect Plaintiff of shooting Doyle, as any evidence pointing to Plaintiff was false, fabricated, or coerced by the Defendants.

**ANSWER: Defendant denies the allegations in paragraph 69 of Plaintiff's Amended Complaint.**

70.     Due to Defendants' acts, Plaintiff was subsequently tried for the attempted murders of Officer Doyle and of teenager Vashon Prince.

**ANSWER: Defendant denies the allegations in paragraph 70 of Plaintiff's Amended Complaint.**

71.    Defendants never disclosed to prosecutors or defense attorneys their own misconduct in fabricating and coercing evidence and further suppressed other evidence, such as Sherry Shannon's exculpatory statement about the perpetrator.

**ANSWER: Defendant denies the allegations in paragraph 71 of Plaintiff's Amended Complaint.**

72.    The entirety of the evidence used against Plaintiff during the course of the criminal case was fabricated by the Defendants. That included, among other things, Defendants' own reports, false witness statements, and the false confession they attributed to Plaintiff.

**ANSWER: Defendant denies the allegations in paragraph 71 of Plaintiff's Amended Complaint.**

73.    As a result, Plaintiff was convicted in 2005 of aggravated battery and of the attempted murders of Officer Doyle and Prince. Plaintiff—who had been 18 for less than two months when he was arrested and had no prior convictions—was sentenced to 80 years of imprisonment, though that was later reduced to 30 years.

**ANSWER: Defendant denies Plaintiff was convicted as a result of evidence fabricated by the defendants. Defendants lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 73 of Plaintiff's Amended Complaint.**

### Plaintiff's Release and Exoneration

74.    Plaintiff never gave up hope of proving his innocence.

**ANSWER: Defendant denies that Plaintiff is innocent of the crimes related to his shooting of Officer Doyle and Vashon Prince. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 74 of Plaintiff's Amended Complaint.**

75.     While proceedings related to his innocence and unlawful interrogation were pending, Plaintiff sought executive clemency during the COVID-19 pandemic. The governor commuted his sentence, and Plaintiff was released in December 2020, having served 19 years of wrongful incarceration.

**ANSWER: Defendant denies that Plaintiff is innocent of the crimes related to his shooting of Officer Doyle and Vashon Prince and further denies that Plaintiff was wrongfully incarcerated. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 75 of Plaintiff's Amended Complaint.**

76.     In post-conviction proceedings, Plaintiff's conviction was vacated in 2022 on the basis that Defendants O'Brien and Halloran had tortured Plaintiff during his interrogation and had coerced him into inculpating himself.

**ANSWER: Defendant denies the allegations in paragraph 76 of Plaintiff's Amended Complaint.**

77.     The State subsequently declined to retry Plaintiff and dropped the charges against him.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 77 of Plaintiff's Amended Complaint.**

78.     On September 27 2023, Plaintiff filed a petition for a Certificate of Innocence in Cook County Circuit Court, and on March 8, 2024, his petition was granted.

**ANSWER: Defendant denies that Plaintiff is innocent of the crimes related to his shooting of Officer Doyle and Vashon Prince. Defendant admits the remaining allegations in paragraph 78 of Plaintiff's Amended Complaint.**

## Defendants' Pattern of Misconduct

79. The shooting of Officer Doyle is far from the only time Defendants O'Brien and Halloran, often joined by others, have worked together to "close" a case quickly, regardless of the evidence. Nor is it the first time in which these detectives used physical and psychological torture, including exploiting an existing physical vulnerability, to do so. Rather, these detectives had engaged in a longstanding pattern of such misconduct.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 79 of Plaintiff's Amended Complaint.**

80. As a result, numerous men have had their convictions overturned, notwithstanding confessions taken by Defendants Halloran and O'Brien.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 80 of Plaintiff's Amended Complaint.**

81. Examples of misconduct committed by Halloran, O'Brien, or both include, but are not limited to:

a. In 1988, Halloran and a partner struck Mickey Grayer in the stomach and groin with a flashlight, and punched and choked him.

21

b.   In 1990, Cortez Brown was tortured by O'Brien into confessing to two murders with which he had absolutely nothing to do. O'Brien, along with Detectives John Paladino and Anthony Maslanka, beat Brown about his head and chest, including with a flashlight. Brown was denied food and his right to an attorney. During post-conviction proceedings, after O'Brien refused to testify and invoked his Fifth Amendment rights, the court vacated Brown's conviction, finding the evidence of the officers' pattern of misconduct "staggering" and "damning."

c.   In 1991, Defendant O'Brien and other officers brought in eleven suspects, mostly juveniles, for a murder and kept them in custody for 12 to 13 hours. One of these boys, Marcus Wiggins, brought a lawsuit against O'Brien and others alleging that he was handcuffed to a wall, beaten about the chest, and electroshocked while being questioned. The detectives also denied Wiggins's mother access to her son, who was a 13-year-old eighth grader at the time of the coerced confession. The other young suspects also gave confessions, many of them after being physically beaten as well. For example, Jesse and Imari Clemon alleged that they were struck about their bodies and chests, including with fists and flashlights. Jesse Clemon was brought to the hospital with an injured hand. Two of these confessions were later thrown out

because of the "periodic screaming [at the police station] throughout the night," screaming that O'Brien testified that he did not hear. All of the defendants were either acquitted or the State entered a *nolle prosequi*.

d.  In August 1991, 15-year-old Johnny Plummer was interrogated for 36 hours by Detective Halloran and others. Plummer alleged that he was hit in the face, stomach and side, including with a flashlight, by the detectives.

e.  In August 1991, Curtis Milsap was slapped in the face while handcuffed and was kicked in the testicles by O'Brien until he confessed to a double murder about which he had no knowledge. Notwithstanding this supposed confession, Milsap was ultimately acquitted of the murders.

f.  Gregory Logan was interrogated regarding a murder in 1991 by O'Brien and other police officers. When Logan professed his innocence, the detectives beat him with a bat, pushed his head against the wall and pointed a gun to his head. He was denied the right to an attorney.

g.  In October 1992, Clayborn Smith was smacked on the face and head, and punched in the ribs by Halloran and other detectives. The detectives also grabbed Smith's neck, pulled his hair and yanked his finger back. After 37 hours of interrogation and

physical torture, Smith confessed to a murder that he did not commit. In pending post-conviction proceedings, the Court barred the state from denying that Halloran and the other officer involved had engaged in a pattern of abuse between 1990 and 2001.

h.     In November 1992, Harold Hill, Dan Young and Peter Williams falsely confessed to a rape and murder after O'Brien, Halloran, and others physically assaulted and psychologically coerced them. Hill was only 16 years old at the time. Dan Young, whose IQ was 56, also falsely confessed after being kicked and struck about his body to a crime with which he had absolutely nothing to do. Peter Williams—who was incarcerated on an unrelated charge at the time of the rape and murder—falsely confessed after being chained to a radiator, struck on an existing injury, hit with a blackjack, and forced to urinate on himself. Williams was never charged; twelve years after their convictions, Hill and Young were exonerated when DNA evidence proved that they could not have been the offenders.

i.     In 1992, Kilroy Watkins was interrogated by Halloran and others. Watkins was choked, punched in the face, and held for over 30 hours. Watkins gave a false confession to the detectives because he could not stand further physical abuse. The Torture Inquiry

24

and Relief Commission subsequently referred Watkins' case for a hearing.

j.  In 1995, Tyrone Hood was interrogated by Halloran and another officer. Hood and several witnesses in his case were beaten and threatened by Halloran and others into giving statement inculpating Hood. Hood has been granted a Certificate of Innocence ("COI"), and his civil lawsuit against Defendant Halloran and others recently settled.

k.  Hood's co-defendant was a man named Wayne Washington. Washington alleged that he was held for two days. During that time, he was handcuffed, slapped in the face, knocked out of his chair, threatened, and denied food and water until he agreed to give a false and fabricated statement inculpating himself and Hood in the murder. Washington has also been granted a COI, and his civil lawsuit against Halloran and other officers recently settled.

l.  In 1993, Emmett White was arrested by O'Brien and Halloran. In an effort to secure a confession, O'Brien and Halloran slapped White in the face and struck White on his body. When White told the officers that he did not have anything to say to them and was exercising his right to remain silent, the detectives became infuriated. The detectives again struck White about the face and

body, threw him on the ground and O'Brien stepped on his face. Although the police alleged that White voluntarily confessed to the crime, when asked under oath about White's allegations that he was beaten about the face and body, O'Brien and Halloran pled the Fifth Amendment.

m.    In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during an interrogation by O'Brien, Halloran, and other officers, all of whom refused to let him contact his family and intimidated him into confessing to a murder that he did not commit. Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, were arrested by the same detectives despite the lack of any physical evidence or eyewitnesses linking them to the crime. O'Brien and Halloran physically abused Escamilla by beating him, including around the chest, and threatening to send his pregnant wife to jail if he did not confess. After hours of abuse, Escamilla eventually complied.

n.    Although Miguel Morales was also beaten during his interrogation, he refused to confess. Therefore, to secure Morales' conviction, O'Brien, Halloran, and others coerced John Willer and Raphael Robinson into identifying Morales as the offender. For example, O'Brien used a very suggestive lineup: He grabbed Robinson by the neck while Robinson was viewing a lineup and

26

asked him "how many fingers am I holding up." When Robinson answered "three," O'Brien used this to say that Robinson had identified person number three. In addition, O'Brien spoke with Robinson prior to his trial testimony to explain who committed the murder and where in the courtroom they would be sitting.

o.   When asked about their interrogation and coercion of Escamilla, Morales, Willer, and Robinson during a deposition in a civil suit, O'Brien and Halloran refused to answer any questions for fear of subjecting themselves to criminal liability.

p.   In December 1993, O'Brien, Halloran, and others "closed" two separate murders by coercing confessions from two intellectually disabled individuals, Fred Ewing and Darnell Stokes. O'Brien and Halloran choked Ewing. One expert concluded that Ewing was "unable to comprehend the substance of the confession which he allegedly made." Absent any other evidence connecting them to the crime, both were acquitted notwithstanding the "confessions" obtained by O'Brien and others. O'Brien and Halloran both refused to answer questions about Ewing's and Stoke's allegations that they were beaten by O'Brien, Halloran and others when in a deposition in an unrelated civil suit.

q.   In 1994, Halloran and other police officers forced Sheila Crosby and Michael Sardin to identify Shondell Walker as a murderer in

grand jury testimony. Halloran threatened that if Crosby did not do so, he would have the Department of Children and Family Services take her children away from her. For Sardin, the detectives threatened that if he did not name Walker as the killer, he would be charged with the murder.

r.　In 1995, officers including Defendant Halloran, took Derrek Flewellen and questioned him for 36 hours, during which time they slapped, kicked and punched him in the face and body, and stomped on and slammed a chair into his injured foot. Officers, including Halloran, threatened to have Flewellen's girlfriend arrested and her child taken away if he would not confess. Flewellen eventually signed a false confession. He spent almost five years in prison before being acquitted of the two murders based on DNA tests, which proved the crime was committed by someone else.

s.　In 1994, Halloran and other officers beat Anthony Williams into falsely confessing to murder and armed robbery.

t.　In 1994, Nevest Coleman, like Plaintiff, voluntarily went to the police station. He had found a body buried in the basement of his apartment building. Halloran and other detectives locked their sights on Coleman. Coleman repeatedly denied his involvement in the rape and murder, which was met with punches to his face.

Eventually, the officers fed Coleman details about the crime and Coleman falsely confessed to being a lookout. In 2016, DNA evidence exculpated Coleman and his co-defendant. In 2017, Coleman was exonerated, and the state dismissed all charges.

u. In 1995, Halloran and other officers interrogated and coerced a confession from Oscar Gomez. The detectives held Gomez for 30 hours, repeatedly beat him while he was shackled to the wall, and prevented him from communicating with an attorney or with his family. Halloran and others threatened to arrest Gomez's father if Gomez did not give an inculpatory statement. Despite his "confession," Gomez was found not guilty. O'Brien and Halloran both took the Fifth Amendment when asked questions about their coercive interrogation of Gomez.

v. In 1995, Abel Quinones confessed to murder after being interrogated for 30 hours and being repeatedly beaten by Halloran. Despite his purported confession, Quinones was found not guilty. Halloran pled the Fifth Amendment when asked questions about the Quinones case in an unrelated civil deposition.

w. In 1995, Halloran and O'Brien interrogated Sean Tyler and Reginald Henderson regarding a 1991 murder. Henderson was shackled to the wall and not allowed to call his mother or an

attorney. Halloran and O'Brien slapped him and hit his head against a desk. He made an inculpatory statement after being hit many times over three days. Tyler was also struck until he was throwing up blood and his chest hurt.

x.  Kylin Little was a witness to a 1996 murder. When O'Brien, Halloran and other officers interrogated him, they physically and psychologically coerced him until he lied and implicated Eric Gibson, a man who had absolutely nothing to do with the crime. Since his interrogation, Little has fully recanted the statement he gave to the police.

y.  In 1996, Jeremy Allen was wrongfully charged with murder after O'Brien coerced two witnesses into falsely identifying Allen. Allen was ultimately acquitted at trial.

z.  In 1996, O'Brien, Halloran, and another officer handcuffed William Ephraim to a wall, held him down, and beat him around the chest, head, and stomach until he lost consciousness. O'Brien beat him repeatedly, and Halloran threatened him that if he did not cooperate and confess, O'Brien and Halloran would continue to beat him. O'Brien and Halloran both took part in beating him after he told a State's Attorney he had been abused.

aa. In February 1997, after being slapped and threatened by O'Brien, Robert Wilson falsely confessed to slashing a woman with a knife.

After being threatened and abused by O'Brien, Wilson—who had high blood pressure and no access to his medication—believed that he would not survive a beating by police and agreed to give a false, inculpatory statement to save his life. O'Brien withheld evidence from the victim that another man, one who exactly fit her description of the perpetrator, had slashed several persons in the same area at about the same time. The victim ultimately recanted her identification of Wilson, but not before Wilson had spent almost 10 years in jail. In a deposition in an unrelated civil suit, O'Brien and Halloran both took the Fifth Amendment when questioned about Wilson's allegations of abuse.

bb. In 1998, 17-year-old Antoine Anderson was interrogated by O'Brien and Halloran about a recent murder. The detectives hit Anderson in the face and chest and threatened to take away his children. As a result of this abuse, and after being held for two days at the police station, Anderson falsely confessed to a crime he did not commit.

cc. In 1998, Halloran and others held Joseph Jackson in an interrogation room in connection with a murder investigation. When Jackson refused to confess, Halloran and another detective placed a book on his chest and stomach and hit the book with a blackjack to avoid leaving visible marks on Jackson's body.

31

Halloran and the detective also put a typewriter cover over Jackson's head and cut off his air supply. Jackson eventually confessed to a murder he did not commit.

dd.   In 2002, Halloran and O'Brien stripped Jerome Weathers of his clothes, gave him a gown to wear, and left him in a cold room. They beat him repeatedly and choked him several times until he almost lost consciousness. They held him for over two days until he gave an inculpatory statement. Mr. Weathers testified in Plaintiff's post-conviction hearing and the Judge found his testimony about his abuse to be credible.

In 2002, O'Brien and Halloran left Stanley Gardner in a cold room with minimal clothes, threatened him, and hit him.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 81, including subsections a through dd, and the last sentence, of Plaintiff's Amended Complaint.**

**The City of Chicago's Policies and Practices Caused Plaintiff's Wrongful Conviction**

82.   As a result of its policies and practices, the Chicago Police Department is responsible for scores of miscarriages of justice like those the Defendant Officers inflicted on Plaintiff and the others described above.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 82 of Plaintiff's Amended Complaint.**

83.     Since 1986, no fewer than 70 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to convict innocent people of serious crimes they did not commit—numerous of which involve the named Defendant Officers.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 83 of Plaintiff's Amended Complaint.**

84.     The pattern of misconduct identified in the paragraphs above involving Defendants Halloran and O'Brien are but a fraction of this widespread practice, which extended throughout the City.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 84 of Plaintiff's Amended Complaint.**

85.     These cases include many in which Chicago police officers employed the same tactics the Defendant Officers employed against Plaintiff in this case, including: (1) using physically and psychologically coercive tactics to obtain involuntary, false, and fabricated confessions; (2) fabricating witness statements; and (3) concealing exculpatory evidence.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or**

**information sufficient to form a belief about the truth of the remaining allegations in paragraph 85 of Plaintiff's Amended Complaint.**

86.     At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false.

**ANSWER:   Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 86 of Plaintiff's Amended Complaint.**

87.     As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendant Officers in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own, enabling police to secure the wrongful convictions of innocent people.

**ANSWER:   Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 87 of Plaintiff's Amended Complaint.**

88.     In 2019, the Federal Bureau of Investigation and Department of Justice confirmed that Chicago Police Department supervisor, Jon Burge—who had supervised Defendants Halloran and O'Brien—was aware that on numerous occasions, detectives he was supervising participated in the torture and physical abuse of persons being questioned.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 88 of Plaintiff's Amended Complaint.**

89. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 89 of Plaintiff's Amended Complaint.**

90. The municipal policy and practice set out in the paragraphs above was described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements and physically abused witnesses. That Report also documents how, as here, Felony Review Unit ASAs in the Cook County's State's Attorney's Office also participate—and are instrumental in—presenting statements to the courts, even when they were coerced or fabricated.

**ANSWER: Defendant denies the allegations in paragraph 90 of Plaintiff's Amended Complaint.**

91. At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable

reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to other participants in the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of an investigation, rather than being maintained as part of the official file.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 91 of Plaintiff's Amended Complaint.**

92.     Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff. The Defendant Officers also maintained clandestine files that were not turned over to the prosecutor and were destroyed or hidden at the close of the Doyle investigation, including, for example, documents relating to witness interviews.

**ANSWER: Defendant denies the allegations in paragraph 92 of Plaintiff's Amended Complaint.**

93.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was detailed in *Fields v. City of Chicago*, 10 C 1168 (N.D. Ill.), a case in which it was discovered that the City maintained a basement full of clandestine files at the 51st and Wentworth Police Station.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 93 of Plaintiff's Amended Complaint.**

94. The policy and practice of file suppression at issue in *Fields* was in place from the 1980s through the 2000s, including during the commission and investigation of the Doyle shooting described above.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 94 of Plaintiff's Amended Complaint.**

95. Indeed, in addition to the contemporaneous notes from the investigation taken on the night of the shooting and days after having not been disclosed, the original file for the Doyle shooting has been suppressed and either lost or destroyed as a result of the City's inadequate and unconstitutional policies and practices with respect to document retention and the production of material information to the criminal justice system.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 95 of Plaintiff's Amended Complaint.**

96. Before and during the period in which Plaintiff was falsely charged with the Doyle shooting and convicted, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating civilians' civil and constitutional rights.

And the Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant further denies that Plaintiff was falsely charged and convicted for the crimes against Officer Doyle and Vashon Prince. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 96 of Plaintiff's Amended Complaint.**

97. Indeed, in a review of 98 allegations of coerced confessions or fabricated evidence that were culled from complaints against officers assigned to Area One and lodged with OPS between 1989 and 1996, OPS did not sustain a single one of these allegations.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 97 of Plaintiff's Amended Complaint.**

98. As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 98 of Plaintiff's Amended Complaint.**

99. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious

misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Defendant Officers here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 99 of Plaintiff's Amended Complaint.**

100. The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

a. The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses.

b. The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding.

    c.    The risks of engaging in tunnel vision during investigation.

    d.    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER: Defendant denies that Plaintiff was wrongfully charged or convicted of the crimes against Officer Doyle and Vashon Prince. Defendant further denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 100, including subsections a through d, of Plaintiff's Amended Complaint.**

101. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

**ANSWER: Defendant denies Plaintiff was wrongfully convicted. Defendant further denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 101 of Plaintiff's Amended Complaint.**

102. The City's failure to train, supervise, and discipline its officers, including the Defendant Officers, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff in this case. Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or**

information sufficient to form a belief about the truth of the remaining allegations in paragraph 102 of Plaintiff's Amended Complaint.

103.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 103 of Plaintiff's Amended Complaint.**

104.    The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 104 of Plaintiff's Amended Complaint.**

**Plaintiff's Damages**

105.    For almost 20 years, starting at age 18, Plaintiff was forced to live in confinement and serve out a punishment for a crime he did not commit.

**ANSWER: Defendant denies the allegations in paragraph 105 of Plaintiff's Amended Complaint.**

106.    Plaintiff was required to live in conditions that are inhumane and damaging to physical and mental health. A constant atmosphere of fear, distrust,

violence, and threats of violence from prisoners and staff alike permeated the prison environments he was forced to inhabit. For more two decades, Plaintiff's life was marked by a steady stream of human rights abuses.

**ANSWER: Defendant denies the allegations in paragraph 106 of Plaintiff's Amended Complaint.**

107.    During his wrongful incarceration, Pittman was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, funerals, and other life events with loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

**ANSWER: Defendant denies the allegations in paragraph 107 of Plaintiff's Amended Complaint.**

108.    Plaintiff was deprived of meaningful opportunities for education and unable to work or start a family. He missed the births of nieces and nephews and was unable to attend the funerals of loved ones from whom he had wrongfully been separated.

**ANSWER: Defendant denies the allegations in paragraph 108 of Plaintiff's Amended Complaint.**

109.    Plaintiff's nearly 20 years of wrongful incarceration forced him into a world of isolation in which he lost contact with some of his friends and family in the outside world.

**ANSWER: Defendant denies the allegations in paragraph 109 of Plaintiff's Amended Complaint.**

110.   Plaintiff must now attempt to make a life for himself outside of prison without the benefit of more than two decades of life experiences, which normally equip adults for the task.

**ANSWER:  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 110 of Plaintiff's Amended Complaint.**

111.   As a result of the foregoing, Plaintiff has suffered tremendous damage, including physical injury, psychological trauma, and emotional damages, all caused by the Defendants' misconduct.

**ANSWER:  Defendant denies the allegations in paragraph 111 of Plaintiff's Amended Complaint.**

### COUNT I – 42 U.S.C. §1983
### Coerced False Confession in Violation of the Fifth and Fourteenth Amendments

112.   Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:   Defendant incorporates her answer to each paragraph of Plaintiff's Complaint as her answer to paragraph 112 of Plaintiff's Amended Complaint.**

113.   As described more fully above, Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

**ANSWER:  Defendant denies the allegations in paragraph 113 of Plaintiff's Amended Complaint.**

114. As described more fully above, Defendants participated in, encouraged, advised, and ordered an unconstitutional and unlawful interrogation of Plaintiff that caused him to make involuntary and false statements implicating himself in the shooting of Officer Doyle.

**ANSWER: Defendant denies the allegations in paragraph 114 of Plaintiff's Amended Complaint.**

115. The coerced, involuntary, false statement Defendants fabricated and attributed to Plaintiff was used against him to his detriment in a criminal case.

**ANSWER: Defendant denies the allegations in paragraph 115 of Plaintiff's Amended Complaint.**

116. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's innocence.

**ANSWER: Defendant denies the allegations in paragraph 116 of Plaintiff's Amended Complaint.**

117. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER: Defendant denies the allegations in paragraph 117 of Plaintiff's Amended Complaint.**

118. Plaintiff's injuries were also caused by the policies, practices, and customs of Defendant City of Chicago.

**ANSWER: Defendant denies the allegations in paragraph 118 of Plaintiff's Amended Complaint.**

119. At all relevant times and before the events giving rise to this lawsuit occurred, the City of Chicago promulgated rules, regulations, policies, and procedures for the conduct of interrogation, testing, and questioning of criminal suspects by officers and agents of the Chicago Police Department. In addition, the City of Chicago promulgated rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 119 of Plaintiff's Amended Complaint.**

120. These rules, regulations, policies, and procedures were implemented by officers and agents of the Chicago Police Department, including the Defendant Officers who were responsible for interrogating suspects and witnesses in connection with the Doyle shooting investigation.

**ANSWER: Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 120 of Plaintiff's Amended Complaint.**

121. Additionally, at all times relevant to the events described in this pleading and for a period of time before those events, Defendant City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department under which individuals like Plaintiff, who were suspected of criminal

activity, were routinely coerced against their will to implicate themselves in crimes of which they were innocent. It was common for suspects interrogated by the Chicago Police Department to falsely confess under extreme duress and after suffering abuse to committing crimes to which they had no connection and for which there was scant evidence to suggest they were involved.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 121 of Plaintiff's Amended Complaint.**

122.  Specifically, at all relevant times and for a period of time before the events giving rise to this action, there existed a widespread practice among officers, employees, and agents of the Chicago Police Department under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (a) individuals who were subjected to actual and threatened physical and psychological violence; (b) individuals who were interrogated at length without the protection of their constitutional rights to have an attorney present or to remain silent; (c) individuals who were forced to sign false statements fabricated by the police; (d) officers and employees who were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (e) supervisors, with knowledge of permissible and impermissible interrogation techniques, who did not properly supervise or discipline police officers and employees, such that the coercive interrogations continued unchecked.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 122 of Plaintiff's Amended Complaint.**

123. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the Chicago Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees as to proper interrogation techniques, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those that affected Plaintiff.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 123 of Plaintiff's Amended Complaint.**

124. The above widespread practices were so well-settled as to constitute *de facto* policy of the Chicago Police Department and were able to exist and thrive because policymakers exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 124 of Plaintiff's Amended Complaint.**

125. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the

knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 125 of Plaintiff's Amended Complaint.**

126.   The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confessions at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation techniques.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 126 of Plaintiff's Amended Complaint.**

127.   Plaintiff's injuries were caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**ANSWER: Defendant denies the allegations in paragraph 127 of Plaintiff's Amended Complaint.**

## COUNT II – 42 U.S.C. § 1983

### Violation of Due Process under the Fourteenth Amendment

128.   Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

**ANSWER: Defendant incorporates her answer to each paragraph of Plaintiff's Complaint as her answer to paragraph 128 of Plaintiff's Amended Complaint.**

129. As described more fully above, Defendants, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

**ANSWER: Defendant denies the allegations in paragraph 129 of Plaintiff's Amended Complaint.**

130. In the manner described more fully above, Defendants deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

**ANSWER: Defendant denies the allegations in paragraph 130 of Plaintiff's Amended Complaint.**

131. In addition, as described more fully above, Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, suborned perjury, obtained Plaintiff's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

**ANSWER: Defendant denies the allegations in paragraph 131 of Plaintiff's Amended Complaint.**

132.    Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

**ANSWER: Defendant denies the allegations in paragraph 132 of Plaintiff's Amended Complaint.**

133.    In addition, Defendants, acting individually, jointly and/or in concert and conspiracy, used unduly suggestive identification procedures to procure a false identification of Plaintiff that was used to deprive him of liberty.

**ANSWER: Defendant denies the allegations in paragraph 133 of Plaintiff's Amended Complaint.**

134.    In a manner described more fully above, Defendants individually, jointly, and/or in concert and in conspiracy, deliberately withheld exculpatory evidence, and destroyed and/or intentionally lost material evidence. In doing so, Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, to preserve material evidence, and to ensure the integrity of eyewitness identifications and statements.

**ANSWER: Defendant denies the allegations in paragraph 134 of Plaintiff's Amended Complaint.**

135.    The destruction and/or loss of evidence was done in bad faith, and/or was done so that Plaintiff could not present obviously exculpatory evidence at the trial.

**ANSWER: Defendant denies the allegations in paragraph 135 of Plaintiff's Amended Complaint.**

136.    Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to

a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

**ANSWER: Defendant denies the allegations in paragraph 136 of Plaintiff's Amended Complaint.**

137. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

**ANSWER: Defendant denies the allegations in paragraph 137 of Plaintiff's Amended Complaint.**

138. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER: Defendant denies the allegations in paragraph 138 of Plaintiff's Amended Complaint.**

139. Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

**ANSWER: Defendant denies the allegations in paragraph 139 of Plaintiff's Amended Complaint.**

140.   The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

**ANSWER:  Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 140 of Plaintiff's Amended Complaint.**

141.   The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

**ANSWER:  Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 141 of Plaintiff's Amended Complaint.**

142.   Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

**ANSWER:  Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 142 of Plaintiff's Amended Complaint.**

143.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost to suspects, witnesses, and the community. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 143 of Plaintiff's Amended Complaint.**

144.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

**ANSWER: Defendant denies the allegations in paragraph 144 of Plaintiff's Amended Complaint.**

145.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**ANSWER: Defendant denies the allegations in paragraph 145 of Plaintiff's Amended Complaint.**

## COUNT III – 42 U.S.C. § 1983

## Liberty Deprivation in Violation of the Fourth Amendment

146.   Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

**ANSWER:   Defendant incorporates her answer to each paragraph of Plaintiff's Complaint as her answer to paragraph 146 of Plaintiff's Amended Complaint.**

147.   In the manner described more fully above, Defendants individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, used fabricated evidence to accuse Plaintiff of criminal activity and detain him without probable cause.

**ANSWER:  Defendant denies the allegations in paragraph 147 of Plaintiff's Amended Complaint.**

148.   In so doing, Defendants caused Plaintiff to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth and Fourteenth Amendments. Specifically, Plaintiff was incarcerated from the date of his arrest until 19 years later.

**ANSWER:  Defendant denies the allegations in paragraph 148 of Plaintiff's Amended Complaint.**

149.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's innocence.

**ANSWER: Defendant denies the allegations in paragraph 149 of Plaintiff's Amended Complaint.**

150.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER: Defendant denies the allegations in paragraph 150 of Plaintiff's Amended Complaint.**

151.     Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

**ANSWER: Defendant denies the allegations in paragraph 151 of Plaintiff's Amended Complaint.**

152.     The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

**ANSWER:  Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 152 of Plaintiff's Amended Complaint.**

153.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

**ANSWER:  Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 153 of Plaintiff's Amended Complaint.**

154.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

**ANSWER:  Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 154 of Plaintiff's Amended Complaint.**

155.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 155 of Plaintiff's Amended Complaint.**

156. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

**ANSWER: Defendants denies the allegations in paragraph 156 of Plaintiff's Amended Complaint.**

157. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**ANSWER: Defendants denies the allegations in paragraph 157 of Plaintiff's Amended Complaint.**

**COUNT IV – 42 U.S.C. § 1983**

**Failure to Intervene**

158. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant incorporates her answer to each paragraph of Plaintiff's Complaint as her answer to paragraph 158 of Plaintiff's Amended Complaint.**

159.   In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more Defendant stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

**ANSWER: Defendants denies the allegations in paragraph 159 of Plaintiff's Amended Complaint.**

160.   As a direct and proximate result of this violation of his constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

**ANSWER: Defendants denies the allegations in paragraph 160 of Plaintiff's Amended Complaint.**

161.   These Defendants had a reasonable opportunity to prevent this harm, but they failed to do so.

**ANSWER: Defendants denies the allegations in paragraph 161 of Plaintiff's Amended Complaint.**

162.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**ANSWER: Defendants denies the allegations in paragraph 162 of Plaintiff's Amended Complaint.**

163.   Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence

implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

**ANSWER: Defendants denies the allegations in paragraph 163 of Plaintiff's Amended Complaint.**

164. The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 164 of Plaintiff's Amended Complaint.**

165. The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 165 of Plaintiff's Amended Complaint.**

166. Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department

maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 166 of Plaintiff's Amended Complaint.**

167.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

**ANSWER: Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 167 of Plaintiff's Amended Complaint.**

168.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

**ANSWER: Defendant denies the allegations in paragraph 168 of Plaintiff's Amended Complaint.**

169.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and

proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**ANSWER: Defendant denies the allegations in paragraph 169 of Plaintiff's Amended Complaint.**

### COUNT V – 42 U.S.C. § 1983

### Conspiracy to Deprive Constitutional Rights

170.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:   Defendant incorporates her answer to each paragraph of Plaintiff's Complaint as her answer to paragraph 170 of Plaintiff's Amended Complaint.**

171.    After the shooting of Officer Doyle, Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

**ANSWER: Defendant denies the allegations in paragraph 171 of Plaintiff's Amended Complaint.**

172.    Additionally, before and after Plaintiff's conviction, Defendants further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more-timely exoneration.

**ANSWER: Defendant denies the allegations in paragraph 172 of Plaintiff's Amended Complaint.**

173.    In this manner, Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER: Defendant denies the allegations in paragraph 173 of Plaintiff's Amended Complaint.**

174.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, conducting unduly suggestive lineups, withholding exculpatory evidence, coercing false statements, and committing perjury during hearings and trials—and was an otherwise willful participant in joint activity.

**ANSWER: Defendant denies the allegations in paragraph 174 of Plaintiff's Amended Complaint.**

175.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

**ANSWER: Defendant denies the allegations in paragraph 175 of Plaintiff's Amended Complaint.**

176.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights. Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of

the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

**ANSWER: Defendant denies the allegations in paragraph 176 of Plaintiff's Amended Complaint.**

177.   The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

**ANSWER:  Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 177 of Plaintiff's Amended Complaint.**

178.   The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

**ANSWER:  Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 178 of Plaintiff's Amended Complaint.**

179.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

**ANSWER:   Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 179 of Plaintiff's Amended Complaint.**

180.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendants' misconduct at issue in this case.

**ANSWER:   Defendant denies that any of the defendants engaged in any misconduct involving the Plaintiff. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 180 of Plaintiff's Amended Complaint.**

181.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

**ANSWER: Defendant denies the allegations in paragraph 181 of Plaintiff's Amended Complaint.**

182. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**ANSWER: Defendant denies the allegations in paragraph 182 of Plaintiff's Amended Complaint.**

**COUNT VI - 42 U.S.C. § 1983**
**Municipal Liability**

**Count VI of Plaintiff's Amended Complaint is not asserted against the Defendant, and thus, no answer is required.**

**COUNT VII – STATE LAW CLAIM**

**Malicious Prosecution**

188. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant incorporates her answer to each paragraph of Plaintiff's Amended Complaint as her answer to paragraph 188 of Plaintiff's Amended Complaint.**

189. Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

**ANSWER: Defendant denies the allegations in paragraph 189 of Plaintiff's Amended Complaint.**

190.    Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER: Defendant denies the allegations in paragraph 190 of Plaintiff's Amended Complaint.**

191.    Statements of Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. Defendants also fabricated evidence, coerced false inculpatory statements from witnesses, used unduly suggestive lineups, and withheld exculpatory evidence that would have demonstrated Plaintiff's innocence, destroyed material and/or exculpatory evidence and used unduly suggestive identification procedures.

**ANSWER: Defendant denies the allegations in paragraph 191 of Plaintiff's Amended Complaint.**

192.    Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Doyle shooting.

**ANSWER: Defendant denies the allegations in paragraph 192 of Plaintiff's Amended Complaint.**

193.    Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. Defendants withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

**ANSWER: Defendant denies the allegations in paragraph 193 of Plaintiff's Amended Complaint.**

194.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER: Defendant denies the allegations in paragraph 194 of Plaintiff's Amended Complaint.**

195.    On October 12, 2022, the prosecution terminated in Plaintiff's favor when his conviction was vacated and all charges against him were dismissed.

**ANSWER: Defendant denies the allegations in paragraph 195 of Plaintiff's Amended Complaint.**

196.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including psychological injury, and emotional distress.

**ANSWER: Defendant denies the allegations in paragraph 196 of Plaintiff's Amended Complaint.**

## COUNT VIII – STATE LAW CLAIM

### Intentional Infliction of Emotional Distress

197.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:  Defendant incorporates her answer to each paragraph of Plaintiff's Amended Complaint as her answer to paragraph 197 of Plaintiff's Amended Complaint.**

198.    The acts and conduct of Defendants as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority, and

they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, emotional distress to Plaintiff, as is more fully alleged above.

**ANSWER: Defendant denies the allegations in paragraph 198 of Plaintiff's Amended Complaint.**

199. As a direct and proximate result of the Defendant' actions, Plaintiff suffered and continues to suffer emotional distress.

**ANSWER: Defendant denies the allegations in paragraph 199 of Plaintiff's Amended Complaint.**

### COUNT IX – STATE LAW CLAIM

### Civil Conspiracy

200. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:  Defendant incorporates her answer to each paragraph of Plaintiff's Amended Complaint as her answer to paragraph 200 of Plaintiff's Amended Complaint.**

201. As described more fully in the preceding paragraphs, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER: Defendant denies the allegations in paragraph 201 of Plaintiff's Amended Complaint.**

202. In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the

malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

**ANSWER: Defendant denies the allegations in paragraph 202 of Plaintiff's Amended Complaint.**

203.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER: Defendant denies the allegations in paragraph 203 of Plaintiff's Amended Complaint.**

204.    As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered damages, including psychological injury and emotional distress, as is more fully alleged above.

**ANSWER: Defendant denies the allegations in paragraph 204 of Plaintiff's Amended Complaint.**

### COUNT X – STATE LAW CLAIM
*Respondeat Superior*

**Count X of Plaintiff's Amended Complaint is not asserted against the Defendant, and thus, no answer is required.**

### COUNT XI – STATE LAW CLAIM
### Indemnification

**Count XI of Plaintiff's Amended Complaint is not asserted against the Defendant, and thus, no answer is required.**

WHEREFORE, Defendant respectfully requests that this Honorable Court dismiss Plaintiff's Amended Complaint (dkt. 69) with prejudice; enter a judgment in Defendant's favor; award Defendant reasonable attorneys' fees, costs, and expenses; and award Defendant any other relief this Court deems just and reasonable.

## JURY DEMAND

Defendant requests a jury trial pursuant to Federal Rule of Civil Procedure 38 on all triable issues.

## DEFENDANT KARIN WEHRLE'S AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

Defendant, Karin Wehrle (n/k/a Dooley), while continuing to deny liability to Plaintiff, and pleading in the alternative and without prejudice to the averments in her Answer to Plaintiff's Amended Complaint, asserts the following Affirmative Defenses:

## FIRST AFFIRMATIVE DEFENSE

*Absolute Prosecutorial Immunity*

At all relevant times, Defendant was an Assistant State's Attorney for the Cook County State's Attorneys' Office. In this capacity, Defendant took action intimately associated with the judicial phase of the criminal process, including but not limited to the preparation for and initiation of judicial proceedings and trial. When Defendant spoke with suspects and witnesses, took statements, and ultimately determined whether criminal charges should be approved, she performed acts toward initiating a prosecution and presenting the State's case. Because the conduct

70

complained of on the part of Defendant is within the scope of her employment as prosecutor, within her role as an advocate of the State, and arises out of the evaluation of evidence and taking statements for the purpose of initiation and prosecution of criminal charges, Plaintiff's claims are barred on the basis of absolute prosecutorial immunity.

## SECOND AFFIRMATIVE DEFENSE

### *Qualified Immunity*

At all relevant times, Defendant was an Assistant State's Attorney for the Cook County State's Attorney's Office. To the extent any of her actions were not protected by absolute prosecutorial immunity, they are protected by qualified immunity as her actions did not violate Plaintiff's constitutional rights and were at all times proper in light of clearly established law. A reasonable government official objectively viewing the facts and circumstances then confronting Defendant could have reasonably believed that the actions taken by her were objectively reasonable and were within constitutional limits that were clearly established at the time.

## THIRD AFFIRMATIVE DEFENSE

### *Sovereign Immunity*

Plaintiff's claims against Defendant are really claims against State officials based upon her actions as an Assistant State's Attorney, functions that fall within the scope of her employment and authority as an Assistant State's Attorney. Plaintiff's claims against Defendant relates to the initiation of charges against, and the criminal prosecution of, Plaintiff. The State's Attorney is the constitutional officer vested with exclusive discretion in the initiation and management of a criminal

prosecution. The prosecution of Plaintiff's case is, therefore, well within the scope of the State's Attorney's authority. Plaintiff's claims against Defendant is against the State of Illinois, and thus sovereign immunity shields Defendant for liability in federal court. The Illinois Court of Claims has sole and exclusive jurisdiction over Plaintiff's state law claims against Defendant.

## FOURTH AFFIRMATIVE DEFENSE

### *Federal Statute of Limitations*

Plaintiff's §1983 claims accrued more than two years earlier than the filing of Plaintiff's Complaint, and, thus, these claims are time-barred.

## FIFTH AFFIRMATIVE DEFENSE

### *Illinois Statute of Limitations*

Plaintiff's state law claims accrued more than one year earlier than the filing of Plaintiff's Complaint, and, thus, these claims are time-barred (745 ILCS 10/8-101).

## SIXTH AFFIRMATIVE DEFENSE

### *Tort Immunity Act 745 ILCS 10/2-201*

Defendant is immune from Plaintiff's state law claims under 745 ILCS 10/2-201 of the Illinois Tort Immunity Act which provides as follows: "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."

## SEVENTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-202*

The acts or omissions that Defendant allegedly took would have been acts or omissions in her capacity as public employees in the execution or enforcement of a law and because those acts or omissions did not constitute willful or wanton conduct, Defendant is immune from suit.

## EIGHTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-204*

Because Defendant was, at all times relevant to the Plaintiff's allegations, a public employee acting within the scope of her employment, she is immune from suit for any injury caused by the act or omission of another person.

## NINTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-205*

Defendant is not liable for any injury caused by her adoption of an enactment, failure to adopt an enactment, or her enforcement or failure to enforce any law.

## TENTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-208*

Defendant is not liable for injury caused by her instituting or prosecuting any judicial or administrative proceeding within the scope of her employment, unless she acted maliciously and without probable cause.

## ELEVENTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-213*

Defendant is immune from punitive or exemplary damages under 745 ILCS 10/2-213 which provides as follows: "Notwithstanding any other provision of law, a public employee is not liable to pay punitive or exemplary damages in actions brought against the employee based on an injury allegedly arising out of an act or omission occurring within the scope of employment of such an employee serving in a position involving the determination of policy or the exercise of discretion when the injury is the result of an act or omission occurring in the performance of any legislative, quasi-legislative or quasi-judicial function, even though abused."

## TWELFTH AFFIRMATIVE DEFENSE

*Attorney Fees*

Plaintiff is not entitled to attorney fees for his state law claims. *See Kerns v. Engelke*, 76 Ill.2d 154, 166 (Ill. 1979).

## THIRTEENTH AFFIRMATIVE DEFENSE

*Failure to Mitigate Damages*

To the extent Plaintiff failed to mitigate any claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that Plaintiff had a duty to mitigate claimed injuries and damages, commensurate with the degree of failure to mitigate attributed to Plaintiff by the jury in this case.

## FOURTEENTH AFFIRMATIVE DEFENSE

*Res Judicata and Collateral Estoppel*

Plaintiff's claims in the Complaint are barred by the doctrines of res judicata and collateral estoppel to the extent that they involve issues or claims that were, or could have been, resolved in the underlying criminal or post-conviction proceedings.

WHEREFORE, Defendant respectfully requests that this Honorable Court dismiss Plaintiff's Amended Complaint (dkt. 69) with prejudice; enter a judgment in Defendant's favor; award Defendant reasonable attorneys' fees, costs, and expenses; and award Defendant any other relief this Court deems just and reasonable.

Date: April 24, 2024

Respectfully submitted,

HINSHAW & CULBERTSON LLP

*/s/ Michael C. Stephenson*
Michael C. Stephenson

One of the attorneys for Defendant Karin Wehrle

Robert T. Shannon
Michael Stephenson
Danielle Mikhail
Hinshaw & Culbertson LLP
151 North Franklin Street
Suite 2500
Chicago, IL 60606
Telephone: 312-704-3000
Facsimile: 312-704-3001
rshannon@hinshawlaw.com
mstephenson@hinshawlaw.com
dmikhail@hinshawlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2024, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent electronic notification of the filing on the same day and was served upon all counsel of record via the Court's CM/ECF system.

*/s/ Michael C. Stephenson*
Michael C. Stephenson
