**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARCELOUS PITTMAN, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| *v.* ) | |
| ) | Case No. 23-cv-14786 |
| JOHN HALLORAN; JAMES O'BRIEN; ) | |
| MICHAEL CLANCY; RONNIE LEWIS; ) | |
| JOHN L. FOSTER; EILEEN O'DONNELL; ) | |
| JOHN HENRY; P. MCCORMACK; JAMES ) | |
| BREEN; UNKNOWN EMPLOYEES OF THE ) | |
| CITY OF CHICAGO; THE CITY OF ) | **JURY TRIAL DEMANDED** |
| CHICAGO; KAREN WEHRLE;, and COOK ) | |
| COUNTY, ILLINOIS. ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

**DEFENDANTS HALLORAN, O'BRIEN, CLANCY, LEWIS, FOSTER, BREEN AND
HENRY'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED
COMPLAINT**

Defendants JOHN HALLORAN, JAMES O'BRIEN, MICHAEL CLANCY, RONNIE LEWIS,

JOHN L. FOSTER, JAMES BREEN, and JOHN HENRY (collectively "The Officer Defendants"), and

for their Answer and Affirmative Defenses to Plaintiff's Complaint, state as follows:

**Introduction**

1.      Plaintiff, Marcelous Pittman, was wrongfully convicted of a 2001 shooting that he did
not commit. Despite his innocence, Plaintiff spent some 19 years incarcerated for this crime until his
sentence was commuted and he was released in 2020. Even then, Plaintiff spent more than two years
contesting this wrongful conviction before the conviction was vacated and the charges were dismissed.

**ANSWER:    The Officer Defendants deny that they engaged in any wrongdoing or misconduct**

**or that Plaintiff's conviction was "wrongful." The Officer Defendants lack knowledge sufficient to**

**form a belief as to the truth of the allegations that Plaintiff did not commit the 2001 shooting or**

**that he spent "more than two years" contesting his conviction.  The Officer Defendants admit the**

**remaining allegations in paragraph 1.**

1

2.     Plaintiff's wrongful conviction was no accident. Instead, this conviction resulted from a City of Chicago practice of coercing vulnerable children and young men into adopting coerced, false inculpatory statements that were invented by the police.

**ANSWER:     The Officer Defendants deny that Plaintiff's conviction was "wrongful," deny that they engaged in any misconduct or wrongdoing as alleged in paragraph 2 and therefore deny the allegations therein.**

3.     In Plaintiff's case, this practice was perpetuated by some of the City's most notorious and abusive detectives: John Halloran and James O'Brien. These men are responsible for many wrongful convictions. But a number of other, less well-known CPD officers also acted pursuant to the City's unconstitutional practices and committed egregious misconduct to generate false evidence against Plaintiff.

**ANSWER:     The Officer Defendants deny the allegations in paragraph 3.**

4.     By 2001, the year Plaintiff was charged with the crimes he did not commit, the City's practice of coercing false inculpatory statements was known and condoned within the "Felony Review Unit" of the Cook County State's Attorney's Office. The former Assistant State's Attorney named in this case—Karen Wehrle—participated in fabricating and submitting the false confession extracted by Defendants Halloran and O'Brien, as well as other false evidence.

**ANSWER:     Defendants Halloran and O'Brien deny that they coerced or fabricated a false confession or "other false evidence" and therefore deny the allegations in paragraph 4. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4.**

5.     With this Complaint, Plaintiff seeks justice for the constitutional harm caused by Defendants as well as for the other harms and hardships Plaintiff endured as a result of Defendants' actions. Plaintiff also seeks to shed light on the unconstitutional policies and practices of the City of Chicago that caused and perpetuated his wrongful conviction. Some measure of accountability for the wrongs done to Plaintiff is sought with this suit.

**ANSWER:     The Officer Defendants deny that they caused any "constitutional harm," or "other harms or hardships to Plaintiff" and therefore deny the allegations in paragraph 5.**

## Jurisdiction and Venue

6.      This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious actions under the color of law and the deprivation of Plaintiff's constitutional rights.

**ANSWER:    The Officer Defendants admit that this action is brought pursuant to 42 U.S.C. §1983 and Illinois law but deny that Plaintiff's rights were violated or that he is entitled to any relief whatsoever.  The Officer Defendants deny the remaining allegations in paragraph 6.**

7.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of the state-law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:    The Officer Defendants admit the allegations in paragraph 7 but deny that Plaintiff's rights were violated or that he is entitled to any relief whatsoever.**

8.      Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's wrongful conviction. In addition, many, if not all, Defendants reside in this judicial district.

**ANSWER:    The Officer Defendants admit that venue in this judicial district is proper under 28 U.S.C. §1391(b), but deny that any of Plaintiff's rights were violated, that his conviction was "wrongful" or that he is entitled to any relief whatsoever.**

## Parties

9.      Plaintiff, Marcellous Pittman, is a 40-year-old employee of a major airline, a community volunteer, and a loving son, brother, and uncle. Plaintiff resides in Chicago and enjoys spending time with family and friends as he picks up the pieces of his life after more than two decades contesting the false charges against him.

**ANSWER:    The Officer Defendants deny that the charges against Plaintiff were "false." The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9.**

10.      At all times relevant to the events described in this Complaint, Defendants John Halloran, James O'Brien, Ronnie Lewis, John L. Foster, Eileen O'Donnell, John Henry, P. McCormack (#60045), and James Breen were detectives employed by the Chicago Police Department who were acting under color of law and within the scope of their employment. Unknown The Officer Defendants were also

3

employed by the Chicago Police Department and acting under color of law and within the scope of their employment. The Defendant Officers are sued in their individual capacities.

**ANSWER: The Officer Defendants admit that they were employed by the Chicago Police Department acting under color of law and within the scope of their employment at all relevant times, and that they are sued in their individual capacities. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 10.**

11.     At all times relevant, Defendant Karen Wherle was an Assistant State's Attorney in the Felony Review unit of the Cook County State's Attorney's Office (CCSAO) and was employed by the Cook County State's Attorney's Office. Wherle is sued in her individual capacity.

**ANSWER: The Officer Defendants admit the allegations in paragraph 11.**

12.     Defendant City of Chicago is an Illinois municipal corporation and is or was the employer of each of the Defendant Officers listed above. The City has *respondeat superior* liability for the acts of the Defendant Officers and a duty to indemnify them. The City is also liable for the policies and practices of the Chicago Police Department ("CPD").

**ANSWER: The Officer Defendants admit that the City of Chicago is an Illinois municipal corporation and that they were employed by the City of Chicago at all relevant times. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 12.**

13.     Defendant Cook County is a Governmental entity within the State of Illinois, which consists in part of the Cook County State's Attorney's Office, and was at all relevant times the employer of Defendant Wehrle. Defendant Cook County is a necessary party to his lawsuit.

**ANSWER: The Officer Defendants admit that Cook County is a governmental entity within the State of Illinois. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 13.**

14.     Defendant Cook County is obligated to indemnify Defendant Wehrle.

**<u>ANSWER:</u> The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14.**

4

<u>Facts</u>

**A Halloween Egg Fight in Washington Park**

15.    On October 31, 2001, a group of young people, some of whom were affiliated or loosely associated with the Calumet Boys/Gangster Disciples and the Mickey Cobras street gangs, engaged in an egg fight in and around Washington Park on Chicago's South Side.

**ANSWER:    The Officer Defendants admit the allegations in paragraph 15.**

16.    Other teenagers, not associated with any sort of gang, also participated in the Halloween egg fight.

**ANSWER:    The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16.**

17.    At no time was Plaintiff armed.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 17.**

18.    After the eggs were thrown, isolated fist fights broke out among some of the youths.

**ANSWER:    The Officer Defendants admit the allegations in paragraph 18.**

19.    Sherry Shannon, the mother of some of the boys who were involved in disputes that evening, witnessed some of these events.

**ANSWER:    The Officer Defendants admit the allegations in paragraph 19.**

**The Shooting of Officer Patrick Doyle**

20.    Officer Patrick Doyle and his partner Officer Nicholas Cortesi were called to the Washington Park neighborhood because of the egg fights and secondary fist fights that had unfolded. As they arrived on the scene in their squad car shortly before 6:00 p.m., a group of young people scattered.

**ANSWER:    The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that "a group of young people scattered." The Officer Defendants admit the remaining allegations in paragraph 20.**

21.    Officer Doyle parked his vehicle on 51st Street, across from Washington Park. He and Officer Cortesi exited and tried to interview some of the teens.

**ANSWER:** **The Officer Defendants deny that Officer Doyle was attempting to "interview" the teens. The Officer Defendants admit the remaining allegations in paragraph 21.**

22.     As the officers stood near a boy named Vashon Prince, someone fired gunshots out of Washington Park. One of the bullets struck Officer Doyle in the chest. Fortunately, his bullet-proof vest sustained the impact, and while he was left with a bruise, the bullet did not penetrate his chest. Doyle was not admitted to the hospital.

**ANSWER:** **The Officer Defendants admit someone fired gunshots out of Washington Park and that one of the bullets struck Officer Doyle in the chest. The Officer Defendants further admit that Doyle's bullet proof vest sustained the impact, that the bullet did not penetrate his chest and that Officer Doyle was bruised. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 22.**

23.     Officers Doyle and Cortesi were facing the park at the time of the shooting, but both stated that they could not identify the shooter because the shooter stood in the dark and out of view.

**ANSWER:** **The Officer Defendants admit the allegations in paragraph 23.**

24.     Plaintiff was not in the vicinity of the shooting and did not see who did it. Plaintiff was not involved in the shooting in any way.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 24.**

25.     Chicago Police Department Officers Taylor and Levigne quickly arrived at the scene from the nearby police station at 51st Street and Wentworth Avenue. In the park, these officers found a .38 caliber revolver in a garbage can.

**ANSWER:** **The Officer Defendants admit that Officers Taylor and Levigne arrived at the scene and found a .38 caliber revolver in a garbage can. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 25.**

### Rounding Up Some Teenagers

26.     Right after the shots were fired, Officer Cortesi and other police officers began apprehending teenagers in and around Washington Park. Many of these teens were brought to the police station at 51st Street and Wentworth Avenue for questioning.

**ANSWER:** **The Officer Defendants admit that after the shots were fired, Officer Cortesi and other police officers interviewed numerous individuals at the scene and at Area One. The Officer Defendants deny the remaining allegations in paragraph 26, including that teenagers were "apprehended."**

27.     The police station at 51st and Wentworth is a large building that housed patrol officers on one floor and the Area One Detective Division, which investigated serious crimes, on the second floor.

**ANSWER:** **The Officer Defendants lack knowledge or information sufficient to form a belief as to whether the station at 51st and Wentworth is considered "large."  The Officer Defendants deny that the Area One detectives only investigated "serious" crimes.  The Officer Defendants admit the remaining allegations in paragraph 27.**

28.     Plaintiff was not one of the teenagers arrested and transported to 51st and Wentworth that night.

**ANSWER:** **The Officer Defendants deny that teens were arrested on the night of the shooting. The Officer Defendants admit the remaining allegations in paragraph 28.**

29.     Defendants Halloran and O'Brien soon became the detectives assigned to lead the investigation into the shooting of Officer Doyle.

**ANSWER:** **The Officer Defendants admit that Halloran and O'Brien were the assigned detectives.  The Officer Defendants deny the remaining allegations in paragraph 29.**

30.     Halloran and O'Brien interviewed some teenagers at the scene and back at Area One.

**ANSWER:** **Defendants Halloran and O'Brien admit the allegations in paragraph 30. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30.**

31.     Defendants, including Halloran and O'Brien, also interviewed Sherry Shannon, an adult eyewitness to the shooting. She was also the mother of four teenagers who were interviewed. She told police she did not recognize the shooter, but she was able to provide a physical description of him, including that he was wearing a Dyett High School Uniform and that he ran and caught a city bus heading away from Washington Park after firing the shots.

**ANSWER:** **The Officer Defendants admit that Sherry Shannon was interviewed and that she was the mother of four teenagers who were also interviewed. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 31.**

32. The person described by Shannon was not, and could not have been, Plaintiff.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 32.**

33. Upon information and belief, Defendants documented Shannon's statements— including the fact that perpetrator was wearing a Dyett jacket—in their contemporaneous reports.

**ANSWER:** **The Officer Defendants admit that Shannon's interview was documented but deny the remaining allegations in paragraph 33.**

34. Defendants never disclosed this statement to the criminal justice system.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 34.**

35. Instead, Defendants O'Brien and Halloran created a report falsely suggesting that Ms. Shannon could provide no information about the shooter.

**ANSWER:** **The Officer Defendants deny the allegations in in paragraph 35.**

36. At Area One, the Defendant Officers interrogated multiple teenagers at the same time, sometimes in the same room. They accused these teens of participating in the shooting and threatened to charge them with the shooting if they did not implicate someone else.

**ANSWER:** **The Officer Defendants admit that multiple teenagers were interviewed at Area One but deny the remaining allegations in paragraph 36.**

37. Officers struck multiple teenage boys who were not considered cooperative enough.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 37.**

38. At some point that night, the Defendant Officers decided that, regardless of the evidence, 18-year-old Plaintiff Marcellous Pittman would be the person who would go down for the shooting of Officer Doyle.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 38.**

39. Defendants then began the process of pressuring, coercing, or otherwise finding ways to claim that teenagers at the station had implicated Plaintiff.

**ANSWER:      The Officer Defendants deny the allegations in paragraph 39.**

40.      For example, Defendants Halloran, O'Brien, Foster, O'Donnell, and Wehrle were among those who interviewed 15-year-old Eric Plunkett and other teens.

**ANSWER:      The Officer Defendants admit that Plunkett who was 15 years old, was interviewed in the presence of Defendant Youth Officer O'Donnell. The Officer Defendants further admit that other teens were also interviewed but lack knowledge or information at this time to form a belief as to who interviewed Plunkett and the other teens.**

41.      They interrogated Plunkett without a parent or guardian present and accused him of being the shooter. They tested his hands, and those of another teen, for gunshot residue. They threatened to charge him with the shooting.

**ANSWER:      The Officer Defendants admit that Plunkett was interviewed and that his and another teen's hands were tested for gunshot residue. The Officer Defendants deny the remaining allegations in paragraph 41.**

42.      Plunkett, fearing prosecution, agreed to sign a false statement fabricated by Defendants against Plaintiff, fabricated by Defendants. In furtherance of this scheme, and to make false evidence valid and voluntary, Defendants Foster, McDonnell [*sic*], and Wehrle then purported to memorialize the false statement they would attribute to Plunkett even though the officers had made it up.

**ANSWER:      The Officer Defendants deny the allegations in paragraph 42.**

43.      The Defendant Officers, including Defendants O'Brien, Halloran, and others, also fabricated statements against Plaintiff from other teenagers. Defendants used threats as well as violence to achieve their goal. Multiple teenage boys and their families were victimized and traumatized by these illegal interrogation tactics.

**ANSWER:      The Officer Defendants deny the allegations in paragraph 43.**

**Plaintiff Learns He Is a Suspect and Seeks To Clear His Name**

44.       The next day, the morning of November 1, 2001, Plaintiff was helping to get his get his [sic] younger siblings ready for school.

**ANSWER:      The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44.**

9

45.     The morning news was on the television, and Plaintiff was stunned to hear that he was wanted for questioning in the shooting of Officer Doyle.

**ANSWER:    The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45.**

46.     Knowing that he was innocent and unsure how to proceed, Plaintiff went to his grandmother, Gertrude Fulton, to ask for advice. Together, trusting to the system, Plaintiff and Ms. Fulton decided to go to the police station to clear Plaintiff's name.

**ANSWER:    The Officer Defendants admit that Plaintiff and his grandmother went to the second district police station on November 1, 2001.  The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 46.**

### The Coercive Interrogation of Plaintiff

47.     Plaintiff and his grandmother arrived at 51st and Wentworth in the late morning or early afternoon and asked to speak with an officer with whom they were somewhat acquainted, Brian Blackman. Plaintiff honestly explained to Blackman that he was innocent of the shooting and did not see who shot Officer Doyle.

**ANSWER:    The Officer Defendants admit that Plaintiff and his grandmother arrived at 51st and Wentworth in the early afternoon on November 1, 2001. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 47.**

48.     Blackman told Plaintiff that he would be fine if he explained the same to the detectives, and Plaintiff was then turned over to Defendants Halloran and O'Brien.

**ANSWER:    Defendants Halloran and O'Brien deny that Plaintiff was "turned over" to them by Blackman.  Halloran and O'Brien lack knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 47. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48.**

49.     Blackman's reassurance was mistaken. Defendants Halloran and O'Brien proceeded to interrogate Plaintiff, including by using violence, until they compelled him to provide a false confession.

**ANSWER:** The Officer Defendants deny the allegations in paragraph 49.

50. Defendants Halloran and O'Brien were dead set on coercing Plaintiff because it was their practice to do so and because they were fueled with additional angst because a fellow CPD officer had been shot.

**ANSWER:** The Officer Defendants deny the allegations in paragraph 50.

51. The Defendant Officers' coercion of Plaintiff began almost immediately. Defendants Halloran and O'Brien demanded Plaintiff strip down to his boxer shorts, and they took away his clothing. They then handcuffed Plaintiff behind his back and left him in the interrogation room. He would remain in this condition throughout his interrogation, which spanned the day.

**ANSWER:** The Officer Defendants deny the allegations in paragraph 51.

52. When Defendants Halloran and O'Brien returned and began questioning Plaintiff, Plaintiff told them, as he had told Blackman, that he had no involvement with the shooting.

**ANSWER: Defendants Halloran and O'Brien deny that they "returned" after having left Plaintiff in room handcuffed behind his back and wearing only boxer shorts. Defendants Halloran and O'Brien admit that when they began questioning Plaintiff at 8:00 p.m. on November 1, 2001, Plaintiff denied involvement in the shooting. Halloran and O'Brien deny the remaining allegations in paragraph 51. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52.**

53. Because Halloran and O'Brien were not engaged in a search for the truth but were instead involved in a guilt-presumptive and accusatory process, they refused to accept these denials.

**ANSWER:** The Officer Defendants deny the allegations in paragraph 53.

54. Defendants Halloran and O'Brien yelled at Plaintiff, called him a liar, and insisted Plaintiff say he shot Officer Doyle. Plaintiff continued to truthfully deny any involvement.

**ANSWER: Defendants Halloran and O'Brien deny the allegations in paragraph 53. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54.**

55. Plaintiff had a large, conspicuous scar on his chest from an open-heart surgery, which Defendants Halloran and O'Brien saw.

**ANSWER: Defendants Halloran and O'Brien deny the allegations in paragraph 54. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 55.**

56. Nonetheless, Defendants Halloran and O'Brien struck Plaintiff in his chest. He could not protect his chest because he was handcuffed behind his back.

**ANSWER: Defendants Halloran and O'Brien deny the allegations in paragraph 55. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 56.**

57. Plaintiff told Defendants Halloran and O'Brien about his concern for his heart condition, evidenced by the scar, but they ignored his pleas and refused to exercise concern for this nearly naked teenager.

**ANSWER: Defendants Halloran and O'Brien deny the allegations in paragraph 56. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 57.**

58. Instead, Defendants Halloran and O'Brien threatened Plaintiff, demanding he say he shot Officer Doyal [*sic*], and they continued to beat him. At one point, Defendant O'Brien choked Plaintiff from behind and lifted him from the ground, causing Plaintiff to fear he would lose consciousness and die.

**ANSWER: Defendants Halloran and O'Brien deny the allegations in paragraph 57. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58.**

59. Defendants Halloran and O'Brien made threats against Plaintiff's life but also against his family members, including his grandmother.

**ANSWER: Defendants Halloran and O'Brien deny the allegations in paragraph 58. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59.**

60. Plaintiff ultimately succumbed and told Defendants Halloran and O'Brien that he would provide a statement falsely implicating himself in the shooting.

**ANSWER: Defendants Halloran and O'Brien admit that Plaintiff provided a statement implicating himself in the shooting of Officer Doyle. Defendants Halloran and O'Brien deny the remaining allegations in paragraph 60. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60.**

61. Defendants Halloran and O'Brien told Pittman what he should say, knowing that it was false, and repeatedly practiced it with him.

**ANSWER: Defendants Halloran and O'Brien deny the allegations in paragraph 61. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 61.**

62. In the midst of the interrogation, Defendants Halloran and O'Brien worked with Defendant ASA Wehrle and informed her of the progress of the unlawful interrogation and Plaintiff's denials.

**ANSWER: Defendants Halloran and O'Brien admit that they informed Defendant ASA Wehrle of the progress of their investigation but deny that they did anything unlawful or told ASA Wehrle that they did anything unlawful. Defendants Halloran and O'Brien deny the remaining allegations in paragraph 62. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62.**

63. ASA Wehrle knew the tactics used in the interrogation of Plaintiff—to move him from truthful denial to a false inculpatory statement—were unlawful. But, as a Cook County Felony Review Unit member who knew she had to "play ball" with these experienced detectives, Defendant Wehrle agreed to participate in creating false evidence anyway.

**ANSWER: The Officer Defendants deny the allegations in paragraph 63.**

64. Once Plaintiff's will had been overcome, ASA Wehrle, along with Defendant O'Brien, videorecorded Plaintiff giving the false statement he had been fed and forced to regurgitate.

**ANSWER: The Officer Defendants admit that Plaintiff gave a videorecorded statement. The Officer Defendants deny the remaining allegations in paragraph 64.**

**Additional Evidence Points Away from Plaintiff**

65.     The Defendant Officers and ASA Wehrle knew Plaintiff [*sic*] the evidence against Plaintiff was false because they had participated in fabricating it and suppressing exculpatory evidence.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 65.**

66.     These defendants also became aware that additional objective evidence confirmed Plaintiff's innocence, including fingerprints found on the gun involved in the shooting and an absence of any gunshot residue on Plaintiff or his clothing.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 66.**

**Plaintiff's Wrongful Prosecution and Conviction**

67.     Plaintiff was charged with the shooting of Officer Doyle based upon the false evidence generated during the interrogations of Plaintiff other teenagers.

**ANSWER:    The Officer Defendants admit that Plaintiff was charged with the shooting of Officer Doyle. The Officer Defendants deny the remaining allegations in paragraph 67.**

68.     Before the creation of this evidence, there was no probable cause to suspect Plaintiff of shooting Doyle.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 68.**

69.     After the creation of this evidence, there was no probable cause to suspect Plaintiff of shooting Doyle, as any evidence pointing to Plaintiff was false, fabricated, or coerced by the Defendants.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 69.**

70.     Due to Defendants' acts, Plaintiff was subsequently tried for the attempted murders of Officer Doyle and of teenager Vashon Prince.

**ANSWER:    The Officer Defendants admit that Plaintiff was tried for the attempted murders of Officer Doyle and Vashon Prince.  The Officer Defendants deny the remaining allegations in paragraph 70.**

71.     Defendants never disclosed to prosecutors or defense attorneys their own misconduct in fabricating and coercing evidence and further suppressed other evidence, such as Sherry Shannon's exculpatory statement about the perpetrator.

**ANSWER: The Officer Defendants deny that they engaged in any wrongdoing or misconduct, and therefore deny the allegations in paragraph 71.**

72. The entirety of the evidence used against Plaintiff during the course of the criminal case was fabricated by the Defendants. That included, among other things, Defendants' own reports, false witness statements, and the false confession they attributed to Plaintiff.

**ANSWER: The Officer Defendants deny the allegations in paragraph 72.**

73. As a result, Plaintiff was convicted in 2005 of aggravated battery and of the attempted murders of Officer Doyle and Prince. Plaintiff—who had been 18 for less than two months when he was arrested and had no prior convictions—was sentenced to 80 years of imprisonment, though that was later reduced to 30 years.

**ANSWER: The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiff had no prior convictions. The Officer Defendants admit the remaining allegations in paragraph 73.**

### Plaintiff's Release and Exoneration

74. Plaintiff never gave up hope of proving his innocence.

**ANSWER: The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74.**

75. While proceedings related to his innocence and unlawful interrogation were pending, Plaintiff sought executive clemency during the COVID-19 pandemic. The governor commuted his sentence, and Plaintiff was released in December 2020, having served 19 years of wrongful incarceration.

**ANSWER: The Officer Defendants admit that the governor commuted Plaintiff's sentence and that Plaintiff was released in December 2020 after serving 19 years in prison. The Officer Defendants deny that Plaintiff's incarceration was "wrongful." The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 75.**

76. In post-conviction proceedings, Plaintiff's conviction was vacated in 2022 on the basis that Defendants O'Brien and Halloran had tortured Plaintiff during his interrogation and had coerced him into inculpating himself.

**ANSWER: Defendants Halloran and O'Brien deny that they tortured Plaintiff during his interrogation or that they coerced him into inculpating himself, and therefore deny the allegations in paragraph 76. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76 but deny that they witnessed any wrongdoing or misconduct as alleged.**

77. The State subsequently declined to retry Plaintiff and dropped the charges against him.

**ANSWER: The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77.**

78. On September 27, 2023, Plaintiff filed a petition for a Certificate of Innocence in Cook County Circuit Court, and on March 8, 2024, his petition was granted.

**ANSWER: The Officer Defendants admit that on September 27, 2023, Plaintiff filed a petition for a Certificate of Innocence in the Cook County Circuit Court. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 78.**

### Defendants' Pattern of Misconduct

79. The shooting of Officer Doyle is far from the only time Defendants O'Brien and Halloran, often joined by others, have worked together to "close" a case quickly, regardless of the evidence. Nor is it the first time in which these detectives used physical and psychological torture, including exploiting an existing physical vulnerability, to do so. Rather, these detectives had engaged in a longstanding pattern of such misconduct.

**ANSWER: Defendants Halloran and O'Brien deny the allegations in paragraph 79. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79.**

80. As a result, numerous men have had their convictions overturned, notwithstanding confessions taken by Defendants Halloran and O'Brien.

**ANSWER: Defendants Halloran and O'Brien admit that some convictions have been vacated despite confessions they obtained. Defendants Halloran and O'Brien lack knowledge or**

**information sufficient to form a belief as to the truth of the remaining allegations in paragraph 80.**

**The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to**

**the truth of the allegations in paragraph 80.**

81.     Examples of misconduct committed by Halloran, O'Brien, or both include, but are not limited to:

a.  In 1988, Halloran and a partner struck Mickey Grayer in the stomach and groin with a flashlight, and punched and choked him.

b.  In 1990, Cortez Brown was tortured by O'Brien into confessing to two murders with which he had absolutely nothing to do. O'Brien, along with Detectives John Paladino and Anthony Maslanka, beat Brown about his head and chest, including with a flashlight. Brown was denied food and his right to an attorney. During post-conviction proceedings, after O'Brien refused to testify and invoked his Fifth Amendment rights, the court vacated Brown's conviction, finding the evidence of the officers' pattern of misconduct "staggering" and "damning."

c.  In 1991, Defendant O'Brien and other officers brought in eleven suspects, mostly juveniles, for a murder and kept them in custody for 12 to 13 hours. One of these boys, Marcus Wiggins, brought a lawsuit against O'Brien and others alleging that he was handcuffed to a wall, beaten about the chest, and electroshocked while being questioned. The detectives also denied Wiggins's mother access to her son, who was a 13-year-old eighth grader at the time of the coerced confession. The other young suspects also gave confessions, many of them after being physically beaten as well. For example, Jesse and Imari Clemon alleged that they were struck about their bodies and chests, including with fists and flashlights. Jesse Clemon was brought to the hospital with an injured hand. Two of these confessions were later thrown out because of the "periodic screaming [at the police station] throughout the night," screaming that O'Brien testified that he did not hear. All of the defendants were either acquitted or the State entered a *nolle prosequi*.

d.  In August 1991, 15-year-old Johnny Plummer was interrogated for 36 hours by Detective Halloran and others. Plummer alleged that he was hit in the face, stomach and side, including with a flashlight, by the detectives.

e.  In August 1991, Curtis Milsap was slapped in the face while handcuffed and was kicked in the testicles by O'Brien until he confessed to a double murder about which he had no knowledge. Notwithstanding this supposed confession, Milsap was ultimately acquitted of the murders.

f.  Gregory Logan was interrogated regarding a murder in 1991 by O'Brien and other police officers. When Logan professed his innocence, the detectives beat him with a bat, pushed his head against the wall and pointed a gun to his head. He was denied the right to an attorney.

g.  In October 1992, Clayborn Smith was smacked on the face and head, and punched in the ribs by Halloran and other detectives. The detectives also grabbed Smith's neck, pulled his hair and yanked his finger back. After 37 hours of interrogation and physical torture, Smith confessed to a murder that he did not commit. In pending post-conviction proceedings, the Court barred the state from denying that Halloran and the other officer involved had engaged in a pattern of abuse between 1990 and 2001.

h.  In November 1992, Harold Hill, Dan Young and Peter Williams falsely confessed to a rape and murder after O'Brien, Halloran, and others physically assaulted and psychologically coerced them. Hill was only 16 years old at the time. Dan Young, whose IQ was 56, also falsely confessed after being kicked and struck about his body to a crime with which he had absolutely nothing to do. Peter Williams—who was incarcerated on an unrelated charge at the time of the rape and murder— falsely confessed after being chained to a radiator, struck on an existing injury, hit with a blackjack, and forced to urinate on himself. Williams was never charged; twelve years after their convictions, Hill and Young were exonerated when DNA evidence proved that they could not have been the offenders.

i.  In 1992, Kilroy Watkins was interrogated by Halloran and others. Watkins was choked, punched in the face, and held for over 30 hours. Watkins gave a false confession to the detectives because he could not stand further physical abuse. The Torture Inquiry and Relief Commission subsequently referred Watkins' case for a hearing.

j.  In 1995, Tyrone Hood was interrogated by Halloran and another officer. Hood and several witnesses in his case were beaten and threatened by Halloran and others into giving statement inculpating Hood. Hood has been granted a Certificate of Innocence ("COI"), and his civil lawsuit against Defendant Halloran and others recently settled.

k.  Hood's co-defendant was a man named Wayne Washington. Washington alleged that he was held for two days. During that time, he was handcuffed, slapped in the face, knocked out of his chair, threatened, and denied food and water until he agreed to give a false and fabricated statement inculpating himself and Hood in the murder. Washington has also been granted a COI, and his civil lawsuit against Halloran and other officers recently settled.

l.  In 1993, Emmett White was arrested by O'Brien and Halloran. In an effort to secure a confession, O'Brien and Halloran slapped White in the face and struck White on his body. When White told the officers that he did not have anything to say to them and was exercising his right to remain silent, the detectives became infuriated. The detectives again struck White about the face and body, threw him on the ground and O'Brien stepped on his face. Although the police alleged that White voluntarily confessed to the crime, when asked under oath about White's allegations that he was beaten about the face and body, O'Brien and Halloran pled the Fifth Amendment.

m. In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during an interrogation by O'Brien, Halloran, and other officers, all of whom refused to let him contact his family and intimidated him into confessing to a murder that he did not commit. Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, were arrested by the same detectives despite the lack of any physical evidence or eyewitnesses linking them to the crime. O'Brien and Halloran physically abused Escamilla by beating him, including around the chest, and threatening to send his pregnant wife to jail if he did not confess. After hours of abuse, Escamilla eventually complied.

n.  Although Miguel Morales was also beaten during his interrogation, he refused to confess. Therefore, to secure Morales' conviction, O'Brien, Halloran, and others coerced John Willer and Raphael Robinson into identifying Morales as the offender. For example, O'Brien used a very suggestive lineup: He grabbed

Robinson by the neck while Robinson was viewing a lineup and asked him "how many fingers am I holding up." When Robinson answered "three," O'Brien used this to say that Robinson had identified person number three. In addition, O'Brien spoke with Robinson prior to his trial testimony to explain who committed the murder and where in the courtroom they would be sitting.

o. When asked about their interrogation and coercion of Escamilla, Morales, Willer, and Robinson during a deposition in a civil suit, O'Brien and Halloran refused to answer any questions for fear of subjecting themselves to criminal liability.

p. In December 1993, O'Brien, Halloran, and others "closed" two separate murders by coercing confessions from two intellectually disabled individuals, Fred Ewing and Darnell Stokes. O'Brien and Halloran choked Ewing. One expert concluded that Ewing was "unable to comprehend the substance of the confession which he allegedly made." Absent any other evidence connecting them to the crime, both were acquitted notwithstanding the "confessions" obtained by O'Brien and others. O'Brien and Halloran both refused to answer questions about Ewing's and Stoke's allegations that they were beaten by O'Brien, Halloran and others when in a deposition in an unrelated civil suit.

q. In 1994, Halloran and other police officers forced Sheila Crosby and Michael Sardin to identify Shondell Walker as a murderer in grand jury testimony. Halloran threatened that if Crosby did not do so, he would have the Department of Children and Family Services take her children away from her. For Sardin, the detectives threatened that if he did not name Walker as the killer, he would be charged with the murder.

r. In 1995, officers including Defendant Halloran, took Derrek Flewellen and questioned him for 36 hours, during which time they slapped, kicked and punched him in the face and body, and stomped on and slammed a chair into his injured foot. Officers, including Halloran, threatened to have Flewellen's girlfriend arrested and her child taken away if he would not confess. Flewellen eventually signed a false confession. He spent almost five years in prison before being acquitted of the two murders based on DNA tests, which proved the crime was committed by someone else.

s. In 1994, Halloran and other officers beat Anthony Williams into falsely confessing to murder and armed robbery.

t. In 1994, Nevest Coleman, like Plaintiff, voluntarily went to the police station. He had found a body buried in the basement of his apartment building. Halloran and other detectives locked their sights on Coleman. Coleman repeatedly denied his involvement in the rape and murder, which was met with punches to his face. Eventually, the officers fed Coleman details about the crime and Coleman falsely confessed to being a lookout. In 2016, DNA evidence exculpated Coleman and his co-defendant. In 2017, Coleman was exonerated, and the state dismissed all charges.

u. In 1995, Halloran and other officers interrogated and coerced a confession from Oscar Gomez. The detectives held Gomez for 30 hours, repeatedly beat him while he was shackled to the wall, and prevented him from communicating with an attorney or with his family. Halloran and others threatened to arrest Gomez's father if Gomez did not give an inculpatory statement. Despite his "confession," Gomez was found not guilty. O'Brien and Halloran both took the Fifth Amendment when asked questions about their coercive interrogation of Gomez.

v. In 1995, Abel Quinones confessed to murder after being interrogated for 30 hours and being repeatedly beaten by Halloran. Despite his purported confession, Quinones was found not guilty. Halloran pled the Fifth Amendment when asked questions about the Quinones case in an unrelated civil deposition.

w. In 1995, Halloran and O'Brien interrogated Sean Tyler and Reginald Henderson regarding a 1991 murder. Henderson was shackled to the wall and not allowed to call his mother or an attorney. Halloran and O'Brien slapped him and hit his head against a desk. He made an inculpatory statement after being hit many times over three days. Tyler was also struck until he was throwing up blood and his chest hurt.

x. Kylin Little was a witness to a 1996 murder. When O'Brien, Halloran and other officers interrogated him, they physically and psychologically coerced him until he lied and implicated Eric Gibson, a man who had absolutely nothing to do with the crime. Since his interrogation, Little has fully recanted the statement he gave to the police.

y. In 1996, Jeremy Allen was wrongfully charged with murder after O'Brien coerced two witnesses into falsely identifying Allen. Allen was ultimately acquitted at trial.

z. In 1996, O'Brien, Halloran, and another officer handcuffed William Ephraim to a wall, held him down, and beat him around the chest, head, and stomach until he lost consciousness. O'Brien beat him repeatedly, and Halloran threatened him that if he did not cooperate and confess, O'Brien and Halloran would continue to beat him. O'Brien and Halloran both took part in beating him after he told a State's Attorney he had been abused.

aa. In February 1997, after being slapped and threatened by O'Brien, Robert Wilson falsely confessed to slashing a woman with a knife. After being threatened and abused by O'Brien, Wilson—who had high blood pressure and no access to his medication—believed that he would not survive a beating by police and agreed to give a false, inculpatory statement to save his life. O'Brien withheld evidence from the victim that another man, one who exactly fit her description of the perpetrator, had slashed several persons in the same area at about the same time. The victim ultimately recanted her identification of Wilson, but not before Wilson had spent almost 10 years in jail. In a deposition in an unrelated civil suit, O'Brien and Halloran both took the Fifth Amendment when questioned about Wilson's allegations of abuse.

bb. In 1998, 17-year-old Antoine Anderson was interrogated by O'Brien and Halloran about a recent murder. The detectives hit Anderson in the face and chest and threatened to take away his children. As a result of this abuse, and after being held for two days at the police station, Anderson falsely confessed to a crime he did not commit.

cc. In 1998, Halloran and others held Joseph Jackson in an interrogation room in connection with a murder investigation. When Jackson refused to confess, Halloran and another detective placed a book on his chest and stomach and hit the book with a blackjack to avoid leaving visible marks on Jackson's body. Halloran and the detective also put a typewriter cover over Jackson's head and cut off his air supply. Jackson eventually confessed to a murder he did not commit.

dd.     In 2002, Halloran and O'Brien stripped Jerome Weathers of his clothes, gave him a gown to wear, and left him in a cold room. They beat him repeatedly and choked him several times until he almost lost consciousness. They held him for over two days until he gave an inculpatory statement. Mr. Weathers testified in Plaintiff's post-conviction hearing and the Judge found his testimony about his abuse to be credible.

ee.     In 2002, O'Brien and Halloran left Stanley Gardner in a cold room with minimal clothes, threatened him, and hit him.

**ANSWER:     Defendants Halloran and O'Brien deny the allegations in paragraph 81, including subparagraphs a-ee. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81 including subparagraphs a-ee.**

**The City of Chicago's Policies and Practices Caused Plaintiff's Wrongful Conviction**

82.     As a result of its policies and practices, the Chicago Police Department is responsible for scores of miscarriages of justice like those the Defendant Officers inflicted on Plaintiff and the others described above.

**ANSWER:     The Officer Defendants deny the allegations in paragraph 82.**

83.     Since 1986, no fewer than 70 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to convict innocent people of serious crimes they did not commit—numerous of which involve the named Defendant Officers.

**ANSWER:     The Officer Defendants deny that they fabricated false evidence or suppressed exculpatory evidence to convict innocent people of crimes they did not commit and therefore deny the allegations in paragraph 83.**

84.     The pattern of misconduct identified in the paragraphs above involving Defendants Halloran and O'Brien are but a fraction of this widespread practice, which extended throughout the City.

**ANSWER:     Defendants Halloran and O'Brien deny that they engaged in a pattern of misconduct and therefore deny the allegations in paragraph 84. The remaining Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84.**

85.     These cases include many in which Chicago police officers employed the same tactics the Defendant Officers employed against Plaintiff in this case, including: (1) using physically and psychologically coercive tactics to obtain involuntary, false, and fabricated confessions; (2) fabricating witness statements; and (3) concealing exculpatory evidence.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 85.**

86.    At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 86.**

87.    As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendant Officers in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own, enabling police to secure the wrongful convictions of innocent people.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 87.**

88.    In 2019, the Federal Bureau of Investigation and Department of Justice confirmed that Chicago Police Department supervisor, Jon Burge—who had supervised Defendants Halloran and O'Brien—was aware that on numerous occasions, detectives he was supervising participated in the torture and physical abuse of persons being questioned.

**ANSWER:    The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 88.**

89.    Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 89.**

90.    The municipal policy and practice set out in the paragraphs above was described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements and physically abused witnesses. That Report also documents how, as here, Felony Review Unit ASAs in the Cook County's State's Attorney's Office also participate—and are instrumental in—presenting statements to the courts, even when they were coerced or fabricated.

**ANSWER:    The Officer Defendants deny the allegations in the FD-302 report and therefore deny the allegations in paragraph 90.**

91.    At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to other participants in the criminal justice system.

As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of an investigation, rather than being maintained as part of the official file.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing**

**and therefore deny the allegations in paragraph 91.**

92.     Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff. The Defendant Officers also maintained clandestine files that were not turned over to the prosecutor and were destroyed or hidden at the close of the Doyle investigation, including, for example, documents relating to witness interviews.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing**

**and therefore deny the allegations in paragraph 92.**

93.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was detailed in *Fields v. City of Chicago*, 10 C 1168 (N.D. Ill.), a case in which it was discovered that the City maintained a basement full of clandestine files at the 51st and Wentworth Police Station.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 93 and further deny that**

**they engaged in any misconduct or wrongdoing.**

94.     The policy and practice of file suppression at issue in *Fields* was in place from the 1980s through the 2000s, including during the commission and investigation of the Doyle shooting described above.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing**

**during the commission and investigation of the Doyle shooting and therefore deny the allegations**

**in paragraph 94.**

95.     Indeed, in addition to the contemporaneous notes from the investigation taken on the night of the shooting and days after having not been disclosed, the original file for the Doyle shooting has been suppressed and either lost or destroyed as a result of the City's inadequate and unconstitutional policies and practices with respect to document retention and the production of material information to the criminal justice system.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 95.**

96.     Before and during the period in which Plaintiff was falsely charged with the Doyle shooting and convicted, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never

imposed significant discipline against police officers accused of violating civilians' civil and constitutional rights. And the Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing or that Plaintiff was falsely charged with the shooting of Officer Doyle. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 96.**

97. Indeed, in a review of 98 allegations of coerced confessions or fabricated evidence that were culled from complaints against officers assigned to Area One and lodged with OPS between 1989 and 1996, OPS did not sustain a single one of these allegations.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 97.**

98. As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 98.**

99. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Defendant Officers here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 99.**

100. The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

    a. The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses.

    b. The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding.

    c. The risks of engaging in tunnel vision during investigation.

    d. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 100.**

101. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

**ANSWER:** **The Officer Defendants lack knowledge or information sufficient to form a belief as to what Plaintiff considers obvious. The Officer Defendants deny the remaining allegations in paragraph 101.**

102. The City's failure to train, supervise, and discipline its officers, including the Defendant Officers, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff in this case. Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 102.**

103. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**ANSWER:** **The Officer Defendants deny that they engaged in any wrongdoing or misconduct and therefore deny the allegations in paragraph 103.**

104. The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

**ANSWER: The Officer Defendants deny that they violated and/or were deliberately indifferent to violations of Plaintiff's constitutional rights and therefore deny the allegations in paragraph 104.**

### Plaintiff's Damages

105.    For almost 20 years, starting at age 18, Plaintiff was forced to live in confinement and serve out a punishment for a crime he did not commit.

**ANSWER: The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiff did not commit the crime for which he was convicted and deny the remaining allegations in paragraph 105.**

106.    Plaintiff was required to live in conditions that are inhumane and damaging to physical and mental health. A constant atmosphere of fear, distrust, violence, and threats of violence from prisoners and staff alike permeated the prison environments he was forced to inhabit. For more two decades, Plaintiff's life was marked by a steady stream of human rights abuses.

**ANSWER: The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106.**

107.    During his wrongful incarceration, Pittman was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, funerals, and other life events with loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

**ANSWER: The Officer Defendants deny that Plaintiff was wrongfully incarcerated and therefore deny the allegations in paragraph 107.**

108.    Plaintiff was deprived of meaningful opportunities for education and unable to work or start a family. He missed the births of nieces and nephews and was unable to attend the funerals of loved ones from whom he had wrongfully been separated.

**ANSWER: The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108.**

109.    Plaintiff's nearly 20 years of wrongful incarceration forced him into a world of isolation in which he lost contact with some of his friends and family in the outside world.

**ANSWER:** **The Officer Defendants deny that Plaintiff's incarceration was wrongful and therefore deny the allegations in paragraph 109.**

110.     Plaintiff must now attempt to make a life for himself outside of prison without the benefit of more than two decades of life experiences, which normally equip adults for the task.

**ANSWER:** **The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110.**

111.     As a result of the foregoing, Plaintiff has suffered tremendous damage, including physical injury, psychological trauma, and emotional damages, all caused by the Defendants' misconduct.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 111.**

## COUNT I – 42 U.S.C. §1983
## Coerced False Confession in Violation of the Fifth and Fourteenth Amendments

112.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** **The Officer Defendants incorporate each paragraph of their answer to Plaintiff's Complaint as if fully restated herein.**

113.     As described more fully above, Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 113.**

114.     As described more fully above, Defendants participated in, encouraged, advised, and ordered an unconstitutional and unlawful interrogation of Plaintiff that caused him to make involuntary and false statements implicating himself in the shooting of Officer Doyle.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 114.**

115.     The coerced, involuntary, false statement Defendants fabricated and attributed to Plaintiff was used against him to his detriment in a criminal case.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 115.**

116.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's innocence.

**ANSWER:** The Officer Defendants deny the allegations in paragraph 116.

117. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** The Officer Defendants deny the allegations in paragraph 117.

118. Plaintiff's injuries were also caused by the policies, practices, and customs of Defendant City of Chicago.

**ANSWER:** The Officer Defendants deny that they engaged in any misconduct or wrongdoing

and therefore deny the allegations in paragraph 118.

119. At all relevant times and before the events giving rise to this lawsuit occurred, the City of Chicago promulgated rules, regulations, policies, and procedures for the conduct of interrogation, testing, and questioning of criminal suspects by officers and agents of the Chicago Police Department. In addition, the City of Chicago promulgated rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects.

**ANSWER:** The Officer Defendants admit the allegations in paragraph 119.

120. These rules, regulations, policies, and procedures were implemented by officers and agents of the Chicago Police Department, including the Defendant Officers who were responsible for interrogating suspects and witnesses in connection with the Doyle shooting investigation.

**ANSWER:** The Officer Defendants admit the allegations in paragraph 120.

121. Additionally, at all times relevant to the events described in this pleading and for a period of time before those events, Defendant City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department under which individuals like Plaintiff, who were suspected of criminal activity, were routinely coerced against their will to implicate themselves in crimes of which they were innocent. It was common for suspects interrogated by the Chicago Police Department to falsely confess under extreme duress and after suffering abuse to committing crimes to which they had no connection and for which there was scant evidence to suggest they were involved.

**ANSWER:** The Officer Defendants deny that they engaged in any misconduct or wrongdoing

and therefore deny the allegations in paragraph 121.

122. Specifically, at all relevant times and for a period of time before the events giving rise to this action, there existed a widespread practice among officers, employees, and agents of the Chicago Police Department under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following:

(a) individuals who were subjected to actual and threatened physical and psychological violence;

(b)individuals who were interrogated at length without the protection of their constitutional rights to have an attorney present or to remain silent; (c) individuals who were forced to sign false statements fabricated by the police; (d) officers and employees who were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (e) supervisors, with knowledge of permissible and impermissible interrogation techniques, who did not properly supervise or discipline police officers and employees, such that the coercive interrogations continued unchecked.

**ANSWER: The Officer Defendants deny that that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 122, including subparagraphs a-e.**

123. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the Chicago Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue, by failing to adequately train, supervise, and control their officers, agents, and employees as to proper interrogation techniques, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those that affected Plaintiff.

**ANSWER: The Officer Defendants deny that that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 123.**

124. The above widespread practices were so well-settled as to constitute *de facto* policy of the Chicago Police Department and were able to exist and thrive because policymakers exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER: The Officer Defendants deny that that they engaged in any misconduct or wrongdoing and therefore deny the allegations 124.**

125. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

**ANSWER: The Officer Defendants deny that that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 125.**

126. The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confessions at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation techniques.

**ANSWER:** **The Officer Defendants deny that that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 126.**

127. Plaintiff's injuries were caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**ANSWER:** **The Officer Defendants deny that that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 127.**

## COUNT II – 42 U.S.C. § 1983
### Violation of Due Process under the Fourteenth Amendment

128. Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

**ANSWER:** **The Officer Defendants incorporate each paragraph of their answer to Plaintiff's Complaint as if fully restated herein.**

129. As described more fully above, Defendants, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 129.**

130. In the manner described more fully above, Defendants deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 130.**

131. In addition, as described more fully above, Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, suborned perjury, obtained Plaintiff's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 131.**

132. Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 132.**

133.     In addition, Defendants, acting individually, jointly and/or in concert and conspiracy, used unduly suggestive identification procedures to procure a false identification of Plaintiff that was used to deprive him of liberty.

**ANSWER:     The Officer Defendants deny the allegations in paragraph 133.**

134.     In a manner described more fully above, Defendants individually, jointly, and/or in concert and in conspiracy, deliberately withheld exculpatory evidence, and destroyed and/or intentionally lost material evidence. In doing so, Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, to preserve material evidence, and to ensure the integrity of eyewitness identifications and statements.

**ANSWER:     The Officer Defendants deny the allegations in paragraph 134.**

135.     The destruction and/or loss of evidence was done in bad faith, and/or was done so that Plaintiff could not present obviously exculpatory evidence at the trial.

**ANSWER:     The Officer Defendants deny the allegations in paragraph 135.**

136.     Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

**ANSWER:     The Officer Defendants deny the allegations in paragraph 136.**

137.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

**ANSWER:     The Officer Defendants deny that they engaged in any wrongdoing or misconduct**

**and therefore deny the allegations in paragraph 137.**

138.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:     The Officer Defendants deny that they engaged in any wrongdoing or misconduct**

**and therefore deny the allegations in paragraph 138.**

139.     Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

**ANSWER:** **The Officer Defendants deny that they engaged in any wrongdoing or misconduct and therefore deny the allegations in paragraph 139.**

140. The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

**ANSWER:** **The Officer Defendants deny that they engaged in any wrongdoing or misconduct and therefore deny the allegations in paragraph 140.**

141. The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

**ANSWER:** **The Officer Defendants deny that they engaged in any wrongdoing or misconduct and therefore deny the allegations in paragraph 141.**

142. Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

**ANSWER:** **The Officer Defendants deny that they engaged in any wrongdoing or misconduct and therefore deny the allegations in paragraph 142.**

143. Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost to suspects, witnesses, and the community. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

**ANSWER:** **The Officer Defendants deny that they engaged in any wrongdoing or misconduct and therefore deny the allegations in paragraph 143.**

144. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

**ANSWER:** **The Officer Defendants deny that they engaged in any wrongdoing or misconduct and therefore deny the allegations in paragraph 144.**

145. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**ANSWER:** **The Officer Defendants deny that they engaged in any wrongdoing or misconduct and therefore deny the allegations in paragraph 145.**

## COUNT III – 42 U.S.C. § 1983
### Liberty Deprivation in Violation of the Fourth Amendment

146. Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

**ANSWER:** **The Officer Defendants incorporate each paragraph of their answer to Plaintiff's Complaint as if fully restated herein.**

147. In the manner described more fully above, Defendants individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, used fabricated evidence to accuse Plaintiff of criminal activity and detain him without probable cause.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 147.**

148. In so doing, Defendants caused Plaintiff to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth and Fourteenth Amendments. Specifically, Plaintiff was incarcerated from the date of his arrest until 19 years later.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 148.**

149. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's innocence.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 149.**

150. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 150.**

151. Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to

criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 151.**

152. The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 152.**

153. The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 153.**

154. Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 154.**

155. Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 155.**

156. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were

committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 156.**

157.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**ANSWER:** **The Officer Defendants deny that they violated Plaintiff's constitutional rights and therefore deny the allegations in paragraph 157.**

## COUNT IV – 42 U.S.C. § 1983
## Failure to Intervene

158.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** **The Officer Defendants incorporate each paragraph of their answer to Plaintiff's Complaint as if fully restated herein.**

159.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more Defendant stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

**ANSWER:** **The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 159.**

160.    As a direct and proximate result of this violation of his constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

**ANSWER:** **The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 160.**

161.    These Defendants had a reasonable opportunity to prevent this harm, but they failed to do so.

**ANSWER:** **The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 161.**

162.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**ANSWER:     The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 162.**

163.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

**ANSWER:     The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 163.**

164.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

**ANSWER:     The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 164.**

165.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

**ANSWER:     The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 165.**

166.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

**ANSWER:     The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 166.**

167.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be

rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

**ANSWER:** **The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 167.**

168. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

**ANSWER:** **The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 168.**

169. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**ANSWER:** **The Officer Defendants deny that they engaged in or observed any misconduct or wrongdoing and therefore deny the allegations in paragraph 169.**

## COUNT V – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

170. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** **The Officer Defendants incorporate each paragraph of their answer to Plaintiff's Complaint as if fully restated herein.**

171. After the shooting of Officer Doyle, Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 171.**

172. Additionally, before and after Plaintiff's conviction, Defendants further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more-timely exoneration.

**ANSWER:** **The Officer Defendants deny the allegations in paragraph 172.**

173.    In this manner, Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 173.**

174.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, conducting unduly suggestive lineups, withholding exculpatory evidence, coercing false statements, and committing perjury during hearings and trials—and was an otherwise willful participant in joint activity.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 174.**

175.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

**ANSWER:    The Officer Defendants deny that they engaged in any wrongdoing or misconduct**

**and therefore deny the allegations in paragraph 175.**

176.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights. Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

**ANSWER:    The Officer Defendants deny that they engaged in any misconduct or wrongdoing**

**and therefore deny the allegations in paragraph 176.**

177.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

**ANSWER:    The Officer Defendants deny that they engaged in any misconduct or wrongdoing**

**and therefore deny the allegations in paragraph 177.**

178.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 178.**

179.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 179.**

180.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendants' misconduct at issue in this case.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 180.**

181.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 181.**

182.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**ANSWER:** **The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 182.**

### COUNT VI – 42 U.S.C. § 1983
### Municipal Liability

**The Officer Defendants make no answer to the allegations in Count VI as these allegations are not directed towards these Defendants. To the extent any of the allegations contained herein could be construed against the Officer Defendants, those allegations are denied**.

## COUNT VII – State Law Claim
## Malicious Prosecution

188.   Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:   The Officer Defendants incorporate each paragraph of their answer to Plaintiff's Complaint as if fully restated herein.**

189.   Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

**ANSWER:   The Officer Defendants deny the allegations in paragraph 189.**

190.   Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:   The Officer Defendants deny the allegations in paragraph 190.**

191.   Statements of Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. Defendants also fabricated evidence, coerced false inculpatory statements from witnesses, used unduly suggestive lineups, and withheld exculpatory evidence that would have demonstrated Plaintiff's innocence, destroyed material and/or exculpatory evidence and used unduly suggestive identification procedures.

**ANSWER:   The Officer Defendants deny the allegations in paragraph 191.**

192.   Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Doyle shooting.

**ANSWER:   The Officer Defendants deny the allegations in paragraph 192.**

193.   Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. Defendants withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

**ANSWER:   The Officer Defendants deny the allegations in paragraph 193.**

194.   The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:   The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 194.**

195. On October 12, 2022, the prosecution terminated in Plaintiff's favor when his conviction was vacated and all charges against him were dismissed.

**ANSWER: The Officer Defendants admit that, on October 12, 2022, Plaintiff's conviction was vacated and the charges against him were dismissed. The Officer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 195.**

196. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including psychological injury, and emotional distress.

**ANSWER: The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 196.**

## COUNT VIII – State Law Claim
### Intentional Infliction of Emotional Distress

197. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: The Officer Defendants incorporate each paragraph of their answers to Plaintiff's Complaint as if fully restated herein.**

198. The acts and conduct of Defendants as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, emotional distress to Plaintiff, as is more fully alleged above.

**ANSWER: The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 198.**

199. As a direct and proximate result of the Defendant' actions, Plaintiff suffered and continues to suffer emotional distress.

**ANSWER: The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 199.**

## COUNT IX – State Law Claim
### Civil Conspiracy

200. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:    The Officer Defendants incorporate each paragraph of their answers to Plaintiff's Complaint as if fully restated herein.**

201.    As described more fully in the preceding paragraphs, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 201.**

202.    In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

**ANSWER:    The Officer Defendants deny the allegations in paragraph 202.**

203.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:    The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 203.**

204.    As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered damages, including psychological injury and emotional distress, as is more fully alleged above.

**ANSWER:    The Officer Defendants deny that they engaged in any misconduct or wrongdoing and therefore deny the allegations in paragraph 204.**

**COUNT X – State Law Claim**
***Respondeat Superior***

**The Officer Defendants make no answer to the allegations in Count X as these allegations are not directed towards these Defendants. To the extent any of the allegations contained herein could be construed against the Officer Defendants, those allegations are denied.**

**COUNT XI – State Law Claim**
**Indemnification**

**The Officer Defendants make no answer to the allegations in Count XI as these allegations are not directed towards these Defendants. To the extent any of the allegations contained herein could be construed against the Officer Defendants, those allegations are denied.**

## **AFFIRMATIVE DEFENSES**

The Officer Defendants assert the following affirmative defenses to Plaintiff's Complaint:

### **First Affirmative Defense**

In further response to Plaintiff's Complaint, and without waiving any of the responses in the foregoing Answer, the Officer Defendants are government officials, namely police officers, who perform discretionary functions. At all times material to the events alleged in Plaintiff's Complaint, a reasonable police officer objectively viewing the facts and circumstances that confronted the Officer Defendants, could have believed their actions to be lawful, in light of the clearly established law and the information that the Officer Defendants possessed. The Officer Defendants and therefore entitled to qualified immunity as to Plaintiff's claims.

### **Second Affirmative Defense**

In further response to Plaintiff's Complaint, and without waiving any of the responses in the foregoing Answer, the Officer Defendants are absolutely immune from civil liability for claims that they committed perjury during their testimony given in judicial proceedings in Plaintiff's underlying criminal case, *Briscoe v. LaHue*, 460 U.S. 325 (1983); *Jurgensen v. Haslinger*, 295 Ill. App. 3d 139, 141-42 (3rd Dist. 1998), and for claims that they suborned or conspired to commit perjury. *See House v. Belford*, 956 F. 2d 711, 720-21 (7th Cir. 1992).

### **Third Affirmative Defense**

In further response to Plaintiff's Complaint, and without waiving any of the responses in the foregoing Answer, Plaintiff's claims are barred or limited by the application of the doctrines of waiver, forfeiture, *res judicata*, collateral estoppel, and/or judicial estoppel.

## **Fourth Affirmative Defense**

In further response to Plaintiff's Complaint, and without waiving any of the responses in the foregoing Answer, Plaintiff's claims as alleged in his Complaint are barred in whole or in part by the applicable statute of limitations under federal and state law.

## **Fifth Affirmative Defense**

As to the state law claims, and without waiving any of the responses in the foregoing Answer, the Officer Defendants are immune from liability for any act or omission in connection with the execution or enforcement of the law pursuant to 745 ILCS 10/2-202, unless such act or omission constitutes willful and wanton misconduct. This immunity applies to public employees who function jointly, in conjunction or in collaboration with other public employees, as well as to those who function singly. 745 ILCS 10/2-212.

## **Sixth Affirmative Defense**

As to the state law claims, and without waiving any of the responses in the foregoing Answer, The Officer Defendants are not liable because a public employee, acting within the scope of his or her employment cannot be liable for an injury caused by the act or omission of another person pursuant to 745 ILCS 10/2-204. This immunity applies to public employees who function jointly, in conjunction or in collaboration with other public employees, as well as to those who function singly. 745 ILCS 10/2-212.

## **Seventh Affirmative Defense**

As to the state law claims, and without waiving any of the responses in the foregoing Answer, the Officer Defendants are immune from liability for any of the claims alleged because their decisions, acts and omissions regarding the investigation and the arrest of Plaintiff, based upon the information and circumstances known to them at the time, were decisions involving the determination of policy and the exercise of discretion for which they cannot be held liable. 745 ILCS 10/2-201. This immunity applies

to public employees who function jointly, in conjunction or in collaboration with other public employees, as well as to those who function singly. 745 ILCS 10/2-212.

### Eighth Affirmative Defense

As to the state law claims, and without waiving any of the responses in the foregoing Answer, the Officer Defendants are not liable for any of the claims alleged because a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208. This immunity applies to public employees who function jointly, in conjunction or in collaboration with other public employees, as well as to those who function singly. 745 ILCS 10/2-212.

### Ninth Affirmative Defense

In further response to Count VIII of Plaintiff's Complaint alleging intentional infliction of emotional distress, and without waiving any of the responses in the foregoing Answer, these claims are time-barred by the applicable statute of limitations. The last alleged interaction between Plaintiff and the Officer Defendants, other than the court appearances, was in 2001, and thus the claim accrued at that time. *Bridewell v. Eberle*, 730 F. 3d 672, 678 (7th Cir. 2013). Under Section 8-101 of the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101, Plaintiff had one year from the date that the injury was received or the cause of action accrued to file this claim against the City or its employees. Plaintiff did not file this claim until 2023.

### Tenth Affirmative Defense

In further response to Plaintiff's Complaint, and without waiving any of the responses in the foregoing Answer, Plaintiff has a duty to mitigate his damages and any damages awarded to him must be reduced by the amount by which Plaintiff's damages could have been reduced had he not failed to take reasonable action to minimize those damages.

**Eleventh Affirmative Defense**

In further response to Plaintiff's Complaint, and without waiving any of the responses in the foregoing Answer, to the extent any injuries or damages claimed by Plaintiff were proximately caused, in whole or in part, by Plaintiff's own wrongful conduct, any verdict or judgment obtained by Plaintiff on an of his claims brought under Illinois law and based on any finding of "reckless" willful and wanton behavior, as opposed to "intentional" willful and wanton behavior, must be reduced by application of the principles of comparative fault, by an amount commensurate with the degree of fault attributed to Plaintiff by the jury in this case. *See Poole v. City of Rolling Meadows*, 167 Ill. 2d 41 (1995).

WHEREFORE, Defendant Chicago Police Officers JOHN HALLORAN, JAMES O'BRIEN, MICHAEL CLANCY, RONNIE LEWIS, JOHN L. FOSTER, JAMES BREEN and JOHN HENRY, deny that Plaintiff is entitled to any relief whatsoever and respectfully request that this Court enter judgment in their favor and against Plaintiff, and award them such further and additional relief as this Court deems just and appropriate.

**JURY DEMAND**

Defendants, JOHN HALLORAN, JAMES O'BRIEN, MICHAEL CLANCY, RONNIE LEWIS, JOHN L. FOSTER, JAMES BREEN, and JOHN HENRY, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

JOHN HALLORAN, JAMES O'BRIEN,
MICHAEL CLANCY, RONNIE LEWIS, JOHN
L. FOSTER, JAMES BREEN, and JOHN HENRY

By: */s/ Brittany D. Johnson-Delgado*
    One of their Attorneys

Eileen E. Rosen
Patrick R. Moran
Andrew J. Grill

46

Brittany D. Johnson-Delgado
ROCK, FUSCO & CONNELLY, LLC
Special Assistant Corporation Counsels
333 W Wacker, 19th Floor
Chicago, IL 60654
T: 312-494-1000
F: 312-494-1001