```
 1                 IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   MARCELOUS PITTMAN,                )
                                       )
 4                  Plaintiff,         )
                                       )  No. 23 C 14786
 5           vs.                       )  Chicago, Illinois
                                       )  December 11, 2024
 6   JOHN HALLORAN, et al.,            )  10:00 a.m.
                                       )
 7                  Defendants.        )

 8              TRANSCRIPT OF PROCEEDINGS - MOTIONS

 9         BEFORE THE HONORABLE GEORGIA N. ALEXAKIS

10   APPEARANCES:

11   For the Plaintiff:        LOEVY & LOEVY
                               311 North Aberdeen, 3rd Floor
12                             Chicago, Illinois 60607
                               BY:  MS. JULIA RICKERT
13
     For Defendant ASA         HINSHAW & CULBERTSON LLP
14   Karen Wehrle              151 North Franklin Street
                               Suite 2500
15                             Chicago, Illinois 60606
                               BY:  MS. DANIELLE MIKHAIL
16
     For Defendant Officers:   ROCK, FUSCO & CONNELLY, LLC
17                             333 West Wacker Drive
                               19th Floor
18                             Chicago, Illinois 60606
                               BY:  MR. PATRICK R. MORAN
19
     For City of Chicago:      THE SOTOS LAW FIRM, P.C.
20                             141 West Jackson Boulevard
                               Suite 1240A
21                             Chicago, Illinois 60604
                               BY:  MS. LISA M. MEADOR
22                                   MR. GEORGE J. YAMIN, JR.

23   Official Court Reporter:  JENNIFER COSTALES, CRR, RMR, CRC
                               219 S. Dearborn St., Room 1928
24                             Chicago, Illinois 60604
                               (312) 435-5895
25                             jenny.uscra@yahoo.com
```

1     (Proceedings in open court)

2         THE COURTROOM DEPUTY:  Case 23 CV 14786, Pittman

3     versus Halloran.

4         THE COURT:  Good morning.  Can we get appearances on

5     the record.  We'll start with the plaintiff.

6         MS. RICKERT:  Sure.  Good morning, Your Honor.  Julia

7     Rickert, R-I-C-K-E-R-T, on behalf of plaintiff Marcelous

8     Pittman.

9         THE COURT:  Good morning.

10        MS. MEADOR:  Good morning, Your Honor.  Lisa Meador,

11    M-E-A-D-O-R, on behalf of the City of Chicago.

12        MR. YAMIN:  Also on behalf of the City, Your Honor,

13    George Yamin.

14        MR. MORAN:  Good morning, Judge.  Pat Moran on behalf

15    of individual police officer defendants.

16        THE COURT:  Good morning.

17        MS. MIKHAIL:  And Danielle Mikhail on behalf ASA

18    Karen Wehrle.

19        THE COURT:  Good morning.

20        MS. MIKHAIL:  Good morning.

21        THE COURT:  So I called the hearing on the motion to

22    bifurcate that the City defendants had filed, a motion to

23    bifurcate and stay discovery regarding the *Monell* claims.

24        I did notice as I was just looking at the docket

25    yesterday that there is a pending agreed motion for a

1  protective order that the parties filed a few weeks ago, and

2  it looks like Judge Finnegan hasn't had the chance to act on

3  it.  Does that sound right?

4  MR. MORAN:  Yes.

5  MS. MEADOR:  I believe so.

6  THE COURT:  Okay.  I guess as a courtesy to my

7  colleague, who I know is in the process of trying to wrap up a

8  lot of things so that she can move on to --

9  MS. MEADOR:  No one likes that.

10  THE COURT:  Hmm?

11  MS. MEADOR:  No one likes that.

12  THE COURT:  No, I know.  It's going to be a massive

13  loss.  I've only been on the bench for a short period of time,

14  and even I in that short of period have realized what an asset

15  she is to this courthouse.  So it makes me very sad to know

16  that she is wrapping things up.

17  But I do know that she's wrapping things up.  And

18  just in the interest of keeping you guys -- you getting what

19  you need and not adding more to her plate, what I would

20  suggest is if someone could send me a Word version of the

21  agreed protective order, and then I can grant the motion and

22  enter the order and, you know, we can all be on our way in

23  that regard.

24  So then going back to the main topic of discussion

25  for today, the City's bifurcation motion.  It is helpful that

1    there are a lot of familiar faces on the defendants' side.

2    Because of the prior hearings in the *Henderson* and *Tyler*

3    cases, I think the City has a pretty good idea of how I view

4    the issue and why in my docket entry setting up the hearing I

5    asked the parties to focus on this question of what is the

6    burden.

7            With respect to plaintiff's counsel, you are the new

8    face in the room, unless I'm misremembering from the *Henderson*

9    and *Tyler* hearings, but I suspect that your colleagues have

10   brought you up to speed as to the types of questions that I

11   asked and my ruling in the *Henderson* and *Tyler* cases on the

12   same type of motion.

13           MS. RICKERT:  Yes, Your Honor.

14           THE COURT:  Okay.

15           MS. RICKERT:  But you're right, I'm not part of those

16   cases directly.

17           THE COURT:  Okay.  So what I wanted to ask first, on

18   this question of whether municipal liability depends on

19   officer liability, I did want to ask the plaintiff whether

20   there was anything different here than what I in the *Henderson*

21   and *Tyler* cases would refer to as sort of a street file

22   theory, that there is a theory there that an individual

23   officer could be held not individually liable either for

24   qualified immunity grounds or on a substantive basis on a

25   *Brady* claim, and yet the municipality could still be found

1   liable.

2          I think I see that same theory at play here based on

3   the plaintiff's response to the bifurcation motion and the

4   complaint itself.  But, one, can you confirm that for me; and,

5   two, are there any other theories that would allow from the

6   plaintiff's perspective consistent verdicts with a finding of

7   no liability with respect to the officer and yes liability

8   with respect to the municipality.

9          MS. RICKERT:  You're correct, Your Honor, that theory

10  that one of our individual defendants, you know, is not

11  responsible for hiding the information, but that a municipal

12  policy that they were not directly involved with is

13  responsible is definitely a theory here and one that we would

14  pursue.  And I think it's as valid here as in any other, the

15  other cases that you've mentioned.

16         I would add that in this particular case the lack of

17  documents is fairly stunning.  There is no State's Attorney

18  file.  There is not a single general progress report from the

19  police department.  There is, you know, the total CPD file is

20  50 pages long.  And somehow there is also no Public Defender

21  file.

22         So the discovery, you know, figuring out what

23  happened to the documents in this case is especially

24  important.  And there could even be, you know, additional

25  evidence of liability that we discover as discovery proceeds

1    on the issue of document retention and those sorts of

2    policies.

3            THE COURT:  But that all goes to the disclosure of

4    exculpatory information.  For example, the other alleged

5    wrongs, a coerced confession, for example, there isn't a

6    possibility at least at this juncture of a consistent verdict

7    with respect to a finding of no liability for the officers but

8    yes liability with respect to the municipality.

9            MS. RICKERT:  That's correct.  It's limited to the

10    *Brady* and fabrication, related fabrication claims, not to the

11    coerced confession, which as you note has squarely met our

12    individual liability, it could have *Monell* implications as

13    well, but not without liability for the individuals.

14            THE COURT:  Okay.  Is there anything that the City

15    wants to say on that point?

16            MS. MEADOR:  I do, Judge.  So I think that what is

17    not being conveyed or understood is that this is not a

18    homicide case, and it's an agg. bat. case, an aggravated

19    battery case.  And the maintenance of an agg. bat. case is

20    different from a homicide case.  And under state law, agg.

21    bat. cases are not retained.

22            And so that's why there is the lack of documents for

23    the Chicago Police Department, for the State's Attorney's

24    office.  The Public Defender's office can't find their file at

25    all.

1          Based on a cursory review, we've gotten about 27,000

2    pages from the State's Attorney's office.

3          That's right, George, right?

4          MR. YAMIN:  Mm-hmm.

5          MS. MEADOR:  And their file contains much more than

6    what we currently have from CPD, but it's because of this

7    retention policy --

8          THE COURT:  Right.

9          MS. MEADOR:  -- provided for.  So that's the

10   explanation.  And to an individual officer liability for

11   withholding of any document, that's just not going to be able

12   to be determined because --

13         THE COURT:  That could -- go ahead, sorry.

14         MS. MEADOR:  No, no, no.  Just saying for this

15   specific case, right, and I understand Your Honor's position

16   there is a separate issue, right, so just addressing that

17   component.

18         And then with regard to being able to determine any

19   sort of pattern and practice of withholding exculpatory

20   information, we're going to have the same scenario with any

21   other agg. bat. case as here because of the file retention.

22         THE COURT:  But doesn't your argument -- I mean, I

23   understand what you are saying.  And to be clear, like I'm not

24   saying I'm accepting the facts, right.  But I accept, I

25   understand what you are saying based on the proffer that you

1     are making, factual proffer that you are making about what the

2     City's -- the various retention policies that are at play.

3          But it seems to me that your argument goes to the

4     merits of the claim as opposed to this, what I'm focused on

5     right now for purposes of figuring out how we're going to

6     proceed on discovery, which is just, theoretically, is it

7     possible as the claim is constructed, as the allegations have

8     been pled in the complaint, is it possible that you could end

9     up with consistent verdicts with an individual officer being

10    found not liable with respect to a failure to disclose

11    exculpatory information, but the City being found liable?

12         And so it seems like an argument to the jury would

13    be:  Well, the City can't be found liable for, you know, X, Y,

14    Z reasons because it's retention -- whatever, because let's

15    say its retention policy precludes like a finding of

16    liability.

17         And yet at this stage in the proceedings, aren't we

18    putting, aren't you putting the cart before the horse?  My

19    point being that shouldn't plaintiff be permitted to get the

20    discovery that would establish or not establish their

21    position?

22         MS. MEADOR:  So I would say a couple of things to

23    that, Your Honor.  And I do understand the thought process

24    based on what the discussion was in *Henderson*.

25         I guess initially the problem with that is that there

1   won't -- so assuming there could be discovery, *Monell* related

2   discovery that could potentially address some sort of pattern

3   and practice, that's just not going to be existing because

4   there is on the one hand CPD that doesn't -- has this, you

5   know, retention policy.  It's not a permanent retention like a

6   homicide file.

7           And then we have the State's Attorney's office and

8   the Public Defender's office, which I speculate, but I can't

9   verify, because I don't represent either entity, but I

10  speculate that they follow the same retention processes.

11          So there won't be able to be any comparison to see if

12  there is documents here in the CPD file that aren't in the

13  State's Attorney's file or the Public Defender's file as a

14  general rule.

15          THE COURT:  Okay.  I think your colleague may want to

16  chime in.

17          MR. MORAN:  You know what, Judge, I was -- this sort

18  of goes back to that prior hearing when we were talking about

19  this and how it relates to that *Thomas* case.

20          One of the things I think is a prerequisite for all

21  of this is that there was a document withheld, right.  The

22  question then I think you're getting at is how did that

23  happen?  Is it because of an individual officer?  Is it

24  because of some systemic thing that the officer wouldn't be

25  personally responsible for?

1       And I have to say, you know, counsel for the

2  plaintiff has been on this case much longer than us.  I think

3  I'm correct in saying she handled the PC in the lower courts

4  and the state court.  So there should be some evidence at this

5  point that there was a document withheld that had an effect on

6  this conviction, and so far we don't have that.

7       So what we're talking about now is going down to find

8  how something happened that we don't know if it even happened

9  yet.  And I think that's a concern, especially given the proof

10  issues that my colleague just pointed out with respect to the

11  difficulty in getting some of these records with an agg. bat.

12  case as opposed to a homicide, which are kept permanently.

13       So I think it's going to -- there is necessarily an

14  increased burden that we may not need -- probably don't need

15  to go down that road yet, without even knowing if a document

16  was actually withheld, if some exculpatory evidence was in

17  fact withheld.  I think that threshold question should be

18  answered first before we start, you know, ordering up hundreds

19  or thousands of files.

20       THE COURT:  Can I hear from the plaintiff?

21       MS. RICKERT:  Yeah, I do have a couple responses.

22  You know, first, this information about retention policies,

23  that's new to me.  The discovery, their responses to our

24  discovery requests so far have not laid any of that out and

25  have said:  We're unaware of any documents being destroyed.

1    So, I mean, that obviously we'll confer about, but that isn't

2    the information that they've provided so far.

3           In the discussions that we had in trying to reach

4    agreement on possible bifurcation, it became clear that what

5    we consider, you know, that what is *Monell* discovery, there is

6    a dispute about that. And so even our questions about what

7    has become of these documents, they were clear that they

8    consider that *Monell* discovery.

9           And we couldn't agree to bifurcation when we don't

10    know what happened to these documents. This is an attempted

11    murder case of an officer. It seems to me like there would

12    be -- these documents would be retained in the normal course

13    during the post conviction. The State's Attorney's office was

14    surprised not to be able to find the documents. They did not

15    say: Well, of course we don't have them. It's an aggravated

16    battery case.

17           And it is not true that we don't have a belief about

18    what documents may exist. So in one of the few police reports

19    that does exist, the supplementary report, you know, one of

20    the typed reports when they've put everything together, it

21    gives an account of a statement from a witness that that

22    witness says she never made.

23           I'd love to see the handwritten contemporaneous

24    reports of the conversation with her. And I think that that

25    could well show us exculpatory information if it exists. And

1   if these exist somewhere, then we want to have them.  If they

2   don't, then their job will be easy in responding to the *Monell*

3   related discovery requests.  So that's my response to those

4   specific issues.

5          MR. MORAN:  That issue, okay, so a witness who says

6   "I didn't give a statement," number one, we don't know if

7   there is a handwritten statement.  The police report just says

8   "statement."

9          Number two though, if that's accurate, I'm not saying

10  it is accurate, but that goes to an individual officer

11  withholding information, which is obviously not legal, right.

12  I mean, so qualified immunity wouldn't apply and it's not a

13  systemic thing.  So if that's accurate, it still doesn't

14  provide us with what we need to get over that threshold issue

15  I think and get into all this discovery, because we don't have

16  an unexplained missing document.  And frankly --

17         THE COURT:  Yet.

18         MR. MORAN:  Well, and not even yet.  I mean, you

19  know, the plaintiff's attorneys have been on this case for a

20  long time, longer than us, before the case was ever filed.

21  Now we're getting conversations that she had with the State's

22  Attorney where the State's Attorney allegedly was surprised at

23  not having -- I mean, we don't know what this individual knows

24  or believes about the case.

25         But we do know that during all of this investigation

1  and litigation, no document was identified as having not been

2  turned over to the State's Attorney's office.  That's number

3  one.

4       Number two, if this witness is accurate or if -- you

5  know, whatever this witness says speaks to an individual

6  liability, not *Monell*.

7       THE COURT:  Yeah, but here is the problem that I'm

8  having, and you can tell me why I'm wrong.  But I'm having a

9  hard time thinking of any other -- in a different civil

10 litigation context, set aside this case, I'm having a hard

11 time thinking of a case where a plaintiff's attorney has to

12 produce evidence before they can get discovery.

13      MR. MORAN:  Well, they're getting discovery.  I mean,

14 they've already got it.

15      THE COURT:  Before they can get a particular type of

16 discovery.

17      MR. MORAN:  Right.  But I guess --

18      THE COURT:  I mean, the whole point is you put out

19 your complaint.  We all know how the process works.  And it

20 seems to me that what you're saying is that because the type

21 of discovery that plaintiff is asking for could create an

22 undue burden on the City, and we'll get to the burden piece,

23 they have to make some sort of higher threshold showing before

24 they can get to that discovery.

25      And I guess I'm having a hard time understanding,

1   that's where I'm having a hard time accepting your argument,

2   because I don't -- I'm unaware of any case law and I don't

3   think you'd be able to point me to any case law that says that

4   a plaintiff has to do anything other than survive a motion to

5   dismiss stage, the motion to dismiss stage, and there hasn't

6   even been a motion to dismiss here, if I'm correct on that,

7   before they can seek discovery to support their well pled

8   allegations.

9          MS. MEADOR:  So a couple of things.

10         MR. MORAN:  Go ahead.

11         MS. MEADOR:  If I might?

12         So from my reading of the complaint is that the *Brady*

13  claim is generic references to fabrication, coercion and

14  police misconduct.

15         THE COURT:  So I don't read the complaint that way.

16         MS. MEADOR:  Okay.

17         THE COURT:  And I guess I just want to make sure that

18  the record is clear on that, so let me pull up the complaint,

19  because I know in the *Henderson* and *Tyler* cases, there was a

20  question about whether or not the street file theory was

21  actually pled in the complaint.  And so I spent time preparing

22  for today to make sure that I was satisfied that that was,

23  that it was.

24         I thought, I'm looking at paragraphs 91 through 95 of

25  the amended complaint, and I thought there it was quite clear

1  that, and frankly more robust than what I saw in the *Henderson*

2  and *Tyler* complaints, a theory that the defendants, and not

3  just the defendants, because it's specifically worded to say

4  that "members of the Chicago Police Department, including the

5  defendant officers," which opens up the possibility that there

6  are other officers who engaged in this unconstitutional

7  activity, "systematically suppressed exculpatory and/or

8  impeaching material by intentionally secreting discoverable

9  reports, memos and other information in files that were

10 maintained solely at the police department and were not

11 disclosed to other participants in the criminal justice

12 system."

13         And then, I mean, there are several other paragraphs

14 that go on in that regard.

15         So I don't read the complaint to say that the *Brady*

16 claim is based solely on coerced confessions.

17         MS. MEADOR:  But that claim relates to individuals,

18 not any sort of policy.

19         THE COURT:  I just told you why -- but I just told

20 you why I read the complaint as not including just the

21 individual officers.  I mean, it's alleging that there was a

22 municipal practice.

23         Paragraph 91 says "members of the Chicago Police

24 Department, including the defendant officers," not "limited to

25 the defendant officers."

1    And then paragraph 92 says, is framed as to say

2  "employees of the City of Chicago, including defendants."  So,

3  again, not limited to the individual defendants.

4    MS. MEADOR:  So, Your Honor, I understand that's your

5  reading of the complaint.  I believe that it is very generic

6  and at this point the plaintiff knows.

7    Now, she's identified a statement.  And there are

8  statements in the State's Attorney file.  The State's

9  Attorney's file is about 27,000 pages.  And there are more

10  documents as I've indicated in their file.  We can't determine

11  what was then given to the Public Defender's office, but

12  that's not on the individual officers or the City.

13    So at this point, you know, to then -- if there is a

14  basis for some sort of street file or *Brady* claim here, then I

15  think as other judges have determined, we talked about Judge

16  Harjani included saying, okay, identify first this threshold

17  of there being an instance here where there was *Brady*, you

18  know, information withheld before moving on to then the next

19  stage of your discovery.

20    But that has to be established here.  You can't just

21  say, well, there is a pattern somewhere.  But it didn't injure

22  this plaintiff.  It has to injure this plaintiff, right.  So

23  if it didn't happen here, then this plaintiff can't claim an

24  injury from it.

25    THE COURT:  Okay.  I would like to, just in the

1    interest of time, I would like to move to the burden argument,

2    which was the argument that I had highlighted for discussion

3    for today.

4              Can I hear from the plaintiff first on this issue.

5              And I guess just to set the stage there, in the

6    *Henderson* and *Tyler* cases and in those hearings, I asked both

7    sides, but in particular the plaintiff, to give me a more

8    realistic picture of what the plaintiff actually needs for

9    discovery.

10             I expressed a concern that it was hard to resolve

11   bifurcation motions when what the parties were relying on to

12   show burden were sort of what I think of as like opening

13   gambit type discovery requests as opposed to what the

14   discovery request would actually look like at the end of the

15   day.

16             MS. RICKERT:  Sure.  I think, you know, in part that

17   will have to be, you know, is something that can be discussed

18   with defendants in meet and confer discussions about what

19   should be narrowed and those sort of proceedings.

20             But, you know, at this point we aren't looking for,

21   you know, every piece of paper that could potentially be

22   relevant.  You know, we are looking for something similar to

23   what has been produced in other cases.  I know that they were

24   concerned about the time period.  These are the kinds of

25   things that can be negotiated and that they can argue this is

1    too broad.  These are the kind of objections that people make

2    to discovery.  It's not if they feel that our initial request

3    is too broad, that is not in and of itself a basis to

4    bifurcation on the basis of burden.  There is many steps

5    before.

6              THE COURT:  Right.  But realistically, like what

7    years, what timeframe would you be looking at?  What timeframe

8    are you looking at?

9              MS. RICKERT:  Yeah, so I believe we asked from 1983

10   through -- I'm trying to remember exactly what --

11             MS. MEADOR:  I think 2005.

12             MS. RICKERT:  2005, okay.

13             MS. MEADOR:  I think so.

14             MS. RICKERT:  That sounds right.  That's when the

15   trial in this case occurred.

16             MS. MEADOR:  2005.

17             MS. RICKERT:  So that would make sense.

18             But I think that we would be willing to narrow that

19   consistently with other cases if need be.  And as discussed,

20   there has been, you know, some substantial relevant discovery

21   in other cases that should ease the burden of having to

22   collect matters.

23             I know that in their reply defendants, you know,

24   point out that in some cases it was, you know, random sampling

25   and in some cases it was a shorter number of years.  These are

1    the kinds of things that we can discuss.

2           I don't want to commit to a limitation today, but, of

3    course, as with all discovery requests, we are willing to

4    negotiate what's realistic.  And if they say, you know, doing

5    this is going to mean, you know, starting with 1983 is going

6    to mean we can't produce all this stuff until, you know, 2026,

7    you know, we'll listen to these things.

8           THE COURT:  Are we only talking about Area 1?

9           MS. RICKERT:  Yes, I believe so.  I can't -- I don't

10   have the -- I should have the discovery request right in front

11   of me, but I don't.

12          MS. MEADOR:  I have it.  I have it if you want it.

13          MS. RICKERT:  Sure.  I appreciate that.

14          MS. MEADOR:  Just because I just happened to --

15          MS. RICKERT:  Although, I mean, some of the flares in

16   this were previously at other areas.

17          MS. MEADOR:  It doesn't appear to be limited.  But,

18   counsel, you look at it.

19          MS. RICKERT:  No, no.  I think that that is -- yeah,

20   it is not, it is not limited as currently drafted.  You know,

21   I think limiting to Area 1 and Area 2 would be something that

22   would be possible.  But this is, yeah -- currently, you know,

23   we're looking from when the 1983 policy was instituted until

24   2005.  And, again, if some other retention policy applies, we

25   want to know.  That's one of the questions that we've asked

1   them as part of our discovery.

2        THE COURT:  The discovery that plaintiff is seeking

3   here, how much of that has already been identified?  What if

4   any portion of that has been identified and produced by the

5   defendant, by the City in other cases?

6        MS. RICKERT:  In other cases, what percentage?  That

7   is hard to say.  But I know that in cases like *Valez* and some

8   others, we do have a substantial amount of materials that

9   already relate, because, you know, especially the area and the

10  officers involved in this have been involved in many cases.

11       And so I would say that, you know, our estimate going

12  into this was that, you know, a high percentage has been

13  produced.  But I couldn't give you an exact number because I

14  don't know what all exists.  But I would think that it's over

15  50 percent of what we would need is already done.

16       THE COURT:  Okay.  Can I hear from the City on this

17  burden point.

18       MS. MEADOR:  Sure.  So, Your Honor, a couple of

19  things.  One is, just going back to our prior discussion, the

20  plaintiff's discovery requests are for homicide files.

21  They're called -- I apologize, hold on.  I don't want to

22  misquote -- "police-related shooting investigations," okay.

23       THE COURT:  Can I just ask where you're looking at?

24       MS. MEADOR:  Yes, Your Honor.  I am at defendants'

25  joint motion, docket number 94, Exhibit C, page 13 of 16.  So

1    docket number, it's 94-4 if that's helpful for Your Honor.

2         THE COURT:  Yeah, 94-4.  And what's the page number

3    you said?

4         MS. MEADOR:  13 of 16.  Is that right?  Yeah, 13 of

5    16.  If it's separated by --

6         THE COURT:  So question 48, for example.

7         MS. MEADOR:  Correct.  And it continues, yeah, 48,

8    49, 50 appear to be the general *Monell* related document

9    requests that we're referring to.

10        And by all means, counsel, if you have a different

11   thought process or if there is something else I'm missing,

12   please feel free to let me know.

13        But so the request is for homicide and police-related

14   shooting investigations in the period from 1983 through 2005.

15   And 1983 being the date because of the enactment of Special

16   Order 83-1 regarding maintenance and disclosure of homicide

17   and police-related shooting incident files.

18        So that goes to the core of this isn't a homicide or

19   police-related shooting investigation.  And 83-1 isn't at

20   issue here because it's not a homicide or police-related

21   shooting incident case.

22        So I think just at its most basic level, I will say

23   that it is -- the case was processed and charged by CPD as an

24   aggravated battery to a police officer.  That is not the same

25   as a police-related shooting.  Police-related shootings are

1  where a police officer has discharged a weapon.  So those are

2  different and those are handled differently.  Homicide files

3  are maintained and handled differently just as we've talked

4  about today.

5       So this discovery request is apples to oranges versus

6  apples to apples to even, you know, say that the policy

7  applies or that then somehow based on discovery that that

8  would then lend information to the maintenance of agg. bat.

9  cases, because it wouldn't.

10      Setting that aside, there aren't -- there has not

11  been any aggravated battery files produced in any case as far

12  as I'm aware.  I understand there may be some somewhere along

13  the line here.

14      THE COURT:  Right.  But like this *Valez* case which I

15  think came up in the plaintiff's response, I guess what was

16  produced there that -- I guess your position would be that

17  nothing that was produced there, little that was produced

18  there would be relevant here?

19      MS. MEADOR:  Correct, because --

20      THE COURT:  What was that case about?

21      MS. MEADOR:  I apologize, because I am not familiar

22  with *Valez*.

23      Do you know *Valez*?

24      MR. MORAN:  I believe it's a homicide, wrongful

25  conviction/homicide type case.  But, you know, don't hold me

1   to that.

2           THE COURT:  Yeah, I guess as I'm understanding --

3           MS. MEADOR:  Is that what you believe, counsel?

4           MS. RICKERT:  Yes.

5           THE COURT:  -- it's a homicide case.

6           MS. RICKERT:  Yes.

7           THE COURT:  So your general point being that

8   discovery requests for homicide related investigative files

9   are by definition not going to be relevant to this case

10  because it's not a homicide case?

11          MS. MEADOR:  Correct.

12          THE COURT:  Okay.

13          MS. MEADOR:  And so then so we have this one side of

14  the *Brady/Monell* claim.  And it's my understanding, I don't

15  want to be remiss in not addressing it today, it's my

16  understanding that there is also the question of CRs with

17  relation to the discipline component.

18          And I should say our belief is that the timeframe has

19  to be discrete and it should be relevant.  And for, yeah --

20  well, I know the request for files is 22 years.  It seems to

21  be for the CRs, 1996 to 2006, which I think the --

22          THE COURT:  Where are you seeing that?

23          MS. MEADOR:  I am seeing it on the same document.

24          THE COURT:  I see, yes.  Question 50.

25          MS. MEADOR:  Number 50, correct.

1         And so none of those CRs based on my knowledge have

2    been produced regarding Area 1 or --

3         THE COURT:  Or that time period?

4         MS. MEADOR:  Correct.  Let me just make sure --

5    strike that.  1996, the year 1996 was produced in

6    *Hood/Washington*, but that's it.  That's the last year of the

7    *Hood/Washington* CR production.

8         THE COURT:  So the City's position is, as an example,

9    that the discovery request number 50 on this page that we're

10    talking about at 94-4 is seeking approximately nine years of

11    information that has not been produced or identified in any

12    other wrongful conviction case?

13         MS. MEADOR:  That's correct.

14         THE COURT:  Can I hear from the plaintiff.

15         MS. RICKERT:  I think that is probably correct on

16    that specific point.

17         But these are arguments, you know, for opposing

18    specific discovery requests, not for delaying the

19    consideration.

20         THE COURT:  I understand that general point.  But I

21    guess part of the issue I have, yes, part of the issue that I

22    have here is, when it comes to assessing the burden is, one,

23    trying to get a realistic sense as to what exactly the

24    plaintiffs are going to be seeking to try and understand what

25    defendants have already produced, because to the extent that

1   this is going to be, I'm just going to say the phrase cut

2   paste, even though I recognize that it's not just a

3   cut-and-paste job, but, you know, to the extent that at least

4   a substantial amount of the work has already been done, then

5   that obviously eliminates the burden.  So those are two things

6   that are going on in my head.

7           One other thing that is going on is, from a burden

8   standpoint, I don't discount the burden that arises just in

9   the meet-and-confer negotiation process as between the

10  parties, but obviously that ends up encompassing time and

11  effort on the part of the judiciary as well.

12          And so I understand your point, I certainly

13  understand your point that the objections that are being made

14  normally are objections that would arise during the course of

15  a discovery negotiation process that will often involve the

16  time of a district judge or magistrate judge, which is fine,

17  that normally happens.

18          It just seems here that given the volume of discovery

19  that is being sought for purposes of *Monell* claims, that I

20  would be remiss not to count that time as part of the burden.

21          And so I guess that's my long way of saying that I

22  don't find particularly persuasive the argument that I

23  shouldn't consider that as part of the burden analysis

24  because, you know, we'll just deal with it down the road.

25  Give us the green light to conduct *Monell* discovery like at

1   this juncture.

2          To me, that is part of the burden analysis.  I do

3   need to think about how do we whittle it down.  And what I

4   found helpful in the *Henderson* and *Tyler* cases was that the

5   plaintiffs in those cases came forward and said, you know,

6   identified with I thought a sufficient degree of

7   specificity -- I understand that the City defendants probably

8   don't agree with me on that -- but I thought identified for me

9   with a sufficient degree of specificity like here are other

10  cases that we would borrow discovery from, and they covered

11  these particular time frames and these particular areas, and

12  here is how they map on to the discovery that we would

13  realistically be seeking here.

14          MS. RICKERT:  Yes.

15          THE COURT:  And I'm not hearing that from you today.

16          MS. RICKERT:  I can give a little bit more detail.

17  And some of this appears in our response.  But, you know, in

18  addition to *Valez*, which involves homicide files from 1996 to

19  2001, the *DeLeon-Reyes* CR files from '95 to '98.  And in the

20  *In re:  Watts*, it is a randomized sample from 1999 to 2011.

21  And in *Fields*, it was homicide files between 1999 and 2006.

22          I hear their argument that homicide files are not

23  relevant.  If the special order that says police involved

24  shootings does not cover when an officer is shot, that's the

25  kind of thing that they should, you know, say in response to

1  our discovery request and tell us what policy, what retention

2  policy does apply, and that could certainly change what we'd

3  be asking for.

4        But based on what we're asking for right now, there

5  are in those cases substantial coverage of years.

6        THE COURT:  Let's say that they're right, that the

7  homicide files are irrelevant to that aggravated battery.  So

8  I guess then is the plaintiff's position, well, then we will

9  be starting fresh with respect to *Monell* discovery?

10        MS. RICKERT:  Well, I think it would depend a whole

11 lot on what retention policy arguably applies.

12        I'm not aware that the street files issue is, you

13 know, limited to homicides and excludes other types of serious

14 crime like the shooting of a police officer.

15        If the policy is, you know, hiding the exculpatory

16 and impeaching materials, I think it would be hidden in other

17 types of cases.  So I would dispute that what's happened in a

18 homicide case has no relevance to the extent it's a policy.

19 If they have an argument that, "Look, we're only hiding stuff

20 in homicide cases.  We would never hide something in an

21 officer, shooting of a police officer," that would be one

22 thing, but I haven't heard that ever.

23        So I would argue that it is relevant.  And, you know,

24 if they say, "Well, it's a different retention policy," that

25 might mean that we have to issue some other discovery

1   requests.  But, you know, we're trying to find out what

2   applies, what happened to the documents here.

3           And so I would disagree that it's not relevant, but I

4   would also say that, you know, if it can be very -- if it can

5   be narrowed based on those kinds of issues, we'll be

6   reasonable.  And I don't think that we would be starting

7   afresh, unless their response to what happened to these

8   documents is it's a different policy of destruction and, you

9   know, and that would be, you know, that would be something new

10  and it would matter.

11          And, you know, as I understand their arguments,

12  especially in their reply brief, there is never a reason to

13  have *Monell* discovery.  It's either going to be, you know, you

14  can't prove your claim because the officers weren't liable or

15  you prove your claim against the officers and you never have a

16  *Monell* trial because now your claims are moot.

17          It can't be that that's how it works and that the

18  City can have policies that violate the constitution and a

19  plaintiff who is injured by those policies can never even get

20  more information about it.

21          So to me, working out the details of what must be

22  produced and what is relevant, what is likely to lead to

23  relevant information is something that should happen.  And I

24  would say that none of us are interested in burdening the

25  Court with frivolous disputes.  The disputes won't be resolved

1  by bifurcating *Monell* because of the disagreements we have

2  about what is *Monell* discovery.

3      Our position is that even if we had no *Monell* claim,

4  we would need to know what happened to these files.  And their

5  position is that, no, that's *Monell* discovery.  So we would be

6  back before you again arguing about these issues anyway.

7      MR. MORAN:  That's a big leap, Judge.  So what we're

8  talking about now is going back to the individual liability to

9  determine retention policies and whether a document was

10 properly destroyed.

11     That's a very narrow issue.  That does not require

12 the production of thousands or hundreds or whatever the number

13 is of records.

14     You know, this is a widespread -- the *Monell* is

15 supposed to be widespread practice, not -- there is no written

16 policy that says, you know, "Officer, you don't have to do

17 this.  You don't have to turn over the exculpatory

18 information."  That doesn't exist.

19     So, you know, I think it's a stretch to say that, you

20 know, they need *Monell* discovery to determine retention

21 policies.  We can give them retention policies.  You know,

22 that's not the issue.  They're looking for a much broader

23 scope here than just figuring out whether a retention policy

24 has been complied with.

25     MS. RICKERT:  That's correct, we are.  However, the

1    position that they took in our discussions about their

2    bifurcation motion was that those types of responses or that

3    type of information is part of *Monell* discovery and we

4    shouldn't be able to get it.

5         So we would be open to something where they give us

6    discovery on retention policies and that sort of thing, and

7    then based on those answers we can discuss what's appropriate

8    going forward.

9         But, you know, bifurcation, especially discovery, you

10   know, trial is still a ways away, but discovery at this stage,

11   to me, I don't see how that solves any of the problems that

12   they're raising.  I mean, they're saying, "You don't have, you

13   don't have a good *Monell* claim."  Well, that would have been

14   something to argue in a motion to dismiss.  But pushing it

15   'til later, I don't see how that solves the problems that

16   they're raising, even related to burden.

17        I think there is based on our allegations, based on

18   the claims that are live, we are entitled to *Monell* discovery.

19   We can address burdensome issues on a case-by-case basis as

20   well as relevance.  And so that would be my position on that.

21        MS. MEADOR:  Briefly, Your Honor, if I may?  Just to

22   be clear, it's not our position that they're not entitled to

23   *Monell* under any set of circumstances, right.  And the City

24   has offered the limited consent to say the City will accept

25   liability if there is a determination here that there is a

1    violation of, you know, a *Brady* violation.  So that gives them

2    what they would need.

3          But moving forward with regard --

4          THE COURT:  I'm not sure I understand that.  I mean,

5    what they want is discovery.

6          MS. MEADOR:  Well, they want discovery, but --

7          THE COURT:  And they want the ability to establish

8    whether there is a widespread pattern or practice.

9          So the City agreeing to -- the City's consent with

10   respect to liability, I mean, I can understand from an

11   economics standpoint --

12         MS. MEADOR:  Right.

13         THE COURT:  -- why that's -- yes, like I put on a

14   business person's hat, like that makes sense.

15         But they're saying, as I understand it, they're

16   saying, Well, we're not looking at this, first of all, we're

17   not looking at this as a pure economic -- we're not looking at

18   this from a purely economic perspective.  And they're the

19   plaintiff.  I mean, they're the masters of their complaint.

20         And I don't think it's really the Court's position to

21   be telling the plaintiff what they should or should not be

22   satisfied with in that regard.

23         MS. MEADOR:  So I would say this, Your Honor.  So the

24   difficulty is that, and as I said earlier, this individual --

25   so it's fine to say, We want *Monell* discovery to see if there

1    is a widespread practice.  But they have to establish that

2    their, you know -- let me be clear.  They want *Monell*

3    discovery to see if there was a widespread practice of

4    withholding exculpatory information in aggravated battery

5    investigations.

6            But they need to establish first that there was a

7    withholding of *Brady* material here and/or that this plaintiff

8    was harmed or injured by.

9            And so then you move to the consideration of what

10   that *Monell* discovery looks like, and it's virtually

11   impossible because of the retention policy related to

12   aggravated battery file retention, they won't get the

13   information to make that comparison.

14           So, you know, and I suspect, as I said before, that

15   it's not just the Chicago Police Department.  It's also then

16   the State's Attorney's office and the Public Defender's

17   office.  I can't say that, I don't represent them, but this is

18   this is what I suspect, because public agencies aren't

19   required under the law to retain all documents forever in

20   perpetuity.  They are with regard, the CPD is with regard to

21   homicide files.  But that's not the case for aggravated

22   battery files.

23           So then where does that get us?  And then even if it

24   was allowed, like that's a lot of burden to really not get us

25   anywhere --

1          THE COURT:  Okay.

2          MS. MEADOR:  -- substantively with regard to a *Monell*

3   claim that's relevant here.

4          THE COURT:  Okay.  All right.  So I have heard

5   enough.  I appreciate everyone's answers and coming prepared

6   and having thoughtful responses to my questions.

7          I have a feeling I'm wrestling with these issues

8   maybe a bit more than some of my colleagues, and I appreciate

9   your indulgence on that point.

10          I will at this juncture, I'm going to deny the

11   defendants' motion to stay *Monell* discovery.  And I'm also

12   going to deny the City defendants' motion to bifurcate the

13   *Monell* claims at trial.  I'm going to deny if without

14   prejudice to renewal.

15          And I will say I'm not going to refer this matter to

16   a magistrate judge for discovery.  I will continue to

17   supervise discovery, and I will explain why.

18          So with respect to this issue, on the issue of a

19   discovery stay, the defendants have argued that the City's

20   liability depends entirely on that of the defendant officers

21   so that *Monell* claims may prove unavailable or unnecessary to

22   try.  And as I've explained in the *Henderson* and *Tyler* cases,

23   I find this argument unpersuasive.

24          Under the Seventh Circuit case law, a municipality

25   can be held liable under *Monell* even when its officers are not

1  so long as we don't end up with inconsistent verdicts.  That's

2  the key language from the *Thomas* opinion.  *Swanigan* also

3  stands for that proposition.

4        And here consistent verdicts are possible in a world

5  in which individual officers are not found liable for

6  suppressing exculpatory information that the City would be

7  liable for having a faulty file keeping system that prevented

8  transmission of exculpatory information.

9        And as I alluded to earlier, I see those theories in

10  the complaint at paragraphs 91 through 95.  And for the same

11  reasons that I explained in *Henderson* and *Tyler*, I find that

12  theory to be akin to the theory that was articulated in

13  *Thomas*.

14        And, of course, there is also a scenario in which the

15  named defendants might be found not liable on a theory of

16  qualified immunity, which is a scenario that the plaintiff

17  points to in his response.  And then certainly in that

18  situation I can envision a scenario in which individual

19  defendants are found not liable, but the municipality is found

20  liable for the secreting of exculpatory information.

21        And as I've previously said in the *Henderson* and

22  *Tyler* cases, I'm not the only district court to have ruled in

23  this manner on this particular aspect of a bifurcation motion.

24  And in particular I'm relying on reasoning from in *Maysonet v.*

25  *Guevara, Gomez v. Guevara* and *Cage v. City of Chicago*.

1    On the burden point, a couple of thoughts here,

2   several thoughts here.  So I do think that the fact that there

3   is a fair amount of wrongful -- and "a fair amount" is an

4   understatement -- but a fair amount of litigation in these

5   wrongful conviction cases with overlapping time periods and

6   overlapping areas suggests strongly to me that there is going

7   to be some duplicative discovery here that is duplicative of

8   discovery that has taken place in other cases.

9    I recognize that plaintiff today has not been able to

10  identify with the same specificity that plaintiff's counsel in

11  *Henderson* and *Tyler* were able to identify where the

12  duplication exists.  And yet common sense tells me that given,

13  again, the amount of litigation that takes place, the amount

14  of work that has already been done in producing these files in

15  other cases, common sense tells me that there will be

16  duplication here.

17   I'm not going to venture a guess as to how complete

18  that duplication is going to be, but the fact that there is

19  some duplication that is going to be in place mitigates the

20  burden on the City in terms of the discovery.

21   I do also find convincing or persuasive the point

22  that plaintiffs make, that the plaintiff makes that the burden

23  is going to be here whether we deal with the discovery today

24  or whether we deal with it after a trial on individual

25  liability, that *Monell* discovery would still theoretically

1   need to get done because of the inconsistent verdict --

2   because of the possibility of having consistent verdicts.  And

3   so I don't see how pushing the *Monell* discovery to some point

4   later in time solves the burden problem.

5       I also think that there is a burden in figuring out

6   what is or is not *Monell* discovery.  This is a point that I've

7   heard made today.  I've heard it made in the *Henderson* and

8   *Tyler* hearings.  I've seen the point made in countless other

9   cases from my colleagues on the bench.  And so that also

10  factors into my analysis that, you know, if we are going to be

11  fighting over what constitutes discovery for individual

12  officers versus what constitutes discovery that only bears on

13  the *Monell* claims, it militates toward me just saying, well,

14  fine, then we'll just do all of the discovery now.

15      I do think that the burden can be mitigated by what

16  I'm going to call sort of a logical phasing of the discovery.

17  And in this regard I do think that Judge Harjani's approach

18  makes sense, that you don't want to -- it makes sense to me

19  that the plaintiffs should not be able to come in and say:

20  Great, the judge granted or denied your motion for a stay of

21  *Monell* related discovery, and so now we're going to ask you to

22  produce all the documents that we're seeking with respect to

23  paragraph 50, for example.  It's like one of the examples that

24  we were just discussing.

25      It makes sense to me from a relevance standpoint that

1    the City would then come back and say:  Whoa, whoa, whoa.

2    Before we turn over a million documents, again, just making up

3    numbers, but before we turn over a million documents, how

4    about you first ask -- first you conduct more narrow, tailored

5    discovery.  That makes sense to me.

6         I also think it makes sense from the plaintiff's

7    standpoint to take that approach.  I think of it from back

8    when I was in civil litigation, I'd start with the smaller

9    witnesses for depositions before I built to the big witness

10   for the deposition.  I mean, it happens all the time in

11   discovery, that you phase your discovery in a logical manner,

12   both logical in terms of the claim that you are trying to like

13   substantively prove and also frankly from an economics

14   standpoint.  You are not going to be asking for, you know, the

15   big piece of the pie before you can establish the smaller

16   piece of the pie.

17        And by retaining supervision of the discovery in this

18   case, I hope to the extent that the parties need help

19   shepherding themselves through that process in a logical way,

20   I will be there to assist in that process.  And so that's what

21   I'll say on the burden point.

22        And then that leaves the issue of a bifurcated trial.

23   I know the parties have briefed this question of potential

24   prejudice to the City, to the individual officers if they're

25   tried at the same time.  I'm going to take the same approach

1    on the question of a bifurcated trial here as I did in

2    *Henderson* and *Tyler* and say that this part of the motion is

3    most certainly denied, but without prejudice to renewal at a

4    time closer to a trial date, because it's just simply too

5    early in the proceedings for me to determine the merits of the

6    defendants' position with respect to prejudice.

7            I don't know what specific evidence we're talking

8    about, what the jury instructions look like, whether any

9    prejudice could be cured through evidentiary rulings, limiting

10   instructions.  I just can't make that kind of accurate

11   assessment.  And as I think one of you pointed out at the last

12   hearing, there might be other reasons aside from prejudice to

13   bifurcate a trial, but that wouldn't really come to light

14   until discovery, until we're closer to a trial date.

15           And so if and when a motion to bifurcate the trial is

16   renewed, I don't mean to suggest that you are limited to only

17   making an argument in favor of bifurcation based on prejudice.

18           So that's my ruling on the motion.  Are there any

19   next steps that we need to talk about now?

20           MS. RICKERT:  I think you can expect to get a motion

21   to extend the discovery schedule.  We've already discussed

22   this, and so just to give you a heads-up that that's coming.

23           THE COURT:  Okay.

24           MS. RICKERT:  But we are moving forward.  We've got a

25   meet and confer this afternoon, in fact, on --

1        MS. MEADOR:  We do, on depositions, yes.

2        MS. RICKERT:  -- on deposition scheduling and

3  dividing up witnesses and hopefully stuff you'll never need to

4  hear about.

5        THE COURT:  Fingers crossed.

6        I mean, you know, honestly, part of this is also an

7  educational process for me, which is part of the reason why

8  I'm keeping supervision of the discovery here.  I made the

9  same decision in *Henderson* and *Tyler*, which is to say that,

10  you know, maybe the next time one of these bifurcation motions

11  gets filed in front of me in a different case, I will take a

12  different point of view, particularly on the burden point,

13  having experienced more firsthand how that all plays out.

14        MS. MEADOR:  Okay.

15        MS. RICKERT:  It's my hope that what happens in

16  *Henderson* and *Tyler* is also stuff that can be repurposed in

17  here to some extent given the officers involved and that sort

18  of thing.

19        MR. MORAN:  That is a different group though.  Some

20  overlap, but many different officers.

21        MS. MEADOR:  Yeah.

22        MS. RICKERT:  Well, differences, yes, but some same.

23        MR. MORAN:  We don't need to go down that road,

24  Judge.

25        THE COURT:  Right.

1          MR. MORAN:  You've got your ruling.

2          MS. RICKERT:  Yes.

3          MR. MORAN:  All good.

4          THE COURT:  I don't know that you feel good about it.

5          MR. MORAN:  Well, it is what it is.

6          THE COURT:  I appreciate that.

7          All right.  So I will not see you until you tell me

8     that you need to see me.

9          Is there a date -- I always like to have a date just

10    to make sure that the case doesn't slip off the radar in any

11    way.  And I'm wondering whether there is a date in place for a

12    next status report, and if not, we can just set one.

13         MS. RICKERT:  I am not aware of a date, but --

14         MR. MORAN:  Why don't we send you a status report

15    maybe at the mid or end of January.

16         MS. MEADOR:  Yeah, that actually --

17         MR. MORAN:  We can tell you where we are, how much --

18    you'll probably get a motion before that date.

19         THE COURT:  Okay, yeah, right.  And if I get a motion

20    before that, then someone will need to remind me that I don't

21    need the status report at the end of January.

22         MR. MORAN:  Yeah.

23         MS. MEADOR:  Okay.

24         THE COURT:  But just so that we have a next date on

25    the docket, I'll set January 30th as a deadline for filing a

1    joint status report.  And you can use the status report, it

2    doesn't need to take any particular form.  For example, like

3    on my standing orders you'll see a joint status, joint initial

4    status report or a joint status report for reassigned cases.

5    I think this one you can just tell me what's going on with

6    discovery and when you anticipate fact discovery being

7    completed and what may or may not need the Court's attention.

8              MS. MEADOR:  Okay.

9              MR. MORAN:  Sounds good.

10             MS. MEADOR:  That sounds good.

11             MS. RICKERT:  Thank you, Your Honor.

12             MS. MEADOR:  Thank you, Judge.

13             MR. MORAN:  Thank you.

14        (Proceedings concluded)

15                  C E R T I F I C A T E

16        I, Jennifer S. Costales, do hereby certify that the
     foregoing is a complete, true, and accurate transcript of the
17   proceedings had in the above-entitled case before the
     Honorable GEORGIA N. ALEXAKIS, one of the judges of said
18   Court, at Chicago, Illinois, on December 11, 2024.

19                       /s/ Jennifer Costales, CRR, RMR, CRC
                         Official Court Reporter
20                       United States District Court
                         Northern District of Illinois
21                       Eastern Division

22

23

24

25