IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARCELOUS PITTMAN, Plaintiff, | ) | Case No. 23 C 14786 |
| v. | ) | |
| JOHN HALLORAN, et al., Defendants. | ) | Chicago, Illinois<br>August 27, 2026<br>1:00 p.m. |

TRANSCRIPT OF PROCEEDINGS - MOTIONS
BEFORE THE HONORABLE GEORGIA N. ALEXAKIS

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | LOEVY & LOEVY<br>BY: MS. RENEE SPENCE<br>MS. JULIA RICKERT<br>MS. ANNALISE WAGNER<br>311 North Aberdeen Street, 3rd Floor<br>Chicago, Illinois 60607 |
| For the officer Defendants: | ROCK FUSCO & CONNELLY, LLC<br>BY: MR. PATRICK R. MORAN<br>333 West Wacker Drive, 19th Floor<br>Chicago, Illinois 60606 |
| For Eileen O'Donnell, Patrick McCormick and James Breen: | JOHNSON & BELL, LTD.<br>BY: MS. LISA M. MC ELROY<br>33 West Monroe Street, Suite 2700<br>Chicago, Illinois 60603 |
| For the City of Chicago: | THE SOTOS LAW FIRM, P.C.<br>BY: MR. LISA M. MEADOR<br>MR. DAVID A. BRUEGGEN<br>141 West Jackson Boulevard, Suite 1240A<br>Chicago, Illinois 60604 |
| Court Reporter: | JENNIFER COSTALES, CRR, RMR, CRC<br>219 S. Dearborn Street, Room 1714<br>Chicago, Illinois 60604<br>Telephone: (312) 435-5895<br>jenny.uscra@yahoo.com |

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE COURT: Good afternoon, folks. We are here on Marcelous Pittman v. John Halloran, et al., 23 CV 14786. Let's start with appearances starting with counsel for Mr. Pittman.

MS. SPENCE: Good afternoon, Your Honor. Renee Spence on behalf of Marcelous Pittman.

MS. WAGNER: Annalise Wagner on behalf of Pittman.

THE COURT: Okay. And then for the defendants.

MS. MEADOR: Good afternoon, Your Honor. Lisa Meador, M-E-A-D-O-R, on behalf of the City of Chicago.

MR. BRUEGGEN: Good afternoon, Judge. Dave Brueggen also on behalf of the City of Chicago.

MS. MC ELROY: Good afternoon, Your Honor. Lisa McElroy, M-C-E-L-R-O-Y, on behalf of Deborah O'Donnell Helfenbein, special representative of Eileen O'Donnell; Geri Yanow, special representative of Patrick McCormick and James Breen.

MR. MORAN: Good morning, Judge. Pat Moran for the police officer defendants who were not just named.

THE COURT: Okay. Good afternoon, everyone.

All right. So I had scheduled today's hearing to resolve what had been filed earlier this month. So that's defendants' motion to compel plaintiff's interrogatory, certain interrogatory responses. That's at docket 235.

And then we had that hearing in early August where the plaintiffs flagged for me that they would be filing a motion to compel with respect to Rule 30(b)(6) testimony from the City. So that ended up getting docketed at docket entry 242.

Since then I've gotten four motions, so plaintiff's motion to compel to prevent duplicative depositions, plaintiff's motion for a rule to show cause with respect to Gabriella Owens, a defendants' motion for protective order regarding Officer Halloran's deposition or Mr. Halloran's deposition, and then a motion that was filed very late last night, a plaintiff's motion to compel with respect to an interrogatory and I think it was three RFPs.

Before we start talking about each of the motions, let's just talk about the fact that you have a fact discovery deadline of Monday. And I know that I -- I went back and I looked at the transcript from earlier in this month when I knew -- when the City filed its original motion, I'll call it the original motion, the one that brought us to this place, and when I think it was you, Ms. Spence, who flagged for me that a different, a separate motion was coming.

And I went back and I looked at the transcript. And I definitely indicated a willingness to extend the fact discovery deadline to accommodate those two motions. I did not say anything that indicated that I was amenable to

extending the fact discovery deadline altogether.

And so I guess I wanted to check in with the parties and see what is your understanding of where things stand, because in looking at these motions, the ones that have been filed in the last week, it doesn't strike me that any of the relief that you're requesting could be granted on a timeline that accommodates the August 31st discovery deadline.

So let me start with you, Ms. Spence.

MS. SPENCE: Yes. As it relates to plaintiff's motion, plaintiff has filed, aside from the Rule 30(b)(6) motion, there is a rule to show cause motion about Ms. Gabriella Owens. That's someone we've been searching for for a very long time. Her deposition was set. I think the motion sets forth all of the efforts that we have tried to make to serve her. And so that was something that we were hoping that we wouldn't have to result in a motion. That, I think, was a bit out of our control.

As it relates to the motion to compel supplementation by a date certain, we conferred with the City about these interrogatories. We are not at impasse as to whether they will supplement. The City has said that it is looking for the answer. They are going to supplement. The issue is because they have said we cannot answer until we have all the information, we wanted to raise with the Court the possibility that we may need additional time once they supplement. And so

that really is the issue about the date. We just want the Court to just set a date that says you need to figure out what the answer is.

My understanding, the City is in a queue to figure out which documents it's going to be able to get and how it's going to kind of resolve its answers. But we wanted to work with the City because the City has been working on this response. So we did not think that --

THE COURT: What about the production requests?

MS. SPENCE: That's in the same -- that is a date certain supplementation. So as it relates to the third set of requests for production, the City says that it had already made the request. The request has -- it wasn't just entered. It's in progress. They're in a queue. They've been following up. And so they expect to have some documents and have a conversation with us about it. And so supplementation, again, we're not at issue about whether or not this is going to be complied with at all.

THE COURT: So why is it styled as a motion to compel?

MS. SPENCE: We want a motion to compel production by a certain date. So that's what --

THE COURT: The date by production has to be August 31st. That's the date. That's the close of fact discovery. If the parties want to negotiate amongst themselves an

informal date because you didn't meet the Court imposed deadline, you guys can do whatever you want in that regard.

But you can't ask -- you can't file a motion to compel two business days, three business days, three business days before the close of discovery and ask me to give you relief that extends past the fact discovery deadline.

You know, I can give you more analysis as to why I have the discretion to do that. But I've spent a fair amount of time, which frankly I shouldn't have done, because people should not filing motions at 11:45 p.m. and noticing them up for a hearing the next afternoon.

MS. SPENCE: Right.

THE COURT: But I know that I'm on good grounds to say that you're late and that your motion to compel is untimely.

And so, again, the parties can do -- you can all discuss and resolve whatever you want to resolve, but I think I was -- I know I was clear that the August 31st deadline stood. And I went back and I looked at the docket, and I think it's pretty clear that discovery, fact discovery has been extended a number of times. We have a late January 2025 deadline. Then that becomes an October 2025 deadline. Then that becomes a March 31, 2026 deadline.

Then I enter a deadline of August 31st. I write on the docket the deadline is firm. And then shortly thereafter,

I think it's in April, I affirm that August 31st deadline as part of a whole case management plan. And I say, I wrote down, "The Court fully expects the parties to adhere to the schedule."

So we had an August 31st, Monday is the fact discovery deadline. And the only wiggle room that I provided for when we all spoke by phone earlier this month was with respect to the motions that have now been docketed at 235 and 242.

So the motion to compel, so I guess to put a finer point on it, the motion to compel that was filed last night is denied as untimely.

MS. SPENCE: I understand, Your Honor.

THE COURT: All right. So then with respect -- well, actually, so then before we start talking about other -- well, let me hear more from you, Ms. Spence, then on the duplicative depositions motion and why I -- what's the -- I guess what's the parties' plan with respect to when the depositions are going to be taken of these six individuals?

MS. SPENCE: These are not plaintiff's depositions. So this was the defendants' -- we filed it based on conversations with the defendants. The defendants have been responsible for making the arrangements and speaking to counsel.

THE COURT: Okay. So when are those depositions

noticed up for?

MS. MEADOR: Well, do you want to take the --

MR. MORAN: There is a group of depositions that we haven't been able to locate the person. And I should -- can I preface this, Judge, by saying one thing about the -- you had asked about discovery and what's our plan.

We have been in discussions with the plaintiff over the last few days about a motion to extend discovery for a limited purpose of accomplishing targeted discovery, not generally. And we have a couple of disputes about what should be on that list. But the parties were in agreement that more time would be required to get certain things done. I think these six depositions fall into that category and also the depositions of Halloran and -- one of the issues is whether the 404(b)s would be taken. But that's something we don't need to talk about right this second.

So I just want to put that out there, Judge, that we have been trying do cooperate. And I think the parties in good faith have come up with plan to get what remains to be done and final within a certain window of time.

THE COURT: Then you don't need me to bless it.

MR. MORAN: Yeah.

THE COURT: If you're all in agreement, if you can all agree on -- I can help resolve disputes with respect to the interrogatory responses on the *Monell* claim and the

30(b)(6) deposition, okay. I'm fully prepared to do that today and figure out where folks -- where we've landed, because there have been some moving parts from what I can tell since the motions have been filed. So I'm happy to help resolve those disputes.

But if you are telling me that the parties are otherwise negotiating in good faith with one another about what I'll call an informal extension of the fact discovery deadline so that you can all get whatever you can all agree to get done, I don't have a problem with that.

Just from my standpoint, the Court ordered deadline is Monday. And so once you're on your own, you're on your own for reaching agreement on how discovery will proceed.

MS. MEADOR: So, Your Honor, on behalf of the City, with regard to plaintiff's recently filed motion regarding the 404(b) witnesses, from the City's perspective, the individuals identified are 404(b) witnesses. That's related to counsel for the officers, okay.

But plaintiffs have now newly started calling them *Monell* witnesses. I suspect because of our hearing and you indicating there might be some wiggle room on addressing *Monell* discovery.

At this point, these people have not been -- we don't have the answers to the *Monell* interrogatories. So we don't have any context to understand how propensity evidence

witnesses are now *Monell* witnesses. We would expect that if that's the case, plaintiff would say so in their answers to *Monell* interrogatories, identify the evidence support of that and the theories to which these witnesses apply. And then we could be in a position to say, okay, we're going to file, let's say, a motion for protective order because they can't provide *Monell* evidence or, well, we'll split the deposition, you know, 404(b) or, you know, we take a deposition to try and determine what information they have about *Monell*.

So I think that's -- we're kind of -- it's a cart before the horse situation for the City because we don't have a context for understanding how these individuals are *Monell* witnesses, if that makes sense to you.

So we're in a little bit of a bad position right now to know whether or not these should be categorized as part of what Your Honor discussed for *Monell* discovery or what we discussed.

THE COURT: I guess, I mean, to put it this way, if it wasn't flagged for me as a motion that was coming in the month of August, then it wasn't on my radar as something that I would be contemplating a discrete extension of the discovery deadline.

MS. MEADOR: I think that's our thought process as well. Thank you.

THE COURT: If someone had said to me whenever it

was, the very first week of August, this motion is already on file, this motion is coming, by the way, here is another motion that's coming, I would have said, okay, then we should brief these motions, and then I'll be ready to address them on August 27th.

But instead what I was -- I had one motion on file, and I had one motion teed up for me with respect to the Rule 30(b)(6) deposition.

So when I was asking how much longer would we need to extend discovery to accommodate refined interrogatory responses and 30(b)(6) depositions, I was told, we can't really, it depends, but -- and I don't mean that in a critical way, but the ballpark I was given was 30 to 45 days.

To then find out weeks later that, oh, by the way, there are potentially six or seven more depositions, that's not -- I mean, that doesn't seem likely to me as work that would get done in 30 to 45 days.

My point being is that what I expressed was a willingness to extend fact discovery by 30 to 45 days to accommodate *Monell* Rule 30(b)(6) issues and interrogatory responses.

I guarantee you if someone had said to me, we're also disputing the scope and length of seven more depositions, I would have said, well, that's not all going to get done in 30 to 45 days. And what you guys are asking for is a much more

extensive fact discovery deadline.

But no one said that. And so here we are three business days, two business days from the close of fact discovery, and I'm telling you fact discovery closes on Monday.

MS. WAGNER: Briefly for plaintiff, Your Honor. So regarding the *Monell* witness depositions, Tyrone Reyna was served with a subpoena, but the deposition was never noticed. We informed defendant officers that plaintiff would oppose the deposition of anyone who had recently been deposed including Mr. Reyna. His deposition was not noticed.

In an August meet and confer just a few weeks ago, we asked if they planned to move forward with those depositions, and defendant officers said yes.

So then we immediately started working on a motion for a protective order to prevent those depositions from moving forward because we just learned that they in fact were moving forward.

This representation that there are six *Monell* 404(b) witness depositions we're negotiating is not true. It was our understanding that there are two that they were potentially going to pursue depending on how the protective order shakes out and that they are potentially going to pursue Tyrone Reyna's, which we oppose.

There is other 404(b) *Monell* witnesses who were on

our disclosures. It's our understanding that defendants did not take any steps to pursue those depositions. So we would, like Your Honor mentioned, oppose any request to take those depositions after the close of discovery.

THE COURT: But I just told you that fact discovery isn't going past August 31st.

MS. WAGNER: Yes. And that was plaintiff's understanding too. We've been working very diligently to get all of our --

THE COURT: Okay. So then what's --

MS. WAGNER: So the defendant officers have represented to us that they would like to move forward with those depositions, and we have said we oppose those depositions.

THE COURT: I assume that you want to depose Officer Halloran, correct?

MS. WAGNER: So Officer Halloran's deposition was set for yesterday, August 26, two days before defendant officers asked if we would agree to limit his deposition to four hours and to not ask --

THE COURT: When is Officer Halloran's deposition currently noticed for?

MS. WAGNER: It was noticed for yesterday.

THE COURT: When is it currently noticed for?

MS. WAGNER: It hasn't been renoticed because they

filed their motion.

THE COURT: Okay. So it seems to me that both sides have a lot to gain from negotiations, because I assume that you want to depose Officer Halloran.

MS. WAGNER: We're going to move forward with Officer Halloran's deposition, but we were told he's not going to show up. So we didn't want to pay the court reporter for being there when we're being told this witness isn't going to come because we're not agreeing to take three hours off the deposition time of a defendant officer, which we think is --

THE COURT: So presumably you want to take Officer Halloran deposition, yes?

MS. WAGNER: We were prepared to --

THE COURT: Yes or no, Ms. Wagner?

MS. WAGNER: Yes, yes, of course.

THE COURT: Okay. And so you're going to have to do that after August 31st, correct?

MS. WAGNER: Because of how defendants have represented this to us.

THE COURT: Look, everyone was on notice of an August 31st deadline.

MS. WAGNER: Yes.

THE COURT: How you all budgeted for meeting and conferring and negotiating over that is on you, not me. You have an August 31st deadline that you had to meet. If you're

not on track to meet that, then you all have to work cooperatively with one another to figure out what you are willing to do and what depositions you are willing to let each side take past that August 31st deadline.

But I am not giving you an official sanction. I'm not allowing you to take Officer Halloran's deposition past August 31st and not deeming -- not giving the City some kind of similar relief with respect to these other six witnesses.

MS. WAGNER: Respectfully, we've been trying to take Officer Halloran's deposition for the past year, and it's been rescheduled several times. The defendants have taken steps to depose these six witnesses -- actually only three of the six witnesses only in the past month.

So we have been taking extensive efforts to depose Officer Halloran. And in plaintiff's view, we were met with an untenable proposition that we limit it in a way that was baseless. And we were prepared to move forward, and we were told the witness is not going to come if you don't agree to this.

THE COURT: And you don't see the irony in plaintiffs saying that they should be permitted to depose Officer Halloran for seven hours, but the defendants should not be permitted to depose these other six individuals for seven hours? You don't see the irony in that?

MS. WAGNER: So I would submit that those are not

identical situations because the *Monell* witnesses they're seeking to depose are about a one-day period that they've testified about extensively. Tyrone Reyna is set to be deposed in his own case in October.

THE COURT: Let's not talk about Mr. Reyna, because he was just deposed, right? He was deposed in August.

MR. MORAN: No, he was not deposed, Judge.

THE COURT: The motion that was filed told me that he was deposed in August.

MS. WAGNER: I believe it was originally scheduled for August, and it's been moved to October.

MR. MORAN: I can clarify, Judge. That's one of the cases that we're handling. There was a trial conflict with his attorney. He had a trial scheduled. We all agreed to reschedule that deposition to a later date.

So it is not currently scheduled right now. But it should be scheduled in the next, I would think, 60 days.

THE COURT: In this other matter?

MR. MORAN: In this other matter, that is correct.

THE COURT: Okay. So let's talk about Mr. Coleman, who has only been deposed once in 2020. Plaintiff's position is that he either shouldn't be deposed at all or the length of his deposition should be severely circumscribed.

MS. WAGNER: That's right. So when --

THE COURT: How is that different than the relief

that you're opposing with respect to Officer Halloran?

MS. WAGNER: Because in Coleman's deposition, Exhibit J at 39 and 38, he was asked extensively about the physical abuse of Officer Halloran. All of the details were explored. Officer Halloran has not been asked about the details of the investigative steps he took in this case.

THE COURT: But I thought that the City's motion was to prevent plaintiffs from deposing him about his background and his prior CRs.

MS. WAGNER: They're also asking that it be limited to four hours. Plaintiff is not intending to waste any time. In O'Brien's deposition, it took the full seven hours. We spent very little time on background. We spent no time on CRs.

So the motion really is asking to restrict the time that plaintiff is able to spend asking Halloran about the specific allegations in this case.

Also, Halloran's deposition was previously rescheduled due to medical issues. So there are concerns that he won't be available for trial. So plaintiff is entitled to have a clean record to be able to present to the jury rather than clipping together depositions from several different cases.

Differently in the *Monell* 404 --

THE COURT: Okay. So I'm going to interrupt you,

Ms. Wagner, because we've gone far afield from my agenda. My agenda today was to resolve the motion to compel with respect to the interrogatory responses and the plaintiff's motion to compel with respect to the Rule 30(b)(6) testimony. That's what absolutely needs to get resolved --

MS. WAGNER: Understood.

THE COURT: -- today. So we'll talk about those first. And then what I'd like to do is talk about plaintiff's motion for the rule to show cause with respect to Ms. Owens, because I do see that as a narrow -- I see that as warranting a narrow extension of a discovery deadline, because as I read the motion, Ms. Owens is defying a court order, and so that falls into a separate category to me.

And then we can talk about everything else. But I think I've made my point pretty clear as to when fact discovery is closing and at what point you're on your own.

Okay. So with respect to the motion to compel plaintiff's interrogatory responses, in the course of the briefing, plaintiffs submitted revised interrogatory responses. And so then I found myself in a somewhat unfortunate position of not knowing what the objections are to the current version of the interrogatory responses.

So let me hear from the City.

MR. BRUEGGEN: Judge, the objections are pretty much all the same. The problem we have is they provide a three or

four page rambling narrative of all their *Monell* claims, talking about suppression, fabrication, coercion, missing documents, and stuff like that. It's in one answer to interrogatory. Then they incorporate that throughout. So we're not --

THE COURT: Like cut and pasting?

MR. BRUEGGEN: They are not cutting and pasting. They say, go see interrogatory number 1.

THE COURT: That's what I mean.

MR. BRUEGGEN: Sorry. Apologies.

And the problem is though we've asked specific questions about, tell us about your fabrication *Monell* theory. What is the theory? What's the policy or practice that you're alleging? What is the evidence that supports it? And what shows that there was deliberate indifference?

And so they commingle all their theories together in kind of an amorphous blob so we can't parse out what goes with what *Monell* theory, and we're kind of left just guessing at, well, what's the evidence for this theory, what's the evidence for this theory, which is kind of contrary to what Your Honor said early on when we talked about bifurcation. And you said focus on the underlying claim and then work back so you can kind of phase discovery in a logical way.

And we haven't been able to get to that underlying claimed logic and then how the *Monell* flows from it. So

that's what we're looking to get.

THE COURT: And so how would it help -- I guess I'm struggling to understand how it would help the defendants to have plaintiffs take their long answer and cut it up and say this part goes with interrogatory 1 and this one goes with interrogatory 2, et cetera, et cetera.

MS. MEADOR: So if I may, Your Honor? I'm not sure if you recall, I feel like this is a good example to utilize. Your Honor oversaw the *Henderson*, *Tyler* case, and we had come in on a motion to stay and bifurcate *Monell*. And in that briefing, in the discussions with both plaintiffs' counsel in that and our discussions with Your Honor, the plaintiffs early on in the case said, okay, we have a coercion fabrication claim. The evidence related to the coercion fabrication claim comes from the CRs. We'd like them from *Hood*, *Washington* reproduced, right.

Then we have a *Brady* claim with regard to suppressed records, street file. The evidence for that is this, and our *Monell* evidence comes from then the CRs.

THE COURT: You're talking about --

MS. MEADOR: Or strike that, I'm sorry, the homicide files.

THE COURT: You're talking about representations made in *Henderson*, *Tyler*?

MS. MEADOR: Correct, I am, I am. As like an example

of that's how -- and this isn't new. This is how we have engaged with plaintiff's counsel over and over throughout various cases related to *Monell*.

And then there is, okay, the training theory, right. So you have a *Monell* claim, but you have to identify the theories. And this is kind of going back to what we discussed when we were before you last time.

So, you know, okay, so then with training, we've produced the training records. We've produced the policies, et cetera. And then you have, like they'll say, they weren't properly trained on X. So we know what the focus is. We know what their evidence is. We know then the discovery we need to conduct to flush out that evidence and then the discovery we need to defend those claims, right.

We're not getting that. It's just this, look at this, you know, these 50,000 pages of documents.

THE COURT: So to help make -- I guess what would help me understand concretely your criticism, your critique of the interrogatory, just a thought exercise, could we look at the revised response that's been submitted. So I have in front of me what was filed at docket 244-1. And tell me what more you're looking for.

MR. BRUEGGEN: So, Judge, in the first interrogatory, again, this is the one that's the long narrative that they basically talk about, it's basically recasting everything from

their complaint, all their allegations, and they point to various evidence here or there. But there is no clarification as to what this evidence supports, which *Monell* theory, because they jump back and forth.

If you go to basically right after they start answering subject to and not with -- at the bottom they start talking about concealing exculpatory evidence. This interrogatory --

THE COURT: What page are you on? I'm sorry. What page are you on?

MR. BRUEGGEN: Page 4. It's 5 of 21 for the file copy, Judge.

THE COURT: Okay.

MR. BRUEGGEN: So down at the bottom, again, this interrogatory asked about their evidence of the policy and practice of fabricating false evidence. And they start now talking about concealing exculpatory evidence and other things. And so they jumble it all together. So at the end of the day they have a bunch of evidence, but they haven't told us what evidence supports what claim. So we can't do discovery to try to figure out what those claims are.

And then if you move on --

THE COURT: But why?

MR. BRUEGGEN: I'm sorry?

THE COURT: But why?

MR. BRUEGGEN: Because we're trying to figure out what evidence do they have to support this claim. And they just give us a bunch of evidence. They say look, basically look at the whole record.

THE COURT: But surely I guess -- okay. So let's imagine a world in which plaintiffs came back and said, okay, fine, we took what we submitted. I'll refer to the entry at 244-1. And we moved some paragraphs under, you know, interrogatory number 5 and some paragraphs under interrogatory number 6, and some paragraphs got moved under interrogatory number 4. Is that all you're asking for?

MR. BRUEGGEN: Judge, that --

THE COURT: I heard Ms. Meador say no, which I suspect like that's what I'm getting at, right.

MS. MEADOR: I'm sorry, yes.

THE COURT: I'm trying to understand what -- because if it's just -- I don't mean to diminish the concern. I understand what you are saying. But surely the problem has to be something more than we need them to cut and paste text into different sections of the document.

MR. BRUEGGEN: And, Judge, that would be the start of it. But the other thing is we want to know everything, because we don't want them to come back and say: Oh, well, this is also evidence.

And we go back and say: Well, you didn't say it was

evidence of your *Brady* claim.

And they say: Oh, yeah, it is. It's buried here when we're talking about fabrication.

That's the problem. We need them to commit to kind of what their theories are and what the evidence is that supports those that so we can actually focus in on the discovery.

THE COURT: Okay.

MS. MEADOR: And if I may, Judge? Like a great example for us is this *Brady* claim that we've been talking about for some time in this case. This is an aggravated battery to appeal. It is not a homicide case. So the evidence that would usually be perpetuated or sought by plaintiffs related to *Brady* evidence, being the homicide files, the corresponding state's attorneys' files and the public defender files or the criminal defense counsel files, that doesn't come in -- that isn't in play here because looking at initially this very -- this case, Mr. Pittman's case, CPD has only a portion of their file based on not -- this is not a file for permanent retention.

The public defender doesn't have their file. The state's attorney doesn't have their file. So if it's a document case, a street file case, then that can't be proven up, because there isn't anything, like there isn't a document to say, yes, this was here in CPD's file, but it was never in

the public defender file, that sort of thing, right.

THE COURT: You're saying that that level of specificity doesn't appear in the interrogatory response?

MS. MEADOR: I am. And so we have been trying to understand, how are you moving forward on a *Brady* theory? Because you won't let it go, right. You're saying you have a *Brady* claim.

Now, when we had our last hearing, Ms. Spence said, well, our *Brady* claim is that the defendant officers didn't disclose their misconduct.

Okay. Accepting that to be true, that then -- okay, then we understand. Okay, then they would say the evidence is you testified in court whatever. That's what they should be saying, right. This is our theory. Our theory is the defendants didn't disclose their own misconduct. And our evidence is that here is the criminal trial transcript, right.

But we don't have that. So, you know, okay, how do we conduct discovery to flush out their claim and defend their claim if we don't know what the theory is and the evidence supporting it.

THE COURT: And when you talk about conducting discovery, I guess what's the relationship between this motion and the Rule 30(b)(6) deposition topics motion?

MR. BRUEGGEN: Judge, basically, we're trying to assess proportionality of their claims. So some of the

30(b)(6) topics are on this *Brady* issue. But they've never identified the *Brady* evidence. So we ask them, then why are we talking about it? Why do we need a witness on this if you haven't identified underlying --

THE COURT: Yeah, I'm thinking, not to jump ahead, but I'm thinking about some of the topics that were flagged with respect to that motion to compel with respect to like production. I think it's like topic 1(f), production of files to the Cook County Public Defender's Office. Like that's one, if I understand the defendants' argument there, it's what files are you talking about that should have been in the public defender's file that wasn't? Is that --

MS. MEADOR: Well, I think that's, that's generally, you know, what the *Brady* claim is about, right, that you had an exculpatory or impeaching piece of a report or document that was part of your investigation that you then did not tender to the State's Attorney's office. The State's Attorney's office then did not tender it to the public defender's office, right, or the criminal defense counsel, right.

Okay. So what, if that's not your claim -- and my understanding is that they, that plaintiff has said they don't have a street file claim. And that's essentially what a street file claim is, documents were secreted away and not disclosed.

And then based on when I was kind of going down that road at our last hearing, Ms. Spence said, okay, well, while that may be true -- and I'm not saying she conceded to not having a *Brady* claim, I'm not inferring that at all -- she said, okay, but our *Brady* theory is that the defendants engaged in misconduct and didn't report it.

Okay. Well, if that's your theory, then go, right, go to this interrogatory that asks what is your *Brady* theory, what's the evidence, and answer that because then we know, okay, is there additional discovery we're going to need regarding that.

THE COURT: Okay.

MS. MEADOR: I guess that's, you know, kind of the way -- and then with regard to the 30(b)(6), okay, then we don't need to worry about these topics because that's not one of your theories that you're moving forward on.

THE COURT: Okay. So what would satisfy the defendants seems like a revised interrogatory response that answers specific questions in a specific -- well, let me phrase that in a better way -- but identifies buckets of evidence that go along with particular facets of the *Monell* claim. So this aspect of the *Monell* claim goes with this evidence, and this other aspect of the *Monell* claim is supported by this other evidence. Obviously there could be some overlap. Can we agree on that?

MS. MEADOR: Possible, yeah.

MR. BRUEGGEN: Yes.

MS. MEADOR: With regard to policies and training, yes, I think that would be true. But then even at its most basic level of identifying which *Monell* theories plaintiff intends to pursue for trial, okay.

THE COURT: What do you mean by that?

MS. MEADOR: So --

THE COURT: Meaning like, for example, interrogatory 1 talks about a policy and practice of fabricating false evidence. Interrogatory number 2 talks about a policy and practice of systematically concealing exculpatory and/or impeaching evidence.

Just as an example, you're saying that there is a world in which they could respond to interrogatory 1 and say, here is our evidence to support a policy and practice of fabricating false evidence.

And in response to interrogatory 2, it's probably not a great example, but theoretically one could respond to interrogatory response number 2 and say, actually, we don't have any evidence to support this policy or pattern or practice.

MS. MEADOR: Yes. And that's actually what I anticipate their answer to number 2 would be because this is the *Brady*, right, component. So while, you know, so if there

is --

THE COURT: Okay.

MS. MEADOR: -- if there is no evidence that in this case with regard to Mr. Pittman, there is no evidence in the record that any exculpatory or impeaching evidence was withheld, documents, let's say, then that would be withdrawn. That's not a claim that they're going to move forward on.

THE COURT: Okay. I mean, I don't want to bleed into sort of a substantive discussion of like how the two things --

MS. MEADOR: Agreed.

THE COURT: -- could still both be true. But as a general matter, I guess the defendants' position is we would like answers that are specific to the question, and I also hear you to be saying, and are more specific than what are currently provided. Is that --

MS. MEADOR: That's correct.

THE COURT: Is that second piece correct?

MR. BRUEGGEN: Yes, Judge, because basically *First Midwest Bank* tells us that you need the underlying constitutional violation before you even consider *Monell*. That's kind of what we need. We need them to point to the underlying constitutional violation and then say, our *Monell* theory is this. This is how the City caused it. This is what -- so if we don't know what the underlying constitutional violation is, we're kind of talking just theoretical

violations, because, again, their burden of proof is to show an underlying constitutional violation and then other *Monell* components. So they're not identifying the underlying constitutional violation.

THE COURT: But why would they have to identify the underlying constitutional violation in response to the interrogatories as framed? Because the interrogatory just asks for the evidence that the City has a policy and practice of fabricating false evidence.

I'm just looking at interrogatory response number 1.

MS. MEADOR: So it's -- go ahead.

MR. BRUEGGEN: I would say it's part C. It's that this policy and practice caused this --

THE COURT: Okay.

MR. BRUEGGEN: -- basically violation.

THE COURT: Okay.

MR. BRUEGGEN: So if we know what the violation they're alleging is, you can work back and say, well, did the practice, you know, how was it tied in?

THE COURT: Okay, all right. Ms. Spence, Ms. Wagner, who wants to respond?

MS. SPENCE: I can address it, Your Honor.

Do you mind if I sit as I --

THE COURT: I'm sorry?

MS. SPENCE: Do you mind if I sit when I address the

Court?

THE COURT: Oh, that's fine. I can see you. As long as you're speaking into a microphone, that's fine, yeah.

MS. SPENCE: So interrogatory number 1 I believe has very clear topic sentences to discuss which theories are being addressed in interrogatory number 1.

As we mention in our response, there are a lot of overlapping pieces of evidence. So that what is happening in interrogatory number 1 is likely going to be incorporated into certain other interrogatories if we had to cut and paste it as Your Honor has alluded to.

But even if you look at the answer to interrogatory number 2, there is additional information in interrogatory number 2 on page 10. I'm referring to the page number at the bottom of the page, not the ECF number.

But if you take, for example, interrogatory number 2 about the concealing exculpatory evidence, it says this was the practice of concealing its officers' coercion of witnesses and suspects and its fabrication -- coercion of witnesses and suspects and its fabrication of evidence against criminal suspects. It cites specifically to an instance in plaintiff's case, the concealing of exculpatory statements and witnesses, such as Shari Shannon in plaintiff's case.

THE COURT: I'm sorry, where are you reading, Ms. Spence?

MS. SPENCE: It appears in 244-1 of the ECF number, or page number would be 11 of 21. So looking at interrogatory number 2, in the answer, plaintiff incorporates interrogatory number 1 and then says, "In addition."

THE COURT: Yep.

MS. SPENCE: And provides additional information about that *Monell* theory. So this is not -- so while I believe in our Rule 30(b)(6) motion we identify another piece of exculpatory evidence, the *Monell* theory is about this widespread custom of suppressing these exculpatory evidence based on the fabrication of statements and the coercion of these people and exculpatory witness statements.

Then you go to for another example --

THE COURT: I'm sorry, I'm just going to have you pause there just so I can read and digest what you just pointed me to.

(Pause.)

THE COURT: Okay. Keep going.

MS. SPENCE: And so another example would be on page 14, the bottom numbered page 14, but it would be the ECF numbers would be 15 of 21.

Interrogatory number 7, this is about lacking a mechanism for identifying police officers who are repeatedly accused of engaging in misconduct. Plaintiff goes through the City of Chicago's policies and explains that none of these

documents appear to describe a mechanism for identifying misconduct.

In interrogatory number 1, we describe the misconduct that is similar to what is happening in plaintiff's case. The City is not confused about the misconduct. There is no -- even as it relates to the exculpatory evidence, the defendants say it didn't happen. Obviously they didn't disclose it if they maintain that it didn't happen.

But our point, my point is that throughout this response, where there needs to be additional information, plaintiff provides that additional information.

This is also true for interrogatory number 9, right, I believe, and interrogatory number 3. There is again expansion.

THE COURT: I guess one question I have is that interrogatory, let's call it the omnibus answer, right, so the response to interrogatory number 1, there are a number of instances where plaintiffs are citing to documents and providing Bates ranges.

MS. SPENCE: Right.

THE COURT: Some of which are relatively, you know, some of which are narrow, okay, I'm looking at one that's a three-page range, some of which are not, right.

And so then I guess my question is how, if I'm the defendants, how do I know in a 2752-page range, which is the

first range that's provided on page 6 of 244-1, right, the very first Bates range at the bottom of that page is Pittman 1 through Pittman 2752, how do I know which pages within that, let's call it a 3,000-page range go with which bucket of the *Monell* claim?

MS. SPENCE: Right. So I have two response, Your Honor. That range that you're specifically pointing out refers to Marcelous Pittman's case, the underlying case of this civil lawsuit. The City has had extensive discovery about those allegations. I don't think that there is any difficulty in identifying where the coercion is, where the suppression is, because that shows up in multiple documents.

The rule for citing to documents is whether or not there is a substantial equity or there is equity between the parties in being able to locate the answer in the documents and whether or not the answer can in fact be found in the document.

As we pointed out in our motion, there is a document that we produced in discovery, and we can update the interrogatory to cite to that document, that lists here are the allegations, here are the documents that are supporting that allegation. Describe what those documents are.

So a motion to suppress, the City can look at the motion to suppress, the motion to suppress includes all of the allegations that would support this idea that there was

fabricated evidence or that the evidence was not only fabricated but the result of coercion.

And so that's really what many of these documents are, they are, the meaning or the significance of the document is apparent on its face. But some of it as we also --

THE COURT: I have to say that's a hard argument to swallow just from a pragmatic standpoint when you are talking about close to a 3,000-page document. When I looked at the cases that you're referring to that make the points about are the parties in an equitable position and able to decipher what the answer is, my takeaway from those cases was that this was not what the courts were contemplating, a 3,000 or close to 3,000-page range of documents to say, a 3,000-page document to say you both are in an equal position to sift through these 3,000 pages and figure out what page supports what aspect of a party's claim.

To me, that comes uncomfortably close to the idea that we are not operating in an efficient and transparent way, which is one of the overriding goals of the Rules of Civil Procedure.

MS. SPENCE: So I think at least with regard to that range, there is no hiding the ball. I can't in this moment represent exactly what's in that 1 through 2752 because I don't have it pulled up in front of me. But it likely includes the trial transcript, so that would be the context

for what was not disclosed, and maybe some reports, and so that's information that the City has. Again, these documents also provide just context. So when we're saying that these are the officers who were involved, this is when the confession was taken, all of those things are in the documents.

I understand that it does on its face look like a lot. But, again, I don't think it's a difficult time to locate the information.

To have plaintiff with all of the examples that plaintiff has where this interrogatory asks plaintiffs to point to specific evidence, what would be required, and this is in the chart that the City has access to, but what --

THE COURT: Can you remind me, I looked at that chart. I don't have it pulled up now.

MS. SPENCE: It's in docket number 244-3.

THE COURT: It's going to take me a minute. So just bear with me.

MS. SPENCE: I wonder if I --

THE COURT: No, I'll pull it up electronically. Just give me a second. 244-3?

MS. SPENCE: Yes, Your Honor.

THE COURT: Okay. I have this document pulled up. Do defendants have this document?

MR. BRUEGGEN: Yes, Judge.

THE COURT: Okay.

MR. BRUEGGEN: We actually looked at it this morning and confirmed some things.

THE COURT: Let me hear from Ms. Spence first about, yeah --

MS. SPENCE: Right. And so there is a summary of the allegation in the supporting information. And so some of it you can see this is the civil complaint, which would also list out the allegations that this individual was making. There is a motion, you know, there are citations to a motion to suppress hearing, which again would list out the allegations of the constitutional violation at issue.

Sometimes it's the deposition of the defendants themselves, O'Brien. And so, again, these are documents where looking at kind of just the nature of the document you can tell what's going to be in it that would be responsive to these requests. It's not just --

THE COURT: How do I map this chart on to the interrogatory responses?

MS. SPENCE: There are Bates stamps in the Supporting Documentation column. And so --

THE COURT: Okay. So let's just make this concrete.

MS. SPENCE: Yeah.

THE COURT: So the very last, I'm on the very last page of the chart. So Stanley Gardner is the name of the

person making the allegation. The supporting documentation is Pittman 6176-6191. So is that Bates range included in interrogatory response 1?

MS. SPENCE: I don't see it. There is a shorter range that's, there is a much shorter range that's included for Stanley Gardner in number 7, on page 7. There is a parenthetical pointing to Stanley Gardner.

THE COURT: Give me one second to find that.

MS. SPENCE: So this would be the fourth line down, Your Honor, and there is a parenthetical.

THE COURT: Yeah. But that doesn't match at all with the --

MS. SPENCE: That doesn't. This does not.

THE COURT: So then how do the defendants use -- I guess how does the Exhibit C, 244-3, support the plaintiff's position that the interrogatory responses are sufficiently specific and sufficiently particular to help the defendants identify the evidence that's supporting your claims and to do the proportionality analysis that they need to do and, frankly, I need to do for purposes of resolving the objections on the Rule 30(b)(6) deposition topics?

MS. SPENCE: Our position would be that what's mentioned in the Bates stamp range maps on to the exhibits that are listed in the chart. And so while --

THE COURT: You mean the substance of the pages?

MS. SPENCE: Yes. So where it refers to a civil complaint, that would be within that Bates stamp range. This was a chart that was created for the post-conviction proceeding, and so the Bates stamp are different. But the documents have been produced, the same documents have been produced in this case.

THE COURT: But if they're not identified the same way, then how does Exhibit C help the defendants?

MS. SPENCE: Because Exhibit C describes what's in that range. So while it may not be page for page, that's what's contained in that range.

THE COURT: Say it again. Try again.

MS. SPENCE: Okay. So if we look at the bottom of page 6, so pertaining to Damoni and Jesse Clemons, Diyez Owens.

THE COURT: Page 6 of?

MS. SPENCE: I'm sorry, I apologize, Your Honor. This would be 244-1.

THE COURT: Okay.

MS. SPENCE: And this would be ECF notice number page 8 of 21 -- sorry, this would be page 7 of 21.

THE COURT: Okay.

MS. SPENCE: There is a reference towards the last sentence to Damoni and Jesse Clemons. There is a parenthetical in the penultimate line. And our position would

be that --

THE COURT: So that's Pittman 10286 through 10773?

MS. SPENCE: Yes, Your Honor.

THE COURT: Okay.

MS. SPENCE: And then our position would be that within that range is on the chart would be these exhibits about the civil complaint and the testimony.

THE COURT: When you say "these exhibits" --

MS. SPENCE: I'm sorry, I'm pointing to a computer that you cannot see. So if you are looking at 244-2.

THE COURT: No, dash 3.

MS. SPENCE: Sorry, 244-3, page 2 of 9, the last row is the Marcus Wiggins row.

THE COURT: So you're saying that this range that shows up in 244-1, Pittman 10286 through 10773 is encompassed -- or, I'm sorry, the other way around, that the documents that are reflected in the Marcus Wiggins row on Exhibit C are encompassed in the range that appears in the interrogatory responses?

MS. SPENCE: That is how I understood it. I can double-check that, Your Honor. But that is my understanding of how we had prepared those Bates stamp range consistent with the chart.

THE COURT: Okay. All right. Is there anything else you want to say, Ms. Spence?

MS. SPENCE: No, Your Honor. I mean, it's just our position that the City is able to identify whether or not the question has in fact been answered by the way that we have structured the narrative. And, again, when you look at specific responses, many of the specific responses, there is additional information to fully flesh out the answer. I think supplementation would really require us to just copy and paste our response to interrogatory number 1 to no real effect.

THE COURT: Okay. All right. Let me hear from the defendants.

MS. MEADOR: So I'll just take a portion. So with regard to the chart that is Exhibit C that Ms. Spence was just talking about, this chart was never identified in the answers to interrogatories in the original or in the supplementing. We received this as correlating to these *Monell* issues only inasmuch as it was provided in their response.

So, you know, it's a little bit difficult for us to then we now have to go back and address. But we did take a look at the chart and the Bates numbers that are identified in the answers to interrogatories as a general rule, we didn't check every single one, but they are not incorporated in this chart.

We don't know where this chart came from. I suspect it came from a different case because there is a column here Possible Objections and Responses. That's not, that's not

anything we've discussed. So I suspect that it was, you know, grabbed from a different case that it was produced for.

And then as to the Bates numbers that are identified that are supposed to support these allegations, they don't. They're not the documents --

THE COURT: What do you mean when you say "they don't"?

MS. MEADOR: So for example with regard to the one we were just talking about, Marcus Wiggins, Jesse Clemons, Owens, that's the last item on 244-3, the Bates numbers that are identified, that's Mr. Pittman's criminal case, his record from appeal. It's none of these documents that are identified.

Same for the first for Mickey Grayer, same for the second, Victor Safforld. I apologize, I don't know how to pronounce that. Same for Gregory Logan.

THE COURT: Why wouldn't documents from their criminal cases be relevant in response to the interrogatories?

MS. MEADOR: I'm not saying they're not. I'm saying what the plaintiff is saying, Mickey Grayer, right, here is his allegation, and the documents we've produced supporting that allegation can be found at Pittman 2593-98. That's not anything related to Mickey Grayer. It's like discussion on the record from Mr. Pittman's criminal case related to like one of the witnesses.

THE COURT: You're saying the chart, you have found at least one instance where the chart is inaccurate?

MS. MEADOR: Yes. The Bates numbers are not correlating to -- so, you know, it says this is supposed to be Mr. Grayer's CR. It's not Mr. Grayer's CR. It's transcripts from Mr. Pittman's criminal case, right. So I don't -- like I said, I'm not really understanding. I assume it came from somewhere else and is, you know, being utilized here. But if plaintiffs have produced Mickey Grayer's CR, it's not Pittman 259 through 98.

THE COURT: Okay.

MS. MEADOR: So this chart is not helpful.

MS. SPENCE: Your Honor, if I may? This is what I was explaining, that this was produced as part of Mr. Pittman's post-conviction proceedings. And so I think this is what we were talking about when you pointed out that the numbers weren't exactly the same.

THE COURT: Yeah. I guess what I'm trying to recollect from your response to this motion, Ms. Spence, is what role Exhibit C plays in connection to the interrogatory responses.

MS. SPENCE: Our position is that it summarizes what's in the range. And so while the Bates stamps are not the same, like our position is that it summarizes the documents that are in the range that have been Bates stamped

anew.

THE COURT: Okay. But I think from the back and forth that we've all just had, Exhibit C doesn't strike me as particularly helpful, because it seems like it's leading the defendant -- if the Bates pages don't match up, if one can't look at this document, the interrogatory responses, and look at a Bates range and then be able to quickly identify all the documents, all the material that are being cited to to support the response to the interrogatory, then I don't see how the chart is helpful.

And then it worries me, it makes me concerned that the interrogatory response is less complete than it could be at this juncture in the process.

MS. SPENCE: If plaintiff were to provide a parenthetical to describe what that range, what the ranges are, so it wouldn't necessarily be, you know, Exhibit X colon, you know, this is the complaint register, but it said something like complaint register, motion to suppress transcript, that kind of thing, would that satisfy the Court?

THE COURT: I think that would be -- I mean, you're saying that you would identify with more specificity what the Bates range is and what within that Bates range supports the -- you would point to as evidence in support of the particular aspect of the *Monell* claim that's at issue in the interrogatory to which you are responding?

MS. SPENCE: I think so. So just to give an example so that I make sure I'm expressing myself clearly. For the range pertaining to plaintiff, if we were to include a parenthetical that says trial transcripts demonstrating, you know, evidence was not disclosed, motion to suppress, well, the motion to suppress, that kind of thing, that that parenthetical to provide a bit more context about what's in this range, because what I am worried about when I listen to the City is that the City wants us to go through certain pages and say, all right, for each example and say the arrest happened on this date, these were the people who were involved, this is the date that the interpretation happened, this was said at the interrogation, this is what the person said is false, and that is just unmanageable for us to do.

THE COURT: Yeah, I can appreciate that position. I also am of the belief that it's not a party's responsibility to provide that finite of a roadmap to the other side.

I guess what I'm saying is when I compare the original response to the interrogatories that was attached to the motion that was filed, you know, whenever it was a few weeks ago now and I look at the revised response that the plaintiff submitted on August 14th, that they provided to the defendants on August 14th, I think we're moving in the right direction, and yet I still don't think that this is specific enough.

MS. SPENCE: So I just wanted to clarify the specificity is the specificity with regard to the reference to the documents where it could be cured by providing more context via parentheticals that describe the documents that are --

THE COURT: I also agree with the defendants that plaintiffs do need to make more of an effort to delineate which aspects of their answer tag to which aspect of the *Monell* claim.

I understand your point, Ms. Spence, that in certain, in response to certain interrogatories you've added language that says, you know, in addition to everything that I've said above, here is another sentence.

I'll be honest, some of the sentences you pointed me to struck me as so generic as to be unhelpful. So, for example, you pointed me to an answer where there were two additional sentences. The second sentence was the one that referenced Shari Shannon. That struck me as sufficiently detailed, because you're identifying a particular individual.

But the preceding sentence, when you say that "In addition, the City of Chicago had a policy and practice of concealing its officers' coercion of witnesses and suspects and its fabrication of evidence against criminal suspects," my reaction to that is, well, that's a theory, but that's not the evidence that supports it.

MS. SPENCE: Right. Those are the people in the parentheticals in interrogatory number 1.

THE COURT: And therefore I think that it needs to be spelled out. I mean, I understand that it is more work for sure. But I think given the nature of the interrogatory responses, I think that level of work and that level -- some additional level of detail is required. And I say that in part because then when I look ahead, when I looked ahead -- I shouldn't say looked ahead.

I did review the parties' filings on the Rule 30(b)(6) deposition testimony. But then I found myself coming back to the interrogatory responses and having a hard time assessing what is a fair scope of a deposition topic until I have a clearer idea of what the plaintiff's theories are and what the evidence is to support it.

I guess what I'm trying to say is at this point I have no real sense of which aspect of the *Monell* claim features more or less prominently in the plaintiff's case. And I have to believe that three years into this litigation that some claims are stronger, some aspects of the claim are stronger than others and some aspects of the claim are weaker than others. And, you know, at the close of fact discovery we should be able to figure that out.

So all of this is a long way of saying that I will grant the defendants' motion to compel interrogatory, yeah, I

will grant the defendant City of Chicago's motion to compel plaintiff to answer the interrogatories that are at issue that are outlined in the motion that appear at docket 235.

The City has asked me, the relief that the City has asked is a 14-day turnaround time. I mean, that seems reasonable to me in light of the work that needs to get done. At the same time I think -- tell me, I want to hear from the parties as to whether you think I'm wrong on this, but I do think we have to take this somewhat in lockstep and then look at the interrogatory responses first and then talk about the Rule 30(b)(6) deposition.

MR. BRUEGGEN: Yes, Judge, that was kind of what we talked about in our 37.2s on the 30(b)(6)s. We asked them to supplement their answers to interrogatories so we could get a better understanding of the scope and proportionality of these claims so that we could discuss them in good detail. So we think that's the appropriate way to move forward.

THE COURT: Okay. So then, Ms. Spence, do you disagree with that?

MS. SPENCE: Do I disagree with the timeline?

THE COURT: The timeline.

MS. SPENCE: If we could ask for three weeks? And the reason is there are four of us on the case, two of whom are dealing with summary judgment motions, multiple summary judgment motions that are due in the first half or the first

two weeks of September. Another person is on trial. So it would fall on just one person to do these. And so if we could get three weeks, that would be very helpful, Your Honor.

THE COURT: Okay. So that would take us to September 17th.

MS. SPENCE: That works for plaintiff, Your Honor.

THE COURT: So then thinking about the Rule 30(b)(6), let's call it the Rule 30(b)(6) motion, I guess what I would like to see happen, here is my hope, that the plaintiffs provide re-revised interrogatory responses. The defendants look at them and say, these are great. Now we can sit down and go back and renegotiate, reopen negotiations with respect to the Rule 30(b)(6) topics.

And then you would come to me and say, great, we figured it all out on our own or we've narrowed the scope of our dispute and this is what's left.

So I'm seeing nods that this generally is the plan. And so I guess my question is if the interrogatory responses from plaintiffs, the revised interrogatory responses come on September 17th, how much time do we want to give the parties to meet and confer on the Rule 30(b)(6) deposition topics before any kind of renewed motion to compel with respect to the Rule 30(b)(6) deposition topics would be due?

MR. BRUEGGEN: Judge, sight unseen with what the answers are, it's a little difficult, but I would say at least

two weeks. You know, if we get the fulsome answers you discussed, it might be easier without having follow-up because maybe there would be some follow-up when they answer and say, hey, please give us this information too because it's important for the 30(b)(6). So hopefully two weeks, and hopefully we get fulsome answers.

MS. MEADOR: And perhaps so if two weeks brings us to, is that October 1st? You know, maybe the following day we can provide the Court with a status report as to where we are, like if we're still engaged in discussions or you know what I mean? It's just a thought as an option.

As opposed to filing motions, right, causing more motion practice, right, if we say, okay, we've talked, we've talked through these couple of topics we're agreed on, we're moving forward; these, we're still at issue, but we might be able to negotiate it. I don't know. It's just a suggestion.

THE COURT: Yeah. I mean, I did notice with respect to the Rule 30(b)(6) motion that even just in between the motion and the response there seemed to have been some narrowing of the dispute.

But, Ms. Spence, you look skeptical.

MS. SPENCE: No. It's the way that Ms. Meador made it seem like I would reject it outright. I'm open to filing a status report.

I do think, Your Honor, I don't think this is

uncommon, but I do think that this has been a case where the parties have engaged in a lot of conversations. If you read our conferral paragraphs they go on for pages.

THE COURT: No.

MS. SPENCE: And so I do think that we are trying in good faith to narrow the issues. And we can get the supplementation, do the conferrals and then present to the Court where we are and then set a briefing schedule if there needs to be a supplemented motion or amended motion.

THE COURT: Okay, all right. Let's do that. So the motion is granted with respect to the interrogatory responses. The plaintiffs will provide revised interrogatory responses by September 17th. And I will look for a status report from the parties on October 2nd telling me where things stand with respect to the dispute over the Rule 30(b)(6) deposition topics.

In the meantime, I will deny without prejudice to renewal the motion on the Rule 30(b)(6) deposition topics that has been filed. It's effectively -- I feel like it will be rendered somewhat obsolete in light of the revised interrogatory responses and the parties renewed negotiations.

MS. SPENCE: Your Honor, if I may just revisit plaintiff's motion to compel by a date certain the City's responses. Interrogatory number 15 does speak about this, the file. And for most of the case up until the most recent

conferral, and this is again the parties -- plaintiff has diligently been trying to talk to the City and work with the City on trying to get this information. The City has consistently represented that it was going to supplement and it's working on getting the documentation. That is in part why this got filed belatedly.

THE COURT: Can you just pause for a second, Ms. Spence --

MS. SPENCE: Sure.

THE COURT: -- so I can pull up -- it helps me to --

MS. SPENCE: Yes.

THE COURT: -- have the motion in front of me.

MS. SPENCE: So this would be 256, Your Honor.

THE COURT: Yep. I've got it.

All right. And then I'm looking at interrogatory number 15 was asking for documents responsive to the plaintiff's discovery request that have been lost, discarded, or destroyed. Tell me more.

MS. SPENCE: Yes. So as the parties have talked about it, this interrogatory is really focused on the Doyle shooting investigation, investigative file, because it's -- for most of this litigation, you know, the City cites the retention schedule, and this is not a homicide case. And then in the most recent meet and confer, the City said, you know, we actually can't represent that this was destroyed pursuant

to a retention schedule because we don't have a certificate of destruction, may be lost, which is very important to us about whether or not it has been lost, because it really could, especially if it's unusual that this kind of file has been lost, that it could really play into our *Brady* theory.

And so supplementation as to this interrogatory is really important for our ability to cite the evidence that the City says that we need to put them on notice that we are going to rely on. We believe that it would be, it's going to be informative. So we'd ask Your Honor to just reconsider as to at least interrogatory number 15 about asking the City to or requiring the City to provide a supplemented response to that, because right now all we have are --

THE COURT: Tell me again what you anticipate the answer is going to be.

MS. SPENCE: That the file has been lost.

THE COURT: That the file has been lost, not destroyed.

MS. SPENCE: Not destroyed pursuant to a retention schedule. There is no certificate of destruction that they have found.

THE COURT: You are saying that the City has said that this certificate -- no. There is no certificate. That the City -- you are asking the City to verify in a interrogatory response that the file was indeed lost?

MS. SPENCE: Or that it's not going to -- it's not saying that it was destroyed pursuant to some kind of retention, that the reason why we don't have documents is because of a routine destruction schedule, like it has been destroyed pursuant to that retention schedule.

THE COURT: Okay. All right. And who from the defendants wants to respond to this issue?

MS. MEADOR: Sure. Your Honor, so to be clear, and I'll let my co-counsel jump in, so back during Mr. Pittman's post-conviction proceedings, this issue came up because the counsel for Mr. Pittman, Ms. Rickert, subpoenaed the police department for the file, for the investigative file.

THE COURT: Just to make sure I'm tracking.

MS. MEADOR: Yes.

THE COURT: So it's an investigative file into the shooting of Officer Doyle?

MS. MEADOR: That's correct, yes.

THE COURT: Okay.

MS. MEADOR: And there was, because only certain number of documents were produced, there was a rule to show cause filed in the criminal case. We did not represent the City in that instance. But then there was representation by the City to the Court and to Mr. Pittman's counsel presenting, providing documents, which have been produced in this case, which indicate that the file was destroyed pursuant to the

file retention policy. And the policy was produced and certain documents were produced. We have always operated under that.

Plaintiff then recently said to us, well, you need to provide us with the certificate of destruction. And that's what we are investigating, whether or not -- I apologize. I cannot represent to the Court that I fully understand how the certificate of destruction appears. But that is what we're investigating.

They have said, well, and if it's lost, like we'll presume it's lost if you can't produce a certificate of destruction. Like, well, that's not, that's not, right -- the certificate of destruction could be, well, here is this box of aggravated battery files, right, for a certain year. So that's what we're working on investigating. We've never indicated that we believe that the file is lost.

If I'm misrepresenting, then please let me know.

MR. BRUEGGEN: Yes, Judge, that's the problem, we can't say it's lost or just can't be found. We believe and based on what they were told in the PC is that it has been destroyed pursuant to retention. But we can't commit to that until we can find documentation that confirms that. Obviously we don't want to take a position that is not accurate.

So we've been continuing to look at this. We've given them kind of all the documents that say this is how it

should be handled. Here is the retention schedule. This is how it should be handled. We just are looking to see if there is a document that says, yes, agg bats from these years were destroyed.

THE COURT: Okay. And how far along is your investigation into this? In the search for this elusive document, how far along, how many stones have been, you know, unturned?

MR. BRUEGGEN: A lot of stones have been unturned. And we're hopeful to have a conversation with our client I believe next week sometime is what we're trying to get.

THE COURT: Who is the client here?

MR. BRUEGGEN: The City of Chicago like with -- or CPD, somebody in the record-keeping department that can help us that maybe has been there for a long time that might be able to know where the old documents might be to make sure that we get what we can that exists.

THE COURT: Okay.

MS. MEADOR: That being said, we have produced documents that relate to it. It's just this, you know, we have an ongoing obligation to look for anything that might pertain to it, and we have agreed to do that.

THE COURT: Yeah. Let me make sure I'm tracking the parties' position. So from Ms. Spence's standpoint, the plaintiff wants the best possible representation or the most

firm possible representation from the City as to what happened to this investigative file.

MS. SPENCE: Yes. And for the City, if the City cannot say definitively, for the City to say that, we don't know. Because what we don't want is that when we say -- and this has come up, you know, in the City's briefing about *Brady*, it's like, well, you can't actually prove it.

We don't want the City to then be able to assert, no, it's been destroyed. We want to be able to say, no, you've taken this position. You told us what you know about the file or what you cannot say about the file, and that part is clear. I think it would also resolve some of those topics in the 30(b)(6) about retention and the search for the file, because we'd at least have a clear answer as to what has gone on.

THE COURT: Okay. But what you are not saying, Ms. Spence, I want to make sure I'm tracking this, you're not hewing so strongly to the idea that there has to be a firm answer either way from the City in the sense of you're not -- you're open to the idea that the City may never be able to conclusively tell you, yes, it was destroyed, here is the document; or yes, it was lost, and here is how we know it was lost; that there is a distinct world in which the City could say, this is what could have happened. This is what should have happened. We haven't been able to confirm either way what did actually happen. And then you can do with that at

trial what you want.

But I guess I just want to make sure I understand you to be not adamant that there has to be like a black and white answer at the end of the day.

MS. SPENCE: Correct. I don't believe there has to be a black and white answer. We just want the City -- to know what the City knows and understand what the City is not going to be able to say about the file, affirmatively say in one way or the other. Like maybe -- mostly because this whole time we believe that it's just been destroyed and that has been the close question, which is why the Rule 30(b)(6) and the theory about retention and what it means for policy and practice, like that's how our theories got formed is based on that understanding.

And while it may, there may have been searches in the post-conviction proceeding, this is a new proceeding with different counsel and different conversations with the City, and so we want to be able to kind of clear that up.

THE COURT: Okay. And so from the City's standpoint, how much more time do you need before you are comfortable making a final assertion of your state of knowledge with respect to this file?

MR. BRUEGGEN: Judge, that's hard. Like I said, we're hoping to talk to somebody next week. Hopefully that person will have the answer. But we could get referred to

another person. So if we could have at least three weeks, because we might have to unfortunately track people down, especially since this filed is old, from 2001, so we're talking now 25, 30 years, and so if we could find someone who was around who might know how things worked, that would make us feel more comfortable about taking a position.

THE COURT: Okay. So I will grant the motion. I will reconsider my earlier denial of the motion as just blanket untimely to the following extent, I will grant the plaintiff's motion to compel the City to answer interrogatory number 15 by September 17th. So you both have deadlines that day. And that's the extent to which I'm granting the motion.

I say that last piece because I note that the motion also talks about additional discovery that might follow. I'm only granting the motion to the extent that you are going to get an answer, that the plaintiff is going to get an answer to the interrogatory.

MS. SPENCE: I understand, Your Honor.

THE COURT: Okay. All right, folks, is there anything else that -- sorry, let's talk about plaintiff's motion for rule to show cause with respect to Ms. Owens.

Is there any opposition to this motion from the defendant, from any of the defendants?

MS. MEADOR: Your Honor, I think we had discussions while Ms. Owens, they were trying to serve Ms. Owens. We

understand the difficulty sometimes that is presented. We have the same issues.

There is more information in the motion than we were provided about the circumstances. My only concern was that the procedures were being followed that, okay, the case law says you send it certified mail. When the green card is returned, you have confirmation that the person received it.

I didn't get that information from plaintiffs. I do see in the motion that it appears that someone had a hold of the subpoena, but then it was taken back. But then another copy was left in the mail.

If those representations aren't right, like, you know, if Ms. Owens had an issue with it, she could come forward and, you know, after the rule to show cause and address it. But it's just our position that we just want to make sure that the appropriate underlying connections have been made confirming Ms. Owens did get the subpoena in order to issue, for this Court to issue a rule to show cause.

THE COURT: Ms. Spence, anything you want to say on that?

MS. SPENCE: So we've offered to -- we've made two requests of the Court: The rule to show cause, which we believe is a very serious hearing, or just an order compelling her to sit for a deposition. We believe that she has been served, not because of the certified mail because the postal

worker was told that the addressee didn't live there, but by having it left in the mailbox at a place that she resides, at a place that she was seen going in, and no one in that house has told us this year that she doesn't live there. And so we do think that that would be appropriate. Really and truly, we just want to get her to -- we just want her to just sit.

THE COURT: Yeah, I understand that. I guess my question is, and I recognize a rule to show cause is a serious move, and it can quickly devolve into, you know, a writ, an order of writ of body attachment, which is a very big deal. I guess my question for you, Ms. Spence, is why not go straight there? Maybe I've answered my own question already. But if she's not responding to the efforts that have already been made -- and I guess I'll say that I read the motion. I read the accompanying materials. It does seem like there were several efforts to notify her of the deposition and that the process server or the investigator, I should say, the investigator met with some serious hostility per the materials that have been presented in front of me.

And so I guess just practically I'm wondering what do we accomplish by going the alternative route first as opposed to going straight to the rule to show cause?

MS. SPENCE: We are really sensitive to arresting, having people arrested, particularly in a civil matter. In my experience, providing them with a court order saying that if

you don't come, you may be arrested, typically starts the conversation so that we can -- we don't even need sometimes the Court's intervention at that point. We can say, can you just come? Let's sit or we'll do it at the courthouse, we'll get it done. And that usually is enough to get people there without sending the marshals. I know also that the Court's resources are very limited, and the marshals are very busy. And so to the extent --

THE COURT: Yeah, although I wouldn't jump straight to the marshals, right.

MS. SPENCE: Okay.

THE COURT: So the way I do it, if I granted your motion on option A to grant the rule to show cause, what I do is I set a date for her to come to court for a hearing. I'm looking at the language that I typically enter. I would set a date. I'd say, you know, motion for rule to show cause is granted to the extent that you have to show up on XYZ date. Plaintiff is directed to serve Ms. Owens promptly with this order, to provide proof of service on the docket. If she fails to appear on the date of the hearing, she risks -- my standard language is she risks sanctions and the issuance of a writ of body attachment.

And then I include language explaining to this nonlawyer person who is out there what that actually means. And so my minute order would read for Ms. Owens' benefit, "The

Court adds the following explanation. If it grants a motion for writ of body attachment, the marshals will be charged with arresting her and bringing her directly to court."

And then I say if she appears for her deposition before the hearing, rule to show cause hearing will be canceled. Onus is on plaintiffs to tell me if Ms. Owens has shown up for her deposition or, you know, I leave it in your discretion to reach out to my courtroom deputy and say, we have a date for the deposition. We've had conversations with her. We don't think this is going to be a problem anymore. And then I vacate the rule to show cause hearing at that point.

I say all of this to assure you that I'm not contemplating sending the marshals out today. It's really just a question of do I enter an order granting the motion for rule to show cause and setting a rule to show cause hearing or are plaintiffs, do you really want me to take that interim step of just issuing an order telling her you have to show up for a deposition, and then if she doesn't, then we'll do everything else that I just laid out.

MS. SPENCE: I understand, Your Honor. We'd prefer the rule to show cause hearing just for the reasons that you are elucidating, that it's more efficient to do that.

THE COURT: Okay, all right. So I'll grant the motion for rule to show cause. I'll enter an order along the

lines of what I just spelled out. The one thing we should decide now is what date you want me to set that rule to show cause hearing for because I would expect you or someone for plaintiff to be there, Ms. Spence.

And I'm happy to set it out, you know, a couple of weeks so that you have the time to try to negotiate with Ms. Owens and show her this copy of the minute order and see if that changes her mind.

MS. SPENCE: Is the Court available on the 24th of September?

THE COURT: Yes. Could we do it at 10:00 a.m.?

MS. SPENCE: Yes, Your Honor. I'm sorry, the 23rd, I know I just said -- we have a deposition in this case on the 24th, and so I'd have to fly.

THE COURT: 23rd is fine. But 23rd at 10:00 a.m.?

MS. SPENCE: Yes, 10:00 a.m. works for plaintiff.

MS. MEADOR: Can I ask --

THE COURT: Actually, I'm sorry, 10:30.

MS. SPENCE: Sure.

THE COURT: 10:30 on the 23rd. Yes, Ms. Meador.

MS. MEADOR: Can I ask, and we can maybe have this conversation with plaintiff's counsel before then, if you guys want to loop us in on your -- if you have luck speaking with Ms. Owens. But, you know, if she does appear and for this hearing, you guys want to go ahead and take her deposition --

MS. SPENCE: That's usually I think --
MS. MEADOR: -- with Your Honor?
MS. SPENCE: I think that would be helpful. And we could do it at our office. I've done it at this courthouse as well.
MS. MEADOR: Right, just --
MS. SPENCE: Just so they go straight upstairs.
MS. MEADOR: Yeah, grab a witness room or something.
THE COURT: Really? That's fine.
MS. MEADOR: If that's an option. Jury room.
MR. MORAN: It's more comfortable.
THE COURT: So comfortable in there.
MS. SPENCE: We would make the arrangements if Your Honor is open to us doing it here.
THE COURT: That's fine, yeah.
MS. SPENCE: We can do it here.
MS. MEADOR: That sounds good.
MS. SPENCE: It's efficient.
MS. MEADOR: I don't know if we'll have any luck talking with her before. But if she goes, then we're all here.
THE COURT: Yeah, so I'll block off my jury room on September 23rd in case it turns into a deposition.
All right. And then that leaves the last two motions. I know I said what I said about the fact discovery

deadline being what it is. I'm wondering whether the parties see any value in me resolving the motions on the duplicative depositions and the Halloran deposition so that that speeds -- I don't know to what extent that would help facilitate negotiations over when the depositions are actually going to take place.

MR. MORAN: Assuming -- I don't mind doing what you instructed, Judge, and having a conversation about resolving it. That's fine with me. Obviously I don't know if we'll get all that done before the 31st. So we'll probably have to build in a little time after that, but --

THE COURT: Yeah, I mean, you would be on your own for when the depositions took place. I'm just saying to the extent the parties are disputing the length and the scope of the depositions, do you want me to rule on the motions in that regard?

MS. MEADOR: I think from the City's perspective, we want to see the answers to the *Monell* interrogatories so that we can understand, at least not with regard to Mr. Halloran's deposition, but with regard to the 404(b) witnesses. And then I think it would be our position, if necessary, we would move for a protective order or --

THE COURT: Yeah, but then you'd be past the discovery deadline.

MR. MORAN: While she's contemplating that, I should

say that we do at this table view these witnesses, these 404(b) witnesses as wearing two distinct hats. One is the *Monell* hat. One is the 404(b) hat. They don't overlap. They're not the same.

So I just want to put that out there because I think it does -- I think the City's point is valid as to knowing what position these witnesses would take relative to *Monell*. Obviously today I can tell you what I think about 404(b) because I know we all know more about that today.

THE COURT: Okay. I'm not sure I understand the through line there.

MR. MORAN: It's a dividing line really.

THE COURT: No. I meant so what I'm trying to figure out is what more you need me to do today.

MR. MORAN: I think we should meet and confer again. And based on your comments, if we need to come back, we can let you know.

THE COURT: Ms. Rickert, actually, can you enter your appearance.

MS. RICKERT: Yes. I'm sorry I was late. I was in a deposition for this case I believe that went longer than anticipated.

I actually saw you this morning.

So Julia Rickert, R-I-C-K-E-R-T, of Loevy & Loevy for plaintiff Marcelous Pittman.

I would like to speak to the protective order that was just filed regarding Detective Halloran. And I understand from my colleagues that there is no discovery extension. And so I think that we do need a ruling. And also I would like to orally move to compel his deposition. And if I could just say a little bit.

This deposition was scheduled previously. It was rescheduled because, I understand, because of health issues. We were patient when they wanted to schedule it for the very end of discovery. We were a bit apprehensive, but, you know, we're not trying to force someone to come in when they're not well. And he's obviously a main defendant here. He has never been deposed or given any testimony about the details of this investigation.

And this deposition was scheduled for yesterday. Ten days, so on the 14th, we reached total impasse. We were very clear we were never open to time limits on his deposition, you know, beyond the seven hours provided for in the federal rules.

They scheduled the deposition, agreed to it after we noticed it without any conditions attached. Ten days after we reached impasse, so Monday afternoon, less than two days before the deposition, they said he's not coming. He's not coming. We're filing a protective order because you won't agree to limit his deposition to four hours. And we don't

agree that your offer to make a good faith effort not to tread old ground will be honored.

And considering that in between during these negotiations over these depositions Detective O'Brien, the other main defendant in the case, was deposed. He was deposed for a full seven hours on the facts of this case. He was not asked questions about his disciplinary history or his pattern of misconduct, and they all are aware of this.

So the fact that Detective Halloran did not show up for his deposition, I think he has, you know, violated the rules. I think it's potentially sanctionable. And we were very clear that the discovery was ending and this was very problematic. I could go more into the reasons why I don't think time limits are appropriate. I mean, the main reason a time limit is not appropriate is because this a complicated case with many, many witnesses, at least nine teenagers who say they were coerced in addition to our client, a 12-hour interrogation, et cetera. So the time limit I don't understand. I mean --

THE COURT: Ms. Rickert, can I ask --

MS. RICKERT: Sure.

THE COURT: -- so the motion from the defendants represents that Mr. Halloran, I'll call him Mr. Halloran, he's been deposed eight times, and he's testified in three post-conviction proceedings. His most recent deposition was

in February of 2023, and that his most recent post-conviction testimony was in July of 2026. Does that all track for you factually?

MS. RICKERT: You know, I am not aware of what's happened in every case. I don't know when he last testified in a post-conviction hearing, if it was in July. I know when he testified in the post-conviction hearing in Mr. Pittman's case back in 2022. That was a very limited proceeding on what happened in the interrogation room. It had nothing to do with the investigation before that, and it wasn't discovery. It was a presentation for the Court.

THE COURT: So has your firm or have you or anyone else at your firm deposed Mr. Halloran in any case?

MS. RICKERT: I have never deposed Mr. Halloran. I believe that Ms. Spence has deposed Mr. Halloran in another case. And I understand, asked because there is a *Monell* claim there I believe or at least -- I'm sorry, there is not, but a 404(b), potential 404(b) evidence being collected, that she asked some basic questions about the complaint in Mr. Pittman's case, but not by any stretch a fulsome round of questioning on the circumstances of the case.

THE COURT: Ms. Spence, how long, do you have any recollection as to how long that deposition was?

MS. SPENCE: That was litigated in -- Mr. Halloran in that case had interaction with one witness. And Judge Ellis I

believe set a five-hour time period for that limited -- right, he was not a defendant. He was a third-party witness and had a very, very limited role. And so that was five hours I think on the record. It was five hours total, six hours in length.

And as to the Pittman allegations, I believe there may have been four questions about it. It was very cursory.

THE COURT: How much time, do you have any recollection as to how much time in that prior deposition Officer Halloran, Mr. Halloran spent talking about his history, his training and CRs?

MS. SPENCE: I do not. It was a number of years ago. So I don't remember. But I anticipate where the Court is going. And this is something that we have said to the defendants, is that we don't have intentions of really going into the background more than we really need to. I mean, to the extent that he is unavailable for whatever reason, to the extent he's unavailable for trial, being able to present a video, a video deposition that is straightforward and clear and not requiring us to pull transcripts from other places just to create foundations for certain questions, right.

If you are going to talk about interrogations, we need to establish that you got training and your training experience on interrogations and writing reports, like those things do just at a minimum need to be established, and we don't plan on doing a lot more than that.

THE COURT: Can you tell me foundationally why you are concerned that he might be unavailable at trial?

MS. RICKERT: Because he has not been able to attend his deposition due to health matters. And I haven't pried into what those consist of or whether -- you know, he is not young. And, you know, I hope he is fully recovered and wish him all the best health. But there is that -- there is always that possibility, it seems, greater here because he has been unable to attend proceedings in this case so far. So that is part of it.

And additionally, you know, we don't have a desire to waste time. We don't have a desire to tread old ground. We're not getting paid by the hour. You know, this is -- we want to get to the point and get through it.

I do want to make one important point I think on the record. While these witnesses have been deposed many times, it is not relevant that they've been deposed by attorneys who work at Loevy & Loevy. Those transcripts are available to all. And if they would not make this argument if Mr. Pittman was represented by someone else, I don't think it's a fair argument to make here. Mr. Pittman's ability to pursue his claims should not be limited by what attorneys he chose.

THE COURT: All right. Let me hear from counsel for Officer Halloran, Mr. Halloran.

MR. MORAN: Of course. And I think obviously then we

are going to be asking for you to make a decision it looks like instead of trying to talk it out.

So the discussions regarding what to do with these depositions, 404(b)s and Halloran and O'Brien occurred, it started in July, July 8th as a matter of fact. And this is in the exhibits that you have. And they asked if we would agree to, you know, they're going to oppose -- they told us they're going to oppose 404(b) deps.

We said, hey, what about O'Brien and Halloran? And this is an email on July 9th, and I can't remember, I think it was Lindsey Hagy wrote it, she said, we'll be as efficient as possible at Detective O'Brien's deposition but cannot agree to question him on any topics. So we're at an impasse on your requests. And then there was a request for further discussion.

Well, as you just heard, O'Brien's deposition went seven hours. Now, I wasn't there, unfortunately, so I can't tell you exactly what happened. I don't have the transcript before me. I've inquired with my colleagues. I'm told that it was not just seven hours of straight questions on the Pittman arrest and investigation. There was more to it involving other things that I think would have fallen under the category that we're concerned with.

So right there you have a situation where --

THE COURT: Such as what? What are the things that

you are most concerned about?

MR. MORAN: We're talking about a deposition where questions are re-asked that don't need to be re-asked.

THE COURT: Such as?

MR. MORAN: I'm sorry.

THE COURT: Such as?

MR. MORAN: Background, training, what his understandings are of the policies and procedures of the Chicago police, things like that.

Now, Detective Halloran has actually testified in nine depositions. I mistakenly left out of the motion that Ms. Spence took his deposition in the Arnold Day case, which was limited to five hours. So he's actually testified more than we anticipated or put in the motion.

But he's testified in the Pittman post-conviction hearing. I think, and, Judge, these are the things that I think are fair to ask about multiple depositions. There is a narrow area of inquiry in which other parties have had ample opportunity to explore, which is now available to the plaintiff. Preventing depositions is especially appropriate when the deponent has already been deposed on the same topic. We're talking about those same topics again.

THE COURT: But that's why I'm honed in on what are the areas of concern.

MR. MORAN: The CRs.

THE COURT: Okay.

MR. MORAN: Multiple CRs at length from attorneys -- by attorneys from Loevy & Loevy, including day long hearings and post-conviction hearings over at the Circuit Court. His training, his background, his understanding of street files and, you know, what the concepts, the *Brady* concepts, all of these things have been -- he's been questioned on all of these topics at length ad nauseam, and it happens over and over at every deposition.

He's been questioned about what he understands the law to be on these subjects. They go through his training from like, I mean, detailed like what year were you a police officer? What year were you this? What year were you that? These things don't need to be covered again. They go through the allegations that have been raised against him.

THE COURT: Allegations raised against him in other cases?

MR. MORAN: Yes.

THE COURT: Okay. Because I think we can all agree that if they wanted to, I mean, that there is no limitation in terms of scope on how many questions they could ask about allegations related to Mr. Pittman.

MR. MORAN: Of course. I don't have a problem with that. If they want to ask him questions about Mr. Pittman, and we put that in the motion, by the way, we said we

understand he's going to be deposed, and we understand that he should, you know, he's going to sit for questions as to the investigation, his role in it, what was done. He did not question every single witness.

And I know in this case there were a number of witnesses who were at the park when the shooting occurred, and, you know, a lot of other police officers were involved in that. But, you know, be that as it may, I understand that there is going to be questioning as to these subjects. I don't think there needs to be seven hours of questioning on these topics. And I think that, you know, I haven't seen any evidence that that's necessary. But if we're just talking -- I mean, if everybody agrees that he's not going to be questioned again about his background, training, understanding of the policies and procedures, the street file issues, the CRs by other people, other lawsuits that have been filed against him, if they agree to that, then all we're talking about is how much time is appropriate for questions as to the Pittman case.

THE COURT: So let me in the spirit of being transparent, let me say that I don't like the idea of limiting a deposition in this situation, I don't like the idea of limiting a deposition in terms of subject matter, because I think it's just going to lead to a lot of fighting at a deposition about what is within bounds, what is without

bounds. Selfishly, I don't want to field phone calls from everyone during the deposition. And so my inclination is that if I were to grant the motion, it would just be with respect to some amount of time.

MR. MORAN: I think that's fair. I think if you limit it to four hours, then the plaintiffs are forced to be efficient, and it probably eliminates those types of vague areas in which you are concerned about the parties raising objections.

THE COURT: Ms. Rickert, what is your or anyone at the plaintiff table?

MS. RICKERT: Yes. I'm much more concerned with the time limit issue. You know, even a third-party witness, if you want to depose them for seven hours, you can. Detective Halloran was deeply involved in this case. This case does involve a lot of witnesses and people other than Mr. Pittman who were coerced. I am quite certain that I could ask relevant, questions that were not previously asked for much more than seven hours.

We aren't asking for more time. But there is no reason why Mr. Pittman's ability to question one of the main defendants in his case should be limited to less than the third-party witnesses in this case that have testified without any restraint.

I am not intending to use seven hours for fun. I

don't have any reason to do that. I would love to get through it quickly. I will say that, with all respect, there are sometimes behavior that I consider obstructive and time wasting when it comes to asking questions. Four hours is simply not enough. And I see no basis in the law to limit Mr. Halloran's deposition so drastically for one thing, but also in any way.

I mean, he has never been questioned at length on the investigation in this case. Again, the only questioning of him of the interrogation was in the context of a court hearing, which is not discovery. And I do have seven hours of questions for him that are directly relevant to Mr. Pittman. I don't believe that I have follow-up questions that I want to ask about things that he's testified about before. I think that if I did, that would be fair game.

And I think it's worth pointing out the reason that Detective Halloran has been deposed so many times is because so many people have credibly accused him of abusing them. He shouldn't get a break for his personal comfort or to inhibit our ability to get the answers that we need for trial because he has been credibly accused of abusing a whole lot of people.

THE COURT: Mr. Moran, what's your response to the concern that Mr. Halloran will be unavailable at trial?

MR. MORAN: I think that's exaggerated, frankly, Judge.

THE COURT: But then I have to ask the follow-up question. Like Ms. Rickert, I'm really not trying to pry.

MR. BRUEGGEN: I'm happy to disclose.

THE COURT: I don't need personal information on the record that Mr. Halloran would not want. But it strikes me as a plausible concern when I'm told that his deposition has been delayed because of health concerns.

MR. MORAN: This was several months ago. So I'm going off memory. I don't have it in front of me. It's a little vague, but my recollection is that it was an episodic thing, like cold or flu symptoms that got in the way. He is not currently dealing with any life-threatening illnesses that would foreseeably prevent him from attending trial.

Judge, to allay that concern, I'd be happy to go and confirm with him that he is of sound mind and body and will be here for trial unless something else happens.

I would also like to point out, Judge, that, you know, there has been talk about what he said at the post-trial hearing. He was questioned. I mean, yeah, that's not technically called discovery, but those transcripts are disclosed in discovery. And they're disclosed in discovery because that's effectively how they've been treated in this lawsuit. So he's already on record. And it's not just like 10 minutes of questioning. It's questioning at length as to the interrogation on direct and cross-examination. Sure, it's

not going to be maybe as in-depth as a deposition, but he's already gone on record.

And I would just also point out, Judge, you know, that the plaintiff's own motion on the 404(b) witnesses lists all kinds of legal reasons why witnesses shouldn't have to undergo multiple depositions. Those all apply in this case.

THE COURT: Yeah, I mean, I'm taking one motion at a time. And I did note earlier what I thought was an ironic juxtaposition of the two motions, meaning that each side is saying that their witnesses should be protected and the other one shouldn't be. I do recognize that they're not all the same. Here what gives me serious pause is the central role that Mr. Halloran plays in the plaintiff's allegations.

And I think that the plaintiff makes a compelling, a very compelling point when pointing out that you have nonparty witnesses here who would be deposed -- if I were to grant the defendants' motion, I would have a very odd situation here where a key defendant in the case has been deposed for less time in this litigation than nonparty witnesses. That just strikes me as untenable.

Four hours definitely strikes me as way too short of a deposition for the amount of ground that needs to be covered.

MR. MORAN: Can I say something, Judge? I don't know that every third-party witness has undergone a seven hour

deposition.

THE COURT: I didn't say every third-party witness.

MR. MORAN: Right.

THE COURT: But even one, even if there is one third-party witness, it just creates an odd dynamic for me.

MR. MORAN: Sure. But, you know, in fairness, those third-party witnesses, that may be the first deposition they're giving in this case, the first time they're testifying in this case. Obviously this is a different situation. It's unique, I understand. Detective Halloran has been accused many times. I would dispute that they're all credible. I think that's, you know, an injection of an issue that doesn't need to be part of this discussion. But it is unique that he's testified so many times. And I think, you know, that's what sets it apart a little bit.

But I see where you are going, Judge. I just, you know -- there has to be a way for us to ensure that this is not going to go over the line from asking questions about Marcelous Pittman to other areas that have already been questioned. So, you know --

THE COURT: I've already said that I'm not limiting with respect to scope. And if plaintiffs want to use their seven hours to explore ancillary matters to the detriment of the core, paying enough attention to the core allegations, then that's perhaps an unwise strategic move that they would

make. But judges don't police people's division of time with respect to depositions. I don't look over people's deposition outlines and tell them, oh, you should really spend more time on X versus Y.

All of which is to say is that I am not persuaded that Mr. Halloran should sit for anything less than a seven hour deposition. And so the motion for a protective order with respect to his deposition is denied.

MR. MORAN: Judge, can I ask for one thing, I guess? Understanding your order, and I'm not going to dispute what you're saying, I would ask though that we be given leave to instruct him not to answer when we think it has crossed the line.

THE COURT: No, no.

MR. MORAN: No? All right.

THE COURT: That request is denied. Okay.

MS. RICKERT: Your Honor, I'm sorry to jump in, but one question, and that is when he will be deposed, because discovery is closing in days. He was supposed to be there yesterday. I need some kind of commitment that he is going to show up for his deposition because this was not how it should have gone.

MR. MORAN: Okay. You know, the idea that he's not showing up, Judge, is not borne out in the record.

THE COURT: What's the date?

MR. MORAN: I mean, I will get a date and I will make sure it's within a reasonable timeframe. I don't know if we can all get it done by the 31st, but I think within the next couple of weeks for sure. We had, you know -- I think that's not going to be an issue. So he's shown up for multiple depositions over the last 20 years. He's not going to blow this one off.

MS. RICKERT: He didn't show up yesterday, which is the reason that I'm asking for, you know, a commitment that this will happen. I don't need a specific date, but if we can all agree that he will indeed be deposed in this case sometime in the near future, I will be satisfied.

MR. MORAN: Okay. So I'm --

THE COURT: I'm happy to be even more specific than that, Ms. Rickert. Sometime in the near future strikes me --

MS. RICKERT: Sometime in the next two weeks.

MR. MORAN: Well, we're supposed to be back, what, the JSR is to be filed by the 17th?

THE COURT: No. October 2nd.

MR. MORAN: Oh, October 2nd. What was the 17th?

THE COURT: The 17th is the deadline for the revised interrogatory response --

MR. MORAN: He'll be deposed by then.

THE COURT: -- and the answer to interrogatory 15 from the City.

MR. MORAN: How about we put it on that, tack it on that date, he'll be deposed by then.

THE COURT: Ms. Rickert, any opposition to that plan?

MS. RICKERT: That's acceptable to me.

THE COURT: Okay, all right. So the motion is denied. And I'll grant the oral motion to compel that Mr. Halloran sit for his deposition by September 17th. Okay.

MR. MORAN: So, Judge, as to the 404(b) --

THE COURT: While I'm here just doling out rulings.

MR. MORAN: What's fair is fair.

THE COURT: No, no. Yes. The line in the sand that I've drawn is with respect to the deadline and when these things take place. But yes, if it would help the parties' meet and confer efforts for me to resolve the other, the last motion, I'm happy to do that. I did spend some time with it.

Can I just say here are my thoughts on that motion. It's motion to compel to prevent, I'll call them the six duplicative, allegedly duplicative depositions. This is at docket 245. I would deny the motion with respect to Coleman and Ward because they've only been deposed once and in each instance several years ago.

MS. WAGNER: Could I just say, Judge, it's plaintiff's position, I know that we listed this all out in our motion, but I believe that Tyrone Reyna's deposition is only one at issue because that's the only deposition that

defendant officers have pursued in advance of the discovery deadline.

THE COURT: Did the defendants agree with that?

MR. MORAN: No, Judge. This issue came to a head on July 8th, where they told us they were going to oppose all these depositions and there was a good --

THE COURT: Oppose or pose?

MR. MORAN: Oppose. There was a good three to four-week period where there was emails being exchanged back and forth on August 14th, I think. The plaintiff finally filed their motion. So we were in the process of hopefully resolving their opposition. It didn't happen.

And, you know, I suppose we can go ahead and during our 37.2 discussions and notice depositions, but I think that tends to be contrary to the spirit of 37.2 and would only inflame tempers perhaps. I think it's easier to try and get an agreement and then notice the depositions. So I don't think we should be punished for not having noticed depositions in --

THE COURT: You're saying that the 37.2 discussions were for purposes of selecting a date or for purposes of resolving this --

MR. MORAN: The objections.

MS. WAGNER: To be clear, Judge, they only subpoenaed Tyrone Reyna. They didn't issue subpoenas regarding the

others. For completeness, plaintiff said we oppose Tyrone Reyna's deposition. And if you were to pursue depositions of other *Monell* witnesses who have been previously deposed, we would also oppose those. But it wasn't until August that they said they're pursuing the others.

Also, if you look to the most recent JSR filed by the parties in July, the only deposition listed there of the deposed six was Tyrone Reyna. So it was not clear to us that these depositions were going to be moving forward until about two weeks ago. It's our position --

THE COURT: Just pause right there, Ms. Wagner.

MS. WAGNER: Yes, that's right.

THE COURT: Just give me one second to look at that joint status report.

MS. WAGNER: Yes, it's the one from July 27, 2026.

THE COURT: Yeah, I see what you are saying, Ms. Wagner, that at docket 233, of the six potential deponents that are at issue in this motion, the only name that appears is Mr. Reyna's name. And this was presented to me as sort of the plan going forward.

So let me hear from the defendants in response.

MR. MORAN: Sure, Judge. On July 7th, plaintiff's counsel wrote, we're planning on opposing the depositions of the *Monell* witnesses. There were no specific names identified. As you know, the *Monell* and 404(b) title is being

used interchangeably. So this issue was teed up by the plaintiffs early on as opposition generally to the witnesses.

THE COURT: I guess my question is if you were planning on deposing Mr. Coleman -- I apologize, I don't remember the genders of each of the individuals. If you were planning on deposing Coleman, Ward, Flewellen, Smith and Wright, why are they not listed on the status report?

MR. MORAN: Unfortunately, I don't have an answer for you on that one, Judge. I wasn't part of producing that at that time. However, I think, you know, in fairness, you know, this was still in the early stages of debate, which included all six of them, not just Mr. Reyna.

And, you know, to say that, you know, all of them cannot be deposed -- and frankly, I think internally, Judge, we probably -- you know, we may not want to depose all six of them or the entire -- I can't remember how many are on the list. I know they identified six who they don't want deposed.

But we internally obviously make decisions on whether we want to take these depositions and whether we are satisfied with the deposition. I think frankly given that there was a debate ongoing at the time, it probably didn't cross anyone's mind except for Mr. Reyna, because we knew he was going to be deposed more recently, or he was supposed to be deposed very recently in his own lawsuit, which obviously got postponed. I don't know if that was like the mindset of, well, he's going

to be deposed, so maybe we'll adopt that for this case. His deposition was scheduled for I think August like 3rd or 4th or something like that. I can't remember. It was early August.

THE COURT: I guess practically speaking, given that you have a discovery deadline of August 31st, you're not going to be able to depose more than one, I mean, more than one person, right?

MR. MORAN: I don't know about that. I think things were evolving in sort of a dynamic way among these discussions. And like I said, we probably would not have tried to take depositions of other 404(b)s just out of --

THE COURT: But then I guess my question is if I have a motion that's presented with respect to six deponents, I need to know which are live disputes.

So then the question comes back to the defendants, of these six, who do you actually want to depose? I think that's a fair question for me to expect a clear answer to given that fact discovery closes on Monday.

MR. MORAN: I would say Reyna is going to get deposed in his own lawsuit. We can just adopt that one. So other than Reyna, I would say I would like -- how about this, give us the ability to take four of them. We won't take all of them. But just as I sit here now, I'm trying to think through what these depositions actually say, and I know some of them --

THE COURT: Yeah, but then it feels like I'm issuing advisory opinions, because practically speaking you're not taking four depositions before close of business on Monday. So then I'm just offering up thoughts as to how long depositions should be that may not take place.

MR. MORAN: Well, I think frankly, Judge, I think the easy way around this is just to say you have until the same day as Halloran, September 17th, to take the 404(b)s. If you can only get one in, you only get one in. If you get more than one in, fine.

MS. WAGNER: If I may?

MS. MEADOR: So if I could, Your Honor, on behalf of the City, because we have a different issue with regard to these witnesses than the counsel for the officers. And we were engaged in discussions with plaintiff for them to, for plaintiff to identify how these witnesses -- they're now calling 404(b) witnesses *Monell* witnesses, okay. So we asked them to identify to us what these witnesses know about the City's policies, practices, procedures.

THE COURT: Okay. So let me just ask a question of the plaintiffs. I understand when plaintiffs are using the term "*Monell* witnesses" to describe these six deponents, you are not actually anticipating that, for example, Mr. Reyna knows about City policies, patterns or practices.

MS. WAGNER: Yes.

THE COURT: Your position is that Mr. Reyna's experiences, his personal experiences support the existence of a policy, pattern or practice.

MS. WAGNER: That's right, Your Honor. And we've included that in our 26(a)(1) disclosures.

THE COURT: Okay. So whether we call them 404(b) or *Monell* witnesses, I go back to my earlier point or one of my earlier points, which was with respect to the *Monell* issue in the City's motions as they were teed up for me in the beginning, at the beginning of the month, I viewed that as requests to show some flexibility with respect to Rule 30(b)(6) issues. But these witnesses are clearly not 30(b)(6) deponents.

MS. MEADOR: Right. And for us they're clearly not individual *Monell* witnesses. If plaintiff is representing, if plaintiff's counsel is representing to us, and Ms. Wagner said earlier all these witnesses are testifying to is this one day event for them and --

THE COURT: Right. But what they want to do is at summary judgment or at trial say, you have heard from XYZ City witness who testified that such and such pattern or policy or practice existed, and in further support of that premise, please look to the testimony of Mr. Reyna or Flewellen or Smith, because you don't just have to take this person's word for it at a high level, but here is an individual person who

experienced that pattern, policy, practice.

MS. MEADOR: Sure. But the problem is their 26(a) disclosures don't say that. They say they have knowledge about the policy, practices and procedures, right. So then for us, I would ask the question: Mr. Coleman, what knowledge do you have about the City policies? No, nothing? Okay, the practices?

Separate from his own experiences, if plaintiff's counsel is representing that each of these witnesses testify only as to their own individual experience, and it's my understanding it's related to physical abuse of Halloran, then there aren't questions we would need to ask, because then they're representing to us, Mr., you know, Ward is not going to say, oh, sure, I saw this policy, right, and I know that. I know about this practice because I know about him and him and him, right.

THE COURT: Are we in agreement on that?

MS. MEADOR: Then we're not in a dispute. Like I'm --

THE COURT: Okay, so I think we're in agreement on that.

MS. WAGNER: If I could just read from --

THE COURT: Are we in agreement on that?

MS. WAGNER: Yes, yes.

THE COURT: Okay. Problem solved.

MS. MEADOR: Then we don't have a dog in the fight.

THE COURT: Great, okay. Back to Mr. Moran.

MR. MORAN: All right, Judge. Looking at the list, we would want Nevist Coleman, Antoine Ward, Derrick Flewellen, and Clayborn Smith.

THE COURT: And then I go back to why aren't they listed on your joint status report?

MR. MORAN: Yeah. And I apologize for that, Judge. I can't, having not been part of it at the time, I can't speak to that. But I also think that their --

THE COURT: Then I think that -- I'm not blaming you.

MR. MORAN: I know, I know, I know.

THE COURT: I just mean this a status report that's supposed to tell the Court what the plan is for discovery going forward. I think Ms. Wagner is correct that if Mr. Reyna's name is the only one that shows up on that list, then that's the only person who is fairly within scope of a deposition to be taken by September 17th.

So I'm going to pause right there, because I do want to check in with my court reporter. She has told me that I have a limit.

See, Jenny, I have a Post-It note that says two hours. We've been going for more than two hours.

(Off the record.)

MR. MORAN: In fairness to my colleagues, Judge, I

would also point out that that JSR did not identify the dispute at all that had been brewing among the parties obviously.

THE COURT: I know. But just it should have been more inclusive.

All right. So we're going to talk about Reyna and how long his deposition can be. And I understand from the record, the motion that's in front of me, is that Mr. Reyna has been deposed twice before, once in 2008 and once in January of 2023. Am I right about that, Ms. Wagner?

MS. WAGNER: That's right. And he is set to be deposed in October in his own case. And I believe Mr. Moran said that we could use that deposition in this case as well. So this might be a nonissue.

MR. MORAN: Well, yeah, obviously I don't mind using that deposition, Judge. Of course, it will probably go the seven hours because it's in his own lawsuit.

THE COURT: Right. Okay. So then it's a nonissue.

MR. MORAN: Now, if for some reason -- there is a settlement conference set in that case in October. If for some reason his deposition doesn't go because of the settlement, because of a settlement -- and I'm not going to say it's going to settle.

THE COURT: Right, right, right, right, yeah.

MR. MORAN: Then we would be back having to deal with

this issue. But I suppose we could bring it up at that time.

THE COURT: Ms. Wagner, what is your response to that?

MS. WAGNER: So we're fine to resolve it now or not. I mean, it's our position that in the January 2023 deposition, he was really thoroughly asked about the allegations.

THE COURT: So let me cut you off there to say that I think a deposition that was taken three years ago is not recent enough, more than three years ago.

So the live question now is what do I do about the fact that there is a possibility that Mr. Reyna wouldn't be deposed in his own case?

MS. WAGNER: So I suppose my --

THE COURT: Sorry, just to finish the thought, my strong inclination is not to kick the can down the road and say, well, let's just see what happens in that settlement conference.

MS. WAGNER: Right. And yes, I suppose that that makes sense. On the other hand, you know, as you said, we are not asking Your Honor to issue advisory opinions. So I think that we can agree to whatever Your Honor thinks best of the situation, I suppose. We don't have a strong position if we resolve it now or resolve it in October.

MR. MORAN: We'd obviously want the full seven hours, Judge.

MS. WAGNER: And we would say two hours maximum would be appropriate. That's what happened in the Day case. Judge Ellis allowed three hours, and then defendants only took two hours with the *Monell* witnesses there. And honestly, we're not sure what new ground is going to be covered.

Tyrone, a quote from the transcript was, "I want to go through all of the physical abuse that you claim the officers did to you" at page 53 of Exhibit H. So it's been covered really thoroughly, and we don't think more than two hours is necessary.

MR. MORAN: So, Judge, I can tell you from experience that a *Monell* deposition --

THE COURT: Let's stop calling it a *Monell* deposition.

MR. MORAN: I'm sorry, 404(b) deposition. You're right. I'm sorry. I'm getting lost in translation.

A person's deposition in their own case is always more detailed. And a regular deposition of someone who is a 404(b) witness is not. Generally there is --

THE COURT: But this wouldn't be a deposition in his own case. We're talking about the deposition that would take place here.

MR. MORAN: Yes, exactly. So if he has now settled his case and he's being deposed here, the level of preparation isn't there, the memory fades, things like that. I think it's

going to take longer than just a couple of hours. And, frankly, given our prior discussion about not limiting subject matter and stuff like that, I don't see any reason to limit this deposition at all if he does not get deposed in his own lawsuit. I think it's fair.

THE COURT: I think you both lost the thread in the sense that I'm trying to figure out timing. Do I compel Mr. Reyna to sit for a deposition by September 17th, because if his case settles, we won't have a deposition in his own case.

MS. MEADOR: I can tell you, Your Honor, that his deposition was postponed to October because his counsel is going to be gone on vacation for the month of September.

THE COURT: So you're saying that I wouldn't get a deposition before September anyway.

MS. MEADOR: Yeah. So I can make that representation that he would not be presented. I think Mr. Greenberg is leaving tomorrow or Tuesday.

MR. MORAN: Tuesday.

THE COURT: Steve Greenberg?

MS. MEADOR: Yes.

THE COURT: On vacation?

MS. MEADOR: Again. He's going to Africa for a month, so we should all be jealous.

MR. MORAN: He's not been shy about telling everyone.

MS. MEADOR: So if that helps address --

THE COURT: It does help. I appreciate that, Ms. Meador.

MS. WAGNER: We would maybe suggest that if you're inclined to rule on the time limit of his deposition, perhaps make it conditional on it can go forward for a two-hour period if the case settles and his deposition doesn't go forward on October 27th.

THE COURT: Yeah, so what I'm going to do is just kick the can down the road and see if the case settles. If it doesn't settle, then he'll be deposed in his own case, Mr. Reyna will. And Mr. Moran has represented that that's sufficient. And so that will be the end of that. If he doesn't get deposed in the other case, then we can revisit his deposition here.

I will flag for the parties, you know, we're going to need to adjust the expert discovery, you know, the rest of the schedule, I think, because we can't embark on expert discovery until all fact discovery is done.

I guess what I'm trying to think through is in a world in which Mr. Reyna doesn't get deposed until after expert discovery has begun, I don't view that as a reason why -- his deposition does not strike me as so critical that we couldn't start expert discovery.

MR. MORAN: Agreed.

MS. WAGNER: Plaintiff agrees too.

THE COURT: Okay. All right. So then with respect to the motion at docket 245, the motion to compel, the motion is granted with respect to Coleman, Ward, Flewellen, Smith, and Wright. And then I'll treat it as denied as premature with respect to Mr. Reyna, okay.

MS. SPENCE: Your Honor, just as to the expert discovery schedule, we will need the 30(b)(6) depositions for expert discovery, and those probably wouldn't happen until October because of the supplementation date.

THE COURT: Yeah, so what I will also do is, let's see, we have expert discovery, so I will strike the rest of, unless anyone has a better way of doing this, but I think it makes sense to strike the case management deadlines that are listed in docket 200 while this limited amount of fact discovery continues over the next, I think it's going to end up being four to six weeks, and then we could reset the schedule. I'm just trying to think through when it would make sense to reset the schedule.

Can I get a proposed schedule from the parties on October 2nd as part of that status report.

MS. SPENCE: I think from plaintiffs that makes sense because at that point we will have at least hopefully narrowed or maybe resolved the issues, and then we can at least have discussion about how many witnesses it would take and how long

we think it would take to complete those depositions.

MS. MEADOR: But also understanding too that it's dependent, right, our -- because, you know, as I explained in our prior hearing, you know, if we need additional discovery based on your clarification of your *Monell* theories, then we will need to address that. We would do that pursuant to our discussions after we get your answer. This is not just limited to what plaintiff gets in *Monell* discovery. It's also with what defendants, the City would be entitled to in order to --

THE COURT: Okay. Let's say this, I feel like we've made a lot of progress today. I will wait for the October 2nd status report, and then I'll strike the case management deadlines with respect to expert discovery, summary judgment today, and then we'll reset them when I have a better sense as to when all fact discovery will be fully, fully complete.

MS. MEADOR: Okay.

THE COURT: Okay. All right. Anything further?

MS. MEADOR: Thank you, Judge.

MS. SPENCE: Thank you, Judge.

MS. RICKERT: Thank you.

(Proceedings concluded at 3:25 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/JENNIFER COSTALES* September 2, 2026

______________________ ____________________

Jennifer Costales, CRR, RMR, CRC